IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COFFIN, on behalf of himself and others similarly situated, | § § § | |
| Plaintiff, | § § | |
| | § | CIVIL ACTION NO. 4:11-cv-00214 |
| V. | § § | |
| BLESSEY MARINE SERVICES, INC., | § § | |
| Defendant. | § | |

## MOTION FOR SUMMARY JUDGMENT
## BY BLESSEY MARINE SERVICES, INC.

Respectfully submitted,

Steven F. Griffith, Jr.
Baker Donelson Bearman
Caldwell & Berkowitz, PC
201 St. Charles Ave., Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000
E-mail:  sgriffith@bakerdonelson.com

Thomas J. "Beau" Bethune, IV
General Counsel
Blessey Marine Services, Inc.
1515 River Oaks Rd. E.
Harahan, Louisiana  70123
Telephone:  (504) 734-2616
Facsimile:  (504) 734-2903
E-mail:  bbethune@blessey.com

**ATTORNEYS FOR DEFENDANT,
BLESSEY MARINE SERVICES, INC.**

**Table of Contents**

Table of Exhibits  ........................................................................................  ii

Table of Authorities  ...................................................................................  iii

I.  Statement of Issues  ...........................................................................  1

II.  Nature and Stage of Proceeding  ......................................................  2

III.  Summary of the Argument  ...............................................................  3

IV.  Factual Background  ..........................................................................  4

    A.  Tankermen at Blessey Marine  ...............................................  4

    B.  Mr. Coffin Chose to Work as a Vessel-
        Based Tankerman, Compensated by a Day Rate.  ..............................  5

    C.  Mr. Coffin Worked Almost Exclusively as a
        Deckhand, with Limited Tankerman Responsibilities.  ......................  6

    D.  Mr. Coffin Spent a Maximum
        of 13% of His Time on Cargo Transfer.  .............................................  12

V.  Summary Judgment Standard  .........................................................  14

VI.  Mr. Coffin is a Seaman, Exempt
    from the FLSA's Overtime Provisions.  ...........................................  15

    A.  Mr. Coffin's Service was Rendered Primarily as an Aid
        in the Operation of the Vessel as a Means of Transportation.  ...........  18

    B.  Mr. Coffin's Maximum of 13% of Work During Cargo
        Transfers is Not "Substantial Work of a Non-Seaman."  ...................  22

VII.  Conclusion  ........................................................................................  24

Certificate of Service  .................................................................................  26

**<u>Table of Exhibits</u>**

1.      Declaration of Dustyn Grenon, dated 6/30/11.

      A.      Vessel Personnel Log for Keith Coffin.

      B.      Analysis of Days and Total Hours Worked by Mr. Coffin.

      C.      Analysis of Maximum Hours Spent
          on Cargo Transfers by Keith Coffin.

2.      Excerpts from the Deposition of Keith Coffin, taken 5/24/11.

3.      Exemplar of Captain's Logs.[i]

---

[i] The Captain's Logs at issue in this case comprise 506 pages of material, are Bates-labeled BM000391 to BM000896, and were produced to Mr. Coffin in April of 2011. Blessey Marine has attached to this Motion those Logs specifically referenced in the Motion, as well as some examples from Mr. Coffin's employment. Pursuant to Fed. R. Evid. 1006, Blessey Marine stands ready to submit the entire set (or any portion) to the Court, if the Court so desires.

# Table of Authorities[ii]

**Page(s)**

## CASES

*Bailey v. Pilots' Ass'n For Bay & River Delaware*,
406 F. Supp. 1302 (E.D. Penn. 1976) ........................................................................ 21

*Bolan v. Bay State Dredging & Contracting Co.*,
48 F. Supp. 266 (D. Mass. 1942) ............................................................................... 21

*Donovan v. Crisostomo*,
689 F.2d 869 (9th Cir. 1982) ...................................................................................... 17

*Gale v. Union Bag & Paper Corp.*,
116 F.2d 27 (5th Cir. 1940) .................................................................................... 9, 21

*Harkins v. Riverboat Servs., Inc.*,
35 F.3d 1099 (7th Cir. 2004) ................................................................................. 17, 21

*Jordan v. American Oil Co.*,
51 F. Supp. 77 (D. R.I. 1943) ..................................................................................... 21

*Levesque v. McGraw & Co.*,
165 F.2d 585 (2nd Cir. 1948) ..................................................................................... 21

*Little v. Liquid Air Corp.*,
37 F.3d 1069 (5th Cir. 1994) (*en banc*) ..................................................................... 15

*Louviere v. Standard Dredging Corp.*,
239 F.2d 164 (5th Cir. 1956) .................................................................................. 8, 21

*Martin v. Bedell*,
955 F.2d 1029 (5th Cir. 1992) ................................................................... 2, 16, 18, 23

*Martin v. McAllister Lighterage Line, Inc.*,
205 F.2d 623 (2nd Cir. 1953) ............................................................................... 21, 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................................................................... 15

---

[ii] In accordance with Section 7(B)(1) of this Court's Procedures, all unpublished authorities are being submitted directly to the Court and opposing counsel conventionally.

*Mitchell v. Brandtjen & Kluge, Inc.,*
   228 F.2d 291 (1st Cir. 1955) ...................................................................... 17

*Owens v. SeaRiver Maritime, Inc.,*
   272 F.3d 698 (5th Cir. 2001) .............................................................*passim*

*Vela v. City of Houston,*
   276 F.3d 659 (5th Cir. 2001) ........................................................................ 1

*Weaver v. Pittsburgh Steamship Co.,*
   153 F.2d 597 (6th Cir. 1946) ...................................................................... 21

**STATUTES**

29 U.S.C. § 213(b)(6) ................................................................................. 1, 15

46 U.S.C. § 11301 ........................................................................................... 12

46 U.S.C. § 11302 ........................................................................................... 12

**REGULATIONS**

29 C.F.R. § 783.31 ............................................................................... 1, 15, 18

29 C.F.R. § 783.32 ................................................................................... 16, 20

29 C.F.R. § 783.33 ....................................................................................... 16

29 C.F.R. § 783.36 ....................................................................................... 20

29 C.F.R. § 783.37 ................................................................................... 16, 23

46 C.F.R. § 15.860 ................................................................................... 4, 5, 6

46 C.F.R. § 35.07-5 ....................................................................................... 12

**OTHER AUTHORITIES**

*Hearings before the H. Subcomm. on Labor Standards, of the*
   *Comm. on Edu. and Labor on H. 4488,* 86th Cong.,
   885-896, 921-949, 1522-1523 (1960) .......................................................... 17

*Hearings Before the H. Subcomm. on Labor Standards, of the*
   *Comm. on Edu. and Labor on H. 4488,* 86th Cong., 939 (1960).................. 16

### MOTION FOR SUMMARY JUDGMENT
### BY BLESSEY MARINE SERVICES, INC.

NOW INTO COURT, through undersigned counsel, comes defendant, Blessey Marine Services, Inc. ("Blessey Marine"), and, pursuant to Federal Rule of Civil Procedure 56, respectfully files this Motion for Summary Judgment.

### I.      Statement of Issues

The issue before the Court is whether summary judgment should be granted where there is no genuine dispute that Mr. Coffin was employed as a "seaman" exempt from the provisions of the Fair Labor Standards Act ("FLSA").   The FLSA exempts from its overtime requirements "any employee employed as a seaman."   29 U.S.C. § 213(b)(6). The FLSA does not define a "seaman," but Department of Labor regulations apply the exemption if the employee:

> performs, as master or subject to the authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such a vessel as a means of transportation, provided he performs no substantial amount of work of a different character.

29 C.F.R. § 783.31.   In making this determination, a "generic job description tells us nothing about the specific duties of each [Tankerman] or what percentage of time was spent on [certain] activities."   *Vela v. City of Houston*, 276 F.3d 659, 677 (5th Cir. 2001).

Instead, the applicability of the "seaman" exemption under the FLSA requires an analysis of the plaintiff's actual day-to-day activities.   *Owens v. SeaRiver Maritime, Inc.*,

272 F.3d 698, 703-04 (5th Cir. 2001) (analyzing the work of a plaintiff in detail).  As Mr.

Coffin explains:

> Under the FLSA, an employee who spends **more than 20% of his work** on non-seaman's work – such as loading and unloading liquid cargo, and tasks closely related to the loading and unloading of liquid cargo – is not employed as a seaman, and, therefore is not exempt from the law's overtime pay requirement. *SeaRiver Maritime, Inc.*, 272 F.3d at 702 (citing 29 C.F.R. § 783.37, the Department of Labor ("DOL") regulation which adopts the 20% rule); *Martin v. Bedell*, 955 F.2d 1029, 1036 (5th Cir. 1992) (applying 20% rule in reversing trial court's judgment for employer).

Complaint, R. Doc. No. 1, ¶ 3 (emphasis added).  The plaintiff, Keith Coffin, worked <u>a maximum of</u> 13% of his time at Blessey Marine on cargo transfers – the only task that could be a non-seaman duty.  Summary judgment should be granted.

## II.    <u>Nature and Stage of Proceeding</u>

On January 17, 2011, Keith Coffin filed his Complaint seeking to represent all Tankermen who worked for Blessey Marine in the United States in the last three years. [R. Doc. No. 1].  On February 14, 2011, Mr. Coffin filed his Motion to Certify.  [R. Doc. No. 8].  Blessey Marine filed its opposition on April 13, 2011.  [R. Doc. No. 24].  The Court has not ruled on the Motion.

An analysis of Mr. Coffin's work on Blessey Marine vessels is now complete, and the non-viability of Mr. Coffin's claim is clear.  In lieu of ruling on the Motion to Certify, Blessey Marine respectfully requests that the Court consider its Motion for Summary Judgment first.  As Mr. Coffin explains, "It makes little sense to certify a class when the underlying claim is a plain loser."  Motion to Certify, p. 6.  A dismissal of Mr. Coffin's

claim via summary judgment would alleviate the possibility of an onerous administration of a collective action notice and opt-in process and would conserve resources for all.

### III.   <u>Summary of the Argument</u>

Blessey Marine owns and operates a fleet of towboats and barges that transport cargo between locations connected by inland waterways.  To comply with regulations promulgated by the United States Coast Guard, Blessey Marine employs Tankermen to serve as part of a marine crew and assigns them to each of its vessels.  Keith Coffin was employed as one of those Tankermen.

As a vessel-based Tankerman for Blessey Marine, Mr. Coffin was responsible for performing all nineteen duties of a Deckhand, and there is no dispute that Deckhands are seamen exempt under the FLSA.  In addition, Mr. Coffin identified five additional duties for Tankermen.  <u>Every one</u> of the twenty-four duties identified has been found to be a seaman duty by at least one Court or the United States Department of Labor, including cargo transfers.  In fact, the only duty over which the parties seem to have a dispute is that of cargo transfers by Mr. Coffin, and Mr. Coffin claims he spent in excess of 20% of his time on that task.

The cargo transfers at issue are performed by a member of a marine crew assigned to a vessel and governed by Coast Guard regulations.  Assuming for this exercise the transfers can be considered a "non-seaman" duty, an analysis of the Captain's Logs for each vessel confirms that Mr. Coffin spent <u>no more than</u> 13% of his time on cargo

transfers.[1]  The 13% calculation is a ceiling – the maximum amount of time he could have spent on the tasks.  Critically, it also falls well below the Department of Labor's 20% threshold, and summary judgment should be granted.

### IV.   Factual Background

#### A.   *Tankermen at Blessey Marine*

Blessey Marine did not invent the position of Tankerman, nor did it invent the notion of what a Tankerman might do.  Rather, the Coast Guard requires a Tankerman be present on all vessels on which cargo loading and unloading may take place.[2]  Tankermen typically begin their careers as vessel Deckhands, working their way up to Tankerman.[3]  Mr. Coffin's path was the same.[4]

---

[1] As explained below, Blessey Marine maintains that all of its vessel-based crewmembers are "seamen" under the FLSA and the Jones Act.  Their activities, including the loading and discharging of cargo, inure to the boat's and barge's transportation function.  The proper loading and unloading of cargo directly affects the trim and stability, cargo weight distribution, and seaworthiness of the vessel.

[2] Regulations issued by the Coast Guard specifically address the manning requirements for Tankermen.  46 C.F.R. § 15.860.  Here, the regulations require that there be two Tankermen on board the vessel at all times.  *Id*. at § 15.860(b).

[3] Declaration of Dustyn Grenon, dated 6/30/11, ¶ 8, attached as Exhibit "1."

[4] There is no dispute that a Deckhand is a "seaman" exempt from the provisions of the FLSA, and there also does not appear to be any reasonable dispute that Captains and Relief Captains in charge of a vessel are also exempt under the Fair Labor Standards Act.  Consequently, Mr. Coffin's theory of the case is somewhat nonsensical.  For Mr. Coffin to prevail, the Court would have to be persuaded that this was the only industry in America where an individual would be promoted out of an exempt position (as a Deckhand) to a non-exempt position (as a Tankerman) and then promoted into an exempt position (as a Relief Captain).

B.   *Mr. Coffin Chose to Work as a Vessel-*
     *Based Tankerman, Compensated by a Day Rate.*

Mr. Coffin testified that he entered the maritime industry as a Deckhand, working for Kirby Inland Marine.[5]  At Kirby, he trained as a Deckhand, was certified to perform the work of a Deckhand, and worked six months as a Deckhand assigned to a vessel, for which he was compensated at a day rate.[6]  While at Kirby, he became interested in a promotion to the Tankerman position, which he viewed as a step up from Deckhand with essentially the same duties.[7]

While Mr. Coffin worked for Kirby as a vessel-based Tankerman, he was compensated by a day rate, just as he was as a Deckhand.[8]  However, during the times he worked as a shore-based Tankerman performing loading and unloading, he was paid hourly.[9]  After he was terminated from Kirby, Mr. Coffin worked as a shore-based Tankerman for two shore-based tanking services:  Accutrans and Fryoux; both times, he was paid an hourly rate.[10]  By the time he got to Blessey Marine, he was familiar with the

---

[5] Deposition of Keith Coffin, taken 5/24/11, pp. 15-16, attached as Exhibit "2."  Kirby operates the nation's largest fleet of inland tank barges.

[6] *Id*. at 16-19.

[7] *Id*. at 19-22.  Obviously, a person's progression from Deckhand to Tankerman to Relief Captain to Captain includes progressive raises as the level of responsibility increases.  If the Court were to find Mr. Coffin a non-exempt employee, he would have made more than his supervisors.

[8] *Id*. at 26-27.

[9] *Id*. at 27, 31.

[10] *Id*. at 41-42, 47-48.

differences between working vessel-based or shore-based, and he was very aware of the fact that Blessey Marine would pay him a day rate as a vessel-based Tankerman.[11]

### C.   Mr. Coffin Worked Almost Exclusively as a Deckhand, with Limited Tankerman Responsibilities.

Mr. Coffin was a vessel-based Tankerman during his entire tenure with Blessey Marine. *See* Blessey Marine Personnel Log, attached at Tab "1" of Exhibit "1." That fact meant that he was assigned to the marine crew of a vessel at all times and answerable to the Captain (or the other person in charge of the vessel).[12]  He acted exclusively at the Captain's direction, and was subject to the Captain's authority as Master of the vessel.[13]

Mr. Coffin worked 28 days on, 14 days off, although there were limited exceptions to that schedule during his tenure.[14]  While on a vessel, Mr. Coffin lived, ate and slept on the vessel – it was his home.  He would work two six-hour shifts per day – either the front watch or the back watch.  The "front watch" consists of the hours 6:00 a.m. to noon and 6:00 p.m. to midnight, while the "back watch" consists of midnight to 6:00 a.m. and

---

[11] *Id*. at 90.  Blessey Marine's policy of paying a vessel-based Tankerman a day rate is the industry norm.

[12] Coffin Depo., pp. 162-63, 173, 187; Grenon Decl. ¶ 9.

[13] Coffin Depo., pp. 162-63, 173, 187; Grenon Decl. ¶ 9.

[14] Coffin Depo., pp. 227-28.

noon to 6:00 p.m.[15]  Mr. Coffin was explicit about the fact that when his shift ended, he was relieved by another Tankerman:

> Q.   What happens if the loading or unloading extends past your six-hour shift?
>
> A.   Another tankerman comes out on the boat.
>
> Q.   And do they go sign the [Declaration of Inspection]?
>
> A.   They relieve me.[16]

In addition, Mr. Coffin described his day-to-day duties in his deposition.  He testified that, even though his title was Tankerman, he performed the following duties of a Deckhand:  (1) cleaning; (2) handling lines; (3) standing watch; (4) making locks, (5) putting out mooring lights, (6) handling running lights, (7) cooking, (8) purchasing supplies, (9) handling radio communications, (10) repairing lines, (11) troubleshooting barge engines, (12) troubleshooting boat engines, (13) changing oil in generators, (14) changing oil in engines, (15) changing engine filters, (16) chipping, (17) painting, (18) tying off to docks, and (19) building tow.[17]  Mr. Coffin agreed that all of these duties

---

[15] Coffin Depo., pp. 227-28; Grenon Decl. ¶ 21.  Pursuant to Coast Guard Regulations, a person cannot work more than 12 hours per day as a Tankerman, although they may work additional hours as a Deckhand.  Grenon Decl. ¶ 19.

[16] Coffin Depo., p. 207; *see also* Coffin Depo., pp. 91, 178-79 (when his shift would end, if Tankerman duties were ongoing, Mr. Coffin was relieved of duty and "washed his hands" of the task).

[17] Coffin Depo., pp. 164-70.

– *i.e.*, the duties of a Deckhand – combined to keep the vessels in a safe and operational condition.[18]

Mr. Coffin explained that there is no Deckhand duty he did not have to perform.[19] So, he was responsible for all the same duties as a Deckhand that kept the vessel operating smoothly.  But, in his deposition, Mr. Coffin explained that there were five additional duties he had as a Tankerman:  (1) pumping out bilge water, (2) fueling the vessels, (3) adding lube oil, (4) preparing the barge for loading and unloading of cargo,[20] and (5) loading and unloading of cargo.[21]  But, even as to his additional duties, as a general principle, Mr. Coffin agreed that a Tankerman's duties were to maintain and help maintain safe and operational control of the vessel.[22]

Pumping out the bilge involves pumping out water and other liquids that have gathered at the bottom of a vessel (between the hull and the lower deck) for disposal.[23] The job is designed to keep the vessel well-maintained and clean; it is also an activity that

---

[18] Coffin Depo., p. 168.  There is no dispute between the parties that a Deckhand is a seaman, exempt from the provisions of the FLSA.  *Louviere v. Standard Dredging Corp.*, 239 F.2d 164, 165 (5th Cir. 1956) (persons performing deckhand duties are seamen under the FLSA).

[19] Coffin Depo., pp. 173-74.

[20] In fact, as discussed below, what Mr. Coffin calls "preparing the barges for loading and unloading" is maintenance and cleaning that occurs on every vessel, regardless of whether or not cargo transfers ever occur.

[21] Coffin Depo., p. 174.

[22] Coffin Depo., p. 172.

[23] Coffin Depo., p. 175.

is necessary on all vessels (ships, yachts, boats and barges) of any size.[24]  In other words, there is nothing about the task that relates to cargo in any way.

Fueling the vessel is exactly what one would expect, and Mr. Coffin confirmed that without fuel in a vessel, the vessel is incapable of moving between ports.[25]  Adding lube oil relates to changing of the oil, but it is a different task.  Every vessel has a tank for storing lube oil, which is then used for changing oil in engines and generators.[26]  And, these tasks are necessary on every vessel of size, whether or not cargo transfers occur.

As to "preparation of the vessels for cargo loading and unloading," Mr. Coffin described the work as follows:

> A.   Most of the time before we arrive to the dock or we are en route to the dock, depending on where we were going, we would have to clean the barges. Like if we were going to Exxon, we would we have to scrub them clean. Exxon is real picky. Everything had to be tool-tight, dogged down, secured on the barge, had to be clean, nothing out of place. Had to inspect the barge, make sure there was no water in the voids or, you know, anything was out of place, make sure the paperwork was up to date and current, valid.
>
> And then, of course, we would tie them off to the dock and land on the dock, tie off the barge, secure them. Sometimes we had to flip them around, double them up, whatever you want to call it. And then the dock man would, you know, lower the gangway. We would go up there and have our conversation. We would have a DOI where we

---

[24] Coffin Depo., p. 176; *Gale v. Union Bag & Paper Corp.*, 116 F.2d 27, 28 (5th Cir. 1940) ("[I]f there was no one to pump out the bilge water … the barge might sink from its accumulation.").

[25] Coffin Depo., p. 177.

[26] Coffin Depo., p. 179.

would go through a checklist that need to be checked and make sure it was right on the barge.

.    .    .    .

Q.    Okay. Nothing out of place?

A.    Yeah.

Q.    Just generally picking up any debris?

A.    Yes.

Q.    Anything that shouldn't be out?

A.    Yes.

Q.    Is that an overall safety issue on the barge?

A.    Yes.

Q.    And I guess on the boat, too, for that matter?

A.    Yes.

Q.    Is that one of the things that deckhands and tankermen are expected to do even when they are not loading and unloading cargo?

A.    <u>Yeah. It's a work practice to keep everything maintained, yeah.</u>[27]

Mr. Coffin was then asked about the portion of "preparing the barges" related to water in

holes and voids:

Q.    And is there an expectation that there would be no water in the voids even when you are not loading and unloading?

A.    Yes. Like if we switched out barges with other boats, dropped them off, fix them up, we would have to do an inspection on those barges as well.[28]

---

[27] Coffin Depo., p. 196.

10

Again, as Mr. Coffin explained, "it's a work practice to keep everything maintained."[29]
So, what Mr. Coffin calls "preparing a barge for cargo loading and unloading" is actually
the same set of tasks that occur on <u>every</u> vessel – general cleaning and maintenance –
whether or not cargo transfers may occur at some future point.  More importantly for this
Motion, they are seaman duties.  Therefore, Mr. Coffin must rely exclusively on actual
cargo transfers to support his claim.

In his deposition, under questioning *by his own lawyer*, Mr. Coffin explained the
proper methodology for determining what his day-to-day activities were for purposes of
the seaman analysis.  He did not cite job descriptions, his own affidavit, or estimates:

Mr. Oberti:  Okay.  So, in order to actually completely – if someone
wanted to objectively analyze how much time – what you
were doing with your working time, you would need
captain's logs.  Right?

Mr. Coffin:  Yes.

Mr. Oberti:  And what else?

Mr. Coffin:  Know if I was on the boat –

Mr. Oberti:  And how do you figure that out?

Mr. Coffin:  -- and what shift I was on.

Mr. Oberti:  How do you figure out if you are on the boat or not?

Mr. Coffin:  Well, they keep track if I was on the boat on the captain's log.

---

[28] Coffin Depo., pp. 196-197.

[29] Coffin Depo., p. 196.

Mr. Oberti:    Okay.  Do we know what shift you are on?  Is there a record of that?

Mr. Coffin:    No.

Mr. Oberti:    Okay.  And when you were on boats other than LAURA ANN BLESSEY,[30] was there a particular shift you were normally assigned to, or did it just vary?

Mr. Coffin:    It depended on where the hole was.  If they needed someone on the back watch, you would be on the back watch.  If they needed someone on the front watch, you would be on the front watch.[31]

Taking Mr. Coffin's invitation, Blessey Marine performed the objective analysis.

> ### D.    Mr. Coffin Spent a Maximum of <u>13% of His Time on Cargo Transfer.</u>

Under the authority granted to it by Congress, the United States Coast Guard has enacted regulations addressing the maintenance of vessel logs.[32]  Pursuant to these regulations, a log must be maintained by vessels such as those owned by Blessey Marine.[33]  Blessey Marine requires a Captain's Log be maintained on board each of its vessels, reflecting the minute-by-minute activities on the vessel.[34]

---

[30] Mr. Coffin had previously testified in his deposition about the precise shifts that he worked on the LAURA ANN BLESSEY.  Coffin Depo., pp. 227-28.

[31] Coffin Depo., pp. 287-88.

[32] 46 C.F.R. § 35.07-5.  In order to supervise the performance of the duties of certified mariners on navigable waters of the United States, Congress requires masters of United States vessels of a certain size to maintain an official book commonly referred to as the "Official Log" or "Master's Log" and to make certain entries in that log depending on the nature of the voyage.  46 U.S.C. §§ 11301, 11302.

[33] *Id.*

[34] Grenon Decl. ¶¶ 11-12 (regarding accuracy of the Captain's Logs at issue in this case).

Dustyn Grenon, Blessey Marine's Director of Operations, performed an analysis of the Captain's Logs at issue in this case. Mr. Grenon's Declaration describes his methodology in detail, and it confirms that he reviewed the Captain's Log for every single day, for every single vessel at issue, to determine the maximum number of hours Mr. Coffin could have possibly spent on cargo transfers.[35] His conclusion: the maximum percentage of time Mr. Coffin could have spent on cargo transfers is **_13%_**.[36]

The 13% calculation is a ceiling: it is the maximum amount of time Mr. Coffin could have spent on cargo transfers because, in making the calculation, Mr. Grenon set several generous criteria:

- As to the M/V BILLY VERDIN, M/V MELVIN TODD, M/V BRUCE BORDELON, and M/V RANDY MARTIN, Mr. Coffin could not recall which shift he worked. Consequently, for days he was assigned to these vessels, Mr. Grenon determined which of the two shifts (*i.e.*, the front or back watch) would provide the higher number of hours of cargo transfer. Mr. Coffin received credit for the higher number.[37] Grenon Decl. ¶ 21.

- On days that Mr. Coffin worked on two different vessels, Mr. Grenon reviewed the Captain's Logs for those vessels independently of each other. In doing so, Mr. Grenon gave Mr. Coffin credit for cargo transfers that could have occurred in as many as four different

---

[35] Grenon Decl. ¶¶ 14-23.

[36] *Id.* at ¶ 23.

[37] For instance, on November 2 and 3, 2010, on the M/V RANDY MARTIN, cargo transfers occurred during the front and back watches. *See* Ex. "3,"Captain's Logs, labeled BM000874-75. Mr. Grenon gave Mr. Coffin credit on each day for the shift that had more cargo transfer activity. Grenon Decl. ¶ 21.

six hour shifts on the same day (two shifts per vessel).[38]  Grenon Decl. ¶ 21.

- On all vessels, Mr. Grenon gave Mr. Coffin credit for all hours in which cargo transfers occurred during his shift, even if the Captain's Logs showed that a third party, shore-based Tankerman performed the transfer.[39]  Grenon Decl. ¶ 21.

- Mr. Grenon included for Mr. Coffin cargo transfer time that occurred on the days he boarded or disembarked from each vessel, whether or not he actually worked the shift when the cargo transfer occurred.[40]  Grenon Decl. ¶ 21.

Based on the above, the undisputed facts reflect that Mr. Coffin spent a <u>maximum</u> of 13% of his time working on cargo transfers (the actual number is certainly lower).

### V.   <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Because summary judgment is an integral part of the Federal Rules of Civil Procedure and designed to secure the just, speedy, and inexpensive

---

[38] For instance, on January 29, 2009, Mr. Coffin worked on two vessels:  the M/V MELVIN TODD and M/V BILLY VERDIN.  Ex. "1," Tab "1," Personnel Log.  In lieu of trying to determine exactly when Mr. Coffin moved from one vessel to the other, Mr. Grenon assumed Mr. Coffin was on both vessels from 12:01 a.m. to 11:59 p.m.  Grenon Decl. ¶ 21.

[39] For instance, on November 12 and 13, 2010, Mr. Coffin testified a shore-based Tankerman performed all of the cargo transfers; as Mr. Coffin put it, "he had no role in it."  Coffin Depo., p. 266.  Nevertheless, Mr. Grenon's analysis gives him full credit for the cargo transfer.  Grenon Decl. ¶ 21.

[40] For instance, on October 14, 2009, the day Mr. Coffin boarded the M/V LAURA ANN BLESSEY, the only cargo loading that could have been during his shift was between 6:00 a.m. and noon.  *See* Ex. "3," Captain's Logs, labeled BM000604-05.  For his analysis, Mr. Grenon gave Mr. Coffin credit for that transfer even though it would have required that Mr. Coffin fly from Houston to St. Louis, travel from the St. Louis airport to the Port of St. Louis, and board the vessel – **all before 6:00 a.m.**

14

determination of every action, a non-movant cannot satisfy his burden under Rule 56 simply by showing "some metaphysical doubt as to the material facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1074, 1075 (5th Cir. 1994) (*en banc*) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### VI.   Mr. Coffin is a Seaman, Exempt from the FLSA's Overtime Provisions.[41]

Seamen are exempt from the overtime provisions of the FLSA.   29 U.S.C. § 213(b)(6).   The FLSA does not define the phrase "employed as a seaman," but the Department of Labor's regulations set forth the following criteria for the exemption:

> An employee will ordinarily be regarded as "employed as a seaman" if he performs, as a master or subject to authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character.[42]

Noting that an employee who may otherwise be considered a seaman might lose that status based on the character of the work performed, the DOL describes two scenarios:

- An employee employed as a seaman does not lose his status as such simply because, as an incident to such employment, he performs some work not connected with operation of the vessel as a means of transportation, such as assisting in the loading or unloading of freight at

---

[41] Blessey Marine notes that there are two additional issues, not raised by this Motion, that require dismissal of Mr. Coffin's claim.  First, every vessel-based member of a marine crew was intended to be exempt as a seaman under the FLSA when Congress enacted the FLSA.  Second, the work of a Tankerman in actually loading and unloading a barge so as to maintain the barge and boat's seaworthiness is clearly a "seaman" duty.  These issues are not before the Court at this time.

[42] 29 C.F.R. §§ 783.31.

the beginning or end of a voyage, if the amount of such work is not substantial.[43]

- Stevedores or roust-abouts traveling aboard a vessel from port to port whose principal duties require them to load and unload the vessel in port would not be employed as seamen even though during the voyage they may perform from time to time certain services of the same type as those rendered by other employees who would be regarded as seamen under the Act.[44]

To resolve this apparent conflict, the DOL suggests the following rule: an employee does not lose exempt status *unless* he performs a "substantial" amount of his time doing non-seaman's work, with "substantial" being defined as "occupy[ing] more than 20 percent of the time worked by the employee during the workweek."[45]

The purpose of the seaman exemption, when enacted by Congress, was to apply *to all vessel-based personnel*:

> The exemption recognizes that at sea, with a normal life impossible, working more than 40 hours a week is an appropriate work norm, as distinct from the situation in most ordinary employments, where, because 40 hours is the norm, requiring the employer to pay time and a half for overtime encourages him to spread the work by hiring enough workers to minimize the need and resulting expense of overtime.[46]

---

[43] 29 C.F.R. § 783.32.

[44] 29 C.F.R. § 783.33.

[45] 29 C.F.R. § 783.37.  The Fifth Circuit utilizes this analysis.  *SeaRiver Maritime, Inc.*, 272 F.3d at 702; *Martin v. Bedell*, 955 F.2d 1029, 1035-36 (5th Cir. 1992).

[46] *Harkins v. Riverboat Servs., Inc.*, 35 F.3d 1099, 1102 (7th Cir. 2004) (citing *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1543-44 (7th Cir. 1987); *Donovan v. Crisostomo*, 689 F.2d 869, 876 (9th Cir. 1982); *Mitchell v. Brandtjen & Kluge, Inc.*, 228 F.2d 291, 292-94 (1st Cir. 1955)).

At the Congressional hearings in 1960, when Congress revisited the viability of the seaman exemption, one worker representative explained, "if we in the river industry wanted to work an 8-hour day or 40-hour week, we would be working on the banks in factories or garages."[47]  Another worker representative testified that Congress, in 1938, "determined that rules and regulations that might be readily applicable to shoreside employment were not practical of application to seamen."[48]

By exempting all seamen, Congress recognized that parsing vessel-based crews as to exempt and non-exempt status could create incredible burdens for employers, problems for workers, and inconsistent results.[49]  Given how plain the facts are with respect to Mr. Coffin's claim, there is no need for the Court to address this issue.[50]

---

[47] *Hearings Before the H. Subcomm. on Labor Standards, of the Comm. on Edu. and Labor on H. 4488*, 86th Cong., p. 939 (1960).

[48] *Id.* at 930.

[49] Towboats within the inland transportation industry are only designed to accommodate two crews, so the working and living conditions of the employees on the vessel would suffer if Blessey Marine were forced to bring additional personnel on board in an effort to provide a forty-hour workweek. Some boats cannot possibly accommodate more crew members, which would require Blessey Marine and similar companies to reconstruct fleets of boats.  Either alternative would result in significant financial hardship to Blessey Marine and other companies within the inland waterway transportation industry and would cause inflationary rates for their services without any benefit to Tankermen or Blessey Marine. Finally, to preserve the natural increase in the pay scales of persons promoted from Deckhand to Tankerman to Pilot to Relief Captain and then Captain, the compensation of a Tankerman to a non-exempt employee would require adjustment of his pay.

In addition, a finding that _all_ Tankermen are covered by the FLSA would produce a host of inequitable results, including (1) crew assignments on vessels with limited sleeping quarters would be impossible, and (2) an incredible administrative burden of tracking the specific times and hours that Tankermen boarded or left their vessels (crew changes take place at various times of the day depending on transportation capability, location of the vessel, and other factors).

17

Mr. Coffin was employed as a Tankerman by Blessey Marine and assigned to vessel crews.  There is no dispute that as a member of the vessel, Mr. Coffin was acting exclusively at the direction of the master on board the vessel:  the Captain or Relief Captain.[51]  As discussed more fully below, Mr. Coffin's services at Blessey Marine were rendered primarily as an aid in the operation of a vessel as a means of transportation, and he did not spend a substantial amount of time on non-seaman duties.

### A.    Mr. Coffin's Service was Rendered Primarily as an Aid in the Operation of the Vessel as a Means of Transportation.

Work is seaman's work if it is "rendered primarily as an aid in the operation of [a] vessel as a means of transportation."  29 C.F.R. § 783.31; *Martin*, 955 F.2d at 1035-36; *SeaRiver*, 272 F.3d at 702.  In *Owens v. SeaRiver Maritime, Inc.*, a former Tankerman filed suit under the FLSA for unpaid overtime.[52]  As a vessel-based Tankerman, Mr. Owens had every single one of the duties that Mr. Coffin described as his own.[53]  But,

---

Likewise, a finding that only <u>some</u> Tankermen are exempt from the overtime provisions of the FLSA will create even more burdens:  (1) competition among Tankermen for certain vessel assignments, and (2) constant shifting of pay methodology every time a vessel receives new orders from a Blessey Marine customer for a new route.  The duties of Blessey Marine vessels constantly change, and if the Court required a vessel-by-vessel analysis, the ability to predict whether Tankermen on a certain vessel will or will not be exempt under the FLSA would be impractical and transitory at best.

[50] For Mr. Coffin to prevail, the Court would have to be persuaded that this was the only industry in America where an individual would be promoted out of an exempt position (as a Deckhand) to a non-exempt position (as a Tankerman) and then promoted into an exempt position (as a Relief Captain).

[51] Coffin Depo., pp. 160 (testifying that the Captain or Relief Captain was in charge of the vessel) & 162 (while on the vessel, Mr. Coffin reported to the Captain or Relief Captain).

[52] 272 F.3d 698, 700 (5th Cir. 2002).

[53] *Id.*

Mr. Owens did not claim he was non-exempt during the time he was a Tankerman.[54] Instead, it was only when SeaRiver reassigned him from a vessel-based Tankerman position to a shore-based Strike Team that he (or the Fifth Circuit) considered the possibility that he might no longer be a seaman.

As the Fifth Circuit explained, once Mr. Owens was transferred to the Strike Team, he "attended the barges only for the purposes of loading and discharging product."[55] He was a member of a shore-based team created to facilitate the loading and unloading of cargo from a permanently moored barge, and he "certainly spen[t] a good percentage of his time loading and unloading."[56] In fact, when he did work on a vessel that came to his shore-based location, the only purpose was to load or unload that vessel.[57] Based on the above, Mr. Owens was not a seaman. Mr. Coffin's situation is quite the opposite.

Mr. Coffin was assigned to a vessel, with the following vessel-related duties:[58] (1) cleaning; (2) handling lines; (3) standing watch; (4) making locks, (5) putting out mooring lights, (6) handling running lights, (7) cooking, (8) purchasing supplies, (9) handling radio communications, (10) repairing lines, (11) troubleshooting barge

---

[54] *Id.* at 700 & 701.

[55] *Id.* at 701.

[56] *Id.* at 703.

[57] *Id.* at 703.

[58] Coffin Depo., pp. 168, 173-174.

19

engines, (12) troubleshooting boat engines, (13) changing oil in generators, (14) changing oil in engines, (15) changing engine filters, (16) chipping, (17) painting, (18) tying off to docks, and (19) building tow.[59]   Mr. Coffin agreed that these duties were performed to keep the vessel in a safe and operational condition.[60]   As a Tankerman, Mr. Coffin was responsible for all of the above duties, plus five more:   (1) pumping out bilge water, (2) fueling the vessels, (3) adding lube oil, (4) preparing the barge for loading and unloading of cargo, and (5) loading and unloading of cargo.[61]

Each of these duties contributed to the overall operation and maintenance of the vessel and was necessary for the safe and operational control of it.[62]   In fact, *every single duty that Mr. Coffin identified* has been previously found by Courts or the Department of Labor to constitute a seaman's duty:

- 29 C.F.R. § 783.32 (seamen include members of a vessel crew, including radio operators, pursers, cooks, and stewards);

- 29 C.F.R. § 783.36 (seaman duties include attending to lines, putting out running and mooring lights, pumping out bilge water);

- United States Department of Labor Administrator's Opinion, FLSA 2006-44 (Nov. 30, 2006) (seaman duties include:   performing maintenance, cleaning, making repairs, changing oil in the generator and engine, painting, mechanical and structural repairs, purchasing supplies, ensuring safety, adjusting the boat's moorings);

---

[59] Coffin Depo., pp. 164-170.

[60] Coffin Depo., pp. 168, 172.

[61] Coffin Depo., pp. 169-171.

[62] Coffin Depo., p. 172.

- *Louviere v. Standard Dredging Corp.*, 239 F.2d 164, 165 (5th Cir. 1956) (seaman duties include:  handling the lines, greasing, oiling, and repairing machinery; scrubbing the deck, and performing other duties routinely performed by a crew member);

- *Martin v. McAllister Lighterage Line, Inc.*, 205 F.2d 623, 625 n. 3 (2nd Cir. 1953) (seaman duties include:  attending to lines, displaying lights, pumping out bilge water, putting out fenders, examining vessel for damage and leakage, <u>supervising loading and unloading of cargo for safety reasons</u>, tending to lines);

- *Weaver v. Pittsburgh Steamship Co.*, 153 F.2d 597, 599 (6th Cir. 1946) (seaman duties include:  repairing equipment, pipes, and gaskets; chipping; painting; cleaning; "sooging;" and turbining tubes);

- *Gale v. Union Bag & Paper Corp.*, 116 F.2d 27, 27 (5th Cir. 1940) (seaman duties include:  all services usual to the occupation of a barge tender, attending to the lines and anchors, putting out running and mooring lights, pumping out bilge water);

- *Jordan v. American Oil Co.,* 51 F. Supp. 77, 78 (D. R.I. 1943) (seaman duties include:  acting under the supervision of the captain, primarily for the safety of the boat; standing watch; providing safety lighting; <u>loading and discharging a barge in a proper manner</u>; protecting the safety of the boat at all times; pumping the bilge water; chipping and painting barges; examining the boat for leaks; checking the running lights).[63]

Mr. Coffin was a Tankerman, licensed by the Coast Guard, but performing all duties of a Deckhand as well.  He was employed by Blessey Marine on vessels and the purpose of his work was to perform all activities necessary to the general maintenance of

---

[63] *Harkins,* 385 F.3d at 1104 (seaman exemption applied to all members of a boat's crew where the boat was permanently moored to a dock and the plaintiff's duties included cleaning); *Levesque v. McGraw & Co.*, 165 F.2d 585, 586 (2nd Cir. 1948) (seaman duties included navigation on a barge); *Bailey v. Pilots' Ass'n For Bay & River Delaware*, 406 F. Supp. 1302, 1307 (E.D. Penn. 1976) (seaman exemption applied to plaintiff as a member of a vessel's crew where his duties included running the motor launches, general maintenance, and standing watch); *Bolan v. Bay State Dredging & Contracting Co.*, 48 F. Supp. 266, 270-71 (D. Mass. 1942) (seaman duties included helping control vessel's movement in navigable water).

the vessel so that it could operate safely and efficiently as a means of transportation.  Just as the Department of Labor noted in its Administrator's Letter, "[Mr. Coffin] performs no duties that are not boat-related."  DOL Admin. Letter, p. 1.  The record (including Mr. Coffin's testimony) demonstrates beyond genuine dispute that the performance of Mr. Coffin's work was to aid in the operation of Blessey Marine's vessels as a means of transportation.  Without the duties Mr. Coffin performed, the Blessey Marine vessels to which he was assigned would not have moved.

Notwithstanding the above, Mr. Coffin takes the position that when he was performing a cargo transfer, his duties were "non-seaman."    Blessey Marine acknowledges the authority in this Circuit for that position,[64] but the evidence in this case proves that the tasks occupied a ***maximum of 13%*** of Mr. Coffin's time.

### B.    Mr. Coffin's Maximum of 13% of Work During Cargo Transfers is Not "Substantial Work of a Non-Seaman."

When a worker performs both seaman's work and non-seaman's work, according to the Department of Labor, he is a seaman unless his non-seaman's work is substantial in amount.  29 C.F.R. § 783.37.  The DOL defines "substantial" as more than 20%, and Mr. Coffin has repeatedly cited this standard:

> Under the FLSA, an employee who spends more than 20% of his work on non-seaman's work – such as loading and unloading liquid cargo, and tasks

---

[64] *Compare SeaRiver Maritime*, 272 F.3d at 701, 702 n.5 (discussing the 20% rule), *with Harkins*, 385 F.3d at 1103 (member of a vessel-based crew is presumed to be a seaman under the FLSA), *and Martin v. McAllister Lighterage Line, Inc.*, 205 F.2d 623, 625 n. 3 (2nd Cir. 1953) (supervising of loading and unloading cargo to ensure safety of vessel is a seaman activity).

> closely related to the loading and unloading of liquid cargo – is not
> employed as a seaman, and, therefore is not exempt from the law's
> overtime pay requirement. *SeaRiver Maritime, Inc.*, 272 F.3d at 702 (citing
> 29 C.F.R. § 783.37, the Department of Labor ("DOL") regulation which
> adopts the 20% rule); *Martin v. Bedell*, 955 F.2d 1029, 1036 (5th Cir. 1992)
> (applying 20% rule in reversing trial court's judgment for employer).

Complaint, R. Doc. No. 1, ¶ 3.  In *Owens v. SeaRiver Maritime, Inc.*, the Fifth Circuit

began its analysis by confirming that a barge tender is a seaman under the FLSA, then

affirmed that the 20% rule should apply, but it did note a point of caution.[65]  Specifically,

the Court cautioned that it would be incorrect to find an employee was a non-seaman

solely because he spends more than 20% of his time during certain weeks in port on non-

seaman duties.  Instead, the Court instructed that an overall assessment of the time at

issue was relevant in determining status, and noted that a person should not be denied

seaman status where his assignment requires "regular and continuous, rather than

intermittent, commitment of the worker's labor to the function of a vessel."[66]

　　　When reviewing every daily log regarding Mr. Coffin's activity, and when giving

him every possible benefit on the numbers, the <u>maximum</u> amount of time Mr. Coffin

could have spent on cargo transfers is still only 13%.[67]  The 13% calculation is only

possible where (1) Mr. Coffin receives credit for transfers in which "he had no role,"[68]

---

[65] 272 F.3d at 701, 702 n.5.

[66] *Id.* at 702 n.5 (quoting *Chandris, Inc. v. Latsis*, 515 U.S. 347 (1995)).

[67] Grenon Decl. ¶ 23.

[68] *See supra* n.39.

(2) transfers that occurred on multiple vessels on the same day,[69] and (3) transfers that would require him to travel hundreds of miles and board a vessel before 6:00 a.m.[70]  The maximum of 13% of his time spent on cargo loading is well below any possible threshold cited by the DOL, well below the percentage that any reported case finds "substantial," and well below anything that should allow Mr. Coffin's claims to survive.  Summary judgment should be granted.

### VII.   Conclusion

There is no dispute about the fact that Mr. Coffin, as a vessel-based employee, was a member of a marine crew that lived, ate, and slept on a vessel.  There is also no dispute about the fact that he performed seaman duties – the only theory advanced by him to be considered non-exempt under the FLSA is his claim that he spent more than 20% of his time on non-seaman duties.   However, the unassailable evidence concludes that Mr. Coffin could have worked no more than 13% of his time on cargo transfers.  Therefore, summary judgment should be granted, and this case should be dismissed.

---

[69] *See supra* n.38.

[70] *See supra* n.40.

Respectfully submitted,

**BAKER DONELSON BEARMAN
CALDWELL & BERKOWITZ, PC**


BY:      *s/Steven F. Griffith, Jr.*
        STEVEN F. GRIFFITH, JR. (La. Bar 27232)
         *(Pro Hac Vice Admission)*
        201 St. Charles Ave., Suite 3600
        New Orleans, Louisiana  70170
        Telephone:  (504) 566-5200
        Facsimile:  (504) 636-4000
        E-mail:  sgriffith@bakerdonelson.com

        **ATTORNEY-IN-CHARGE FOR DEFENDANT,
        BLESSEY MARINE SERVICES, INC.**



OF COUNSEL:

Thomas J. "Beau" Bethune, IV
(U.S.D.C - S.D. Tex. Fed. I.D. No. 1100930)
General Counsel
Blessey Marine Services, Inc.
1515 River Oaks Rd. E.
Harahan, Louisiana  70123
Telephone:  (504) 734-2616
Facsimile:  (504) 734-2903
E-mail:  bbethune@blessey.com

ATTORNEY FOR DEFENDANT,
BLESSEY MARINE SERVICES, INC.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 1st day of July, 2011, I electronically filed the foregoing with the Clerk of the Court using ECF system which sent notification of such filing to the following:

Mark J. Oberti (mark@osattorneys.com)
Edwin Sullivan (ed@osattorneys.com)
ATTORNEYS FOR PLAINTIFF

and I hereby certify that I have mailed by United States Mail, postage prepaid, the document to the following non-ECF participants:

None.

This the 1st day of July, 2011.

*s/Steven F. Griffith, Jr.*
STEVEN F. GRIFFITH, JR.