IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH COFFIN, on behalf of himself and others similarly situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:11-cv-00214 |
| BLESSEY MARINE SERVICES, INC., | § § § | |
| Defendant. | § | |

**MOTION FOR SUMMARY JUDGMENT BY
BLESSEY MARINE SERVICES, INC. ON
PLAINTIFFS' SEAMAN STATUS UNDER THE FLSA**

Respectfully submitted,

Steven F. Griffith, Jr.
Baker Donelson Bearman
Caldwell & Berkowitz, PC
201 St. Charles Ave., Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000
E-mail:  sgriffith@bakerdonelson.com

Thomas J. "Beau" Bethune, IV
General Counsel
Blessey Marine Services, Inc.
1515 River Oaks Rd. E.
Harahan, Louisiana  70123
Telephone:  (504) 734-2616
Facsimile:  (504) 734-2903
E-mail:  bbethune@blessey.com

**ATTORNEYS FOR DEFENDANT,
BLESSEY MARINE SERVICES, INC.**

# Table of Contents

Table of Exhibits ................................................................................ iii

Table of Authorities ........................................................................... iv

I.       Nature and Stage of Proceeding ................................................ 1

II.      Statement of the Issue Before the Court ................................... 1

III.     Summary of the Argument ......................................................... 2

IV.      The Unit Tow's Transportation of
         Liquid Cargo and the Role of the Tankerman. ......................... 4

         A.       The Pieces of the Unit Tow. ......................................... 4

                  1.       The Towboat. ..................................................... 5

                  2.       The Tank Barges. .............................................. 5

         B.       The Vessel-Based Crew. ............................................... 6

         C.       The Tankerman. ............................................................ 7

         D.       The Maintenance of Towboat and Tank Barges, *i.e.,*
                  Preparing Barges for Loading and Unloading Cargo. .............. 9

         E.       The Cargo Transfer Process. ........................................ 10

                  1.       Trim and Stability. ......................................... 11

                  2.       The Drafts of Barges. ...................................... 12

                  3.       The Ports and Waterways in Which the Unit Tow Operates. .......... 13

         F.       Catastrophic Effects of Improper Cargo Transfers. ..................... 14

         G.       Testimony from the Plaintiffs and the Expert. ........................... 15

V.       Summary Judgment Standard ..................................................... 18

VI.    Blessey Marine's Tankermen Are Seamen Under the FLSA.  ..................................  19

    A.    The Plaintiffs Meet the Legal Definition of Seamen.  ...................................  19

        1.    *Owens v. SeaRiver Maritime* – Shore-Based Personnel  .................  21

        2.    *Jordan v. American Oil* – Vessel-Based Tankermen  ......................  23

    B.    Tankermen Were Intended to be Excluded from the FLSA
        with the Enactment and Amendment of the Seaman's Exemption.  .............  26

    C.    *Christopher v. SmithKline Beecham Corp.*
        Confirms the Tankermen are Seamen.  ........................................................  28

        1.    A Finding for the Plaintiffs Would
            Undermine the FLSA and DOL Framework.  ..................................  29

        2.    Tankermen's Work is Appropriately
            Exempt from the FLSA Because it
            Does Not Lend Itself to a 40 Hour Work Week.  ...........................  30

        3.    Tankermen Are Not the Sort of
            Employees the FLSA Was Intended to Protect.  ..............................  31

VII.   Conclusion   .........................................................................................................  32

Certificate of Service   .........................................................................................  34

**Table of Exhibits**

1.   Expert Report of Tom McWhorter, dated May 29, 2012.

2.   Declaration of Martin Creel, dated October 22, 2012.

3.   Declaration of James Clendenon, dated October 22, 2012.

4.   Excerpts from Deposition of Dustyn Grenon, taken June 5, 2012.

5.   Excerpts from Deposition of Dustin Akins, taken February 28, 2012.

6.   Excerpts from Deposition of Keith Coffin, taken May 24, 2011.

7.   Excerpts from Deposition of Joshua Fox, taken April 9, 2012.

8.   Excerpts from Deposition of Mason Fulkerson, taken March 5, 2012.

9.   Excerpts from Deposition of Eric E. Jones, Jr., taken May 29, 2012.

10.  Excerpts from Deposition of Zachary E. Latiolais, taken May 15, 2012.

11.  Excerpts from Deposition of Jose Rangel, taken April 10, 2012.

12.  Excerpts from Deposition of Gregory Robinson, taken April 5, 2012.

13.  Excerpts from Deposition of Jason J. Villarreal, taken May 8, 2012.

14.  Chartering and Shipping Terms, (Practical Guide for Steamship Companies, Masters, Ship's Officer, Shipbrokers, Forwarding Agents, Exporters, Importers, Insurance Brokers, and Banks), J. Bes, Barker & Howard Ltd. (10th Ed.).

15.  Blessey Marine's Responsible Carrier Program Policies and Procedures (February 2002).

16.  United States Department of Labor Administrator's Opinion, FLSA 2006-44 (Nov. 30, 2006).

17.  Hearings Before the House of Representatives Subcommittee on Labor Standards, of the Committee on Education and Labor on House Bill 4488, 86th Congress, (May 5, 1960).

## <u>Table of Authorities</u>

**Page(s)**

**CASES**

*Albertson v. T.J. Stevenson & Co., Inc.,*
 749 F.2d 223 (5th Cir. 1984) ................................................................16

*Allen v. Coil Tubing Services, LLC,*
 846 F. Supp. 2d 678 (S.D. Tex. 2012) ..................................................29

*Bailey v. The Pilots' Ass'n for the Bay River Del.,*
 406 F. Supp. 1302 (E.D. Pa. 1976) ................................................22, 27

*Bolan v. Bay State Dredging & Contracting Co.,*
 48 F. Supp. 266 (D. Mass. 1942) .........................................................27

*Christopher v. SmithKline Beecham Corp.,*
 132 S. Ct. 2156 (2012) ................................................................ *passim*

*Gale v. Union Bag & Paper Corp.,*
 116 F.2d 27 (5th Cir. 1940) ....................................................22, 26, 29

*Harkins v. Riverboat Servs. Inc.,*
 385 F.3d 1009 (7th Cir. 2004) .......................................................27, 28

*Jordan v. American Oil Co.,*
 51 F. Supp. 77 (D.R.I. 1943).......................................24, 25, 27, 29

*Levesque v. McGraw & Co.,*
 165 F.2d 585 (2nd Cir. 1948).............................................................27

*Little v. Liquid Air Corp.,*
 37 F.3d 1069 (5th Cir. 1994) ...............................................................20

*Louviere v. Standard Dredging Corp.,*
 239 F.2d 164 (5th Cir. 1956) ..........................................................9, 26

*Martin v. Bedell,*
 955 F.2d 1029, 1035 (5th Cir. 1992) ...................................................21

*Martin v. McAllister Lighterage Line, Inc.,*
 205 F.2d 623 (2nd Cir. 1953)..............................................................26

*McLaughlin v. Harbor Cruises LLC,*
 No. 06-11299, 2012 WL 3065380 (D. Mass. 7/20/2012)............21, 22, 26

*McLaughlin v. King Welding, Inc.*,
   No. 86-1379, 1988 WL 81539 (C.D. Cal. 3/15/1988) ...........................................25

*Owens v. SeaRiver Maritime, Inc.*,
   272 F.3d 698 (5th Cir. 2001) ...................................................................22, 23, 24

*Owens v. SeaRiver Maritime, Inc.*,
   No. 00-60048, 2000 WL 33981512 ..................................................................23

*Phillips v. Lesco Logistics, LLC*,
   No. 06-3297, 2007 WL 1644039 (S.D. Tex. 6/5/07) .....................................11, 27

*U.S. v. Rosenwasser*,
   323 U.S. 360 (1945) ............................................................................................28

*Weaver v. Pittsburgh Steamship Co.*,
   153 F.2d 597 (6th Cir. 1946) ............................................................................26

**STATUTES**

29 U.S.C. § 213(b)(6) ...................................................................................1, 20

46 U.S.C. § 7317 ..................................................................................................8

**OTHER AUTHORITIES**

29 C.F.R. §§ 781.31 ...........................................................................................23

29 C.F.R. § 783.31 ....................................................................................2, 21, 24

29 C.F.R. § 783.32 .........................................................................................23, 26

29 C.F.R. § 783.33 .............................................................................................21

29 C.F.R. § 783.36 .............................................................................................26

46 C.F.R. § 13.101, *et seq.*..................................................................................8

46 C.F.R. §§ 15.805 .............................................................................................8

46 C.F.R. Part 13...............................................................................................7, 8

Hearings Before the House of Representatives Subcommittee on
   Labor Standards, of the Committee on Education and Labor on
   House Bill 4488, 86th Congress, (May 5, 1960) .......................................28

Federal Rule of Civil Procedure 56 .................................................................1, 20

### MOTION FOR SUMMARY JUDGMENT BY
### BLESSEY MARINE SERVICES, INC. ON
### PLAINTIFFS' SEAMAN STATUS UNDER THE FLSA

Defendant, Blessey Marine Services, Inc., pursuant to Federal Rule of Civil Procedure 56, respectfully moves for summary judgment dismissing the plaintiffs' claims.

### I.      Nature and Stage of Proceeding

There are nine former tankermen seeking overtime compensation and penalties under the FLSA.  Discovery is complete on the issue presented by this Motion, and it confirms that there is no genuine dispute of material fact.  Accordingly, Blessey Marine moves for summary judgment dismissing the plaintiffs' claims with prejudice.

### II.     Statement of the Issue Before the Court

Blessey Marine requests that the Court resolve the single, dispositive legal issue in this case: whether the plaintiffs were properly classified as seamen exempt from the FLSA. 29 U.S.C. § 213(b)(6).   Under the FLSA, a person is considered an exempt seaman if he performs service "which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character."  29 C.F.R. § 783.31.  Testimony from the plaintiffs, Blessey Marine, and the only expert in this case all support the finding that the tankermen are exempt from the FLSA as seamen because all their duties are "rendered primarily as an aid in the operation of a vessel as a means of transportation."  This Motion seeks a ruling from the Court to that effect.

If the Court should disagree and find that certain tankerman duties are not seaman duties, the FLSA next requires an analysis of whether each tankerman spent a "substantial" amount of time on "non-seaman" duties.  Discovery is not quite complete on that point; therefore, if this Motion is denied, Blessey Marine will proceed, as discussed at the last Status Conference, with limited depositions from certain plaintiffs, and then it will raise that issue with the Court.

1

III.    **Summary of the Argument**

The parties agree that the vast majority of tankerman duties, which tankermen share with deckhands, are seaman duties.  But, the parties have a legal disagreement over whether loading and unloading cargo into and from a tank barge (or what the plaintiffs call "preparing" to load and unload cargo) is a seaman duty.  To understand how loading and unloading a tank barge is a seaman duty, one must understand a tankerman's role in Blessey Marine's business.

Blessey Marine towboats and barges have one mission – to safely transport liquid cargo through inland waterways – and Blessey Marine accomplishes that mission through the use of a unit tow.  A "unit tow" is the term used to refer to the combination of towboat and one or more tank barges tied together to comprise one large vessel.



A unit tow is assembled in the water at port or marine terminal by the towboat's crew connecting the towboat and tank barges with specialized equipment.  The result is that the various components (a towboat and tank barges) function as one vessel.  For several reasons, each piece of equipment that makes up a unit tow must be in proper condition before assembly occurs.

These large pieces of equipment will ultimately act as one vessel; therefore, each piece of equipment must, as precisely as possible, be trim, stable,[1] and at even drafts (the depth that a

---

[1] Trim is "the difference between the draughts fore and aft.  If the draught fore and aft is the same, the vessel is…in trim, or …on even keel."  Stability is defined as "the tendency [the vessel] possesses to return to her original position after she has heeled because of external forces."  Chartering and Shipping Terms, (Practical Guide for Steamship Companies, Masters, Ship's Officer, Shipbrokers, Forwarding Agents, Exporters, Importers, Insurance Brokers, and Banks), J. Bes, Barker & Howard Ltd. (10th Ed.), pp. 201-02, attached as Exhibit "14."

vessel sits in the water).  In fact, a unit tow can only carry out its mission of transporting cargo if: (1) the individual barges are trim and stable; (2) the barges are of a similar draft; and (3) the barges are loaded in such a manner to account for specific operating parameters of the ports and waterways in which the unit tow operates, such as tides, currents, and permissible drafts at the next port of call.  As explained below, tankermen are responsible for ensuring that the barges meet these criteria during the cargo transfer process.

A tankerman does not load cargo like a person puts gas in a car.  Instead, they are loading cargo in a manner so that the cargo's weight distribution permits the vessel to function as a means of transportation.  If a tankerman fails in his duties, the unit tow cannot accomplish its mission of transporting cargo; conversely, if a tankerman succeeds, the unit tow succeeds in its mission.  As such, all tankerman duties, including the loading and unloading of tank barges, are rendered primarily as an aid to the tank barge as a means of transporting cargo.

In support of this Motion, Blessey Marine relies upon testimony from its own representatives, as well as the conclusion of the third party expert:

> A Blessey Marine tankerman's duties, including loading and discharging barges, are rendered primarily as an aid to the barge as a means of transporting cargo.[2]

Even the plaintiffs admitted under oath that their loading and unloading duties were rendered primarily as an aid to the tank barges as a means of transporting cargo.  For example:

> Q.  Is it your responsibility, then, during the loading and unloading, to make sure that the barge maintains its ability to transport cargo?
>
> A.  Right.
>
> Q.  And so you're in charge of making sure that it maintains its ability to function as a transportation vehicle?
>
> A.  Right.

---

[2] Ex. "1," McWhorter Expert Report, p. 4.

> Q.      Is there, you know, the services that you're performing in that regard, and they are primarily for making sure that the barge maintains its function as a transportation vehicle?
>
> A.      Right.[3]

So, (1) the plaintiffs, (2) Blessey Marine representatives, and (3) the only expert retained by the parties have testified that a tankerman's duties while loading and unloading tank barges are rendered primarily as an aid to the vessel as a means of transporting cargo.  <u>There is and will not be competent testimony to the contrary</u>.  As such, summary judgment is appropriate.

### IV.   The Unit Tow's Transportation of <u>Liquid Cargo and the Role of the Tankerman.</u>

Blessey Marine does not operate a cruise ship company or a ferry – Blessey Marine's business is the safe transportation of liquid cargo.[4]

### A.      *The Pieces of the Unit Tow.*

A unit tow is typically comprised of a towboat and two tank barges.[5]  The **sole** purpose of this marine equipment, be it pushing in the case of a towboat or carrying in the case of a tank barge, is to transport liquid cargo.



The unit tow's components must fit and complement each other so that the combination of the pieces are together capable of transportation.[6]

---

[3] Ex. "12," Robinson Depo., p. 30; *see also* Ex. "13," Villarreal Depo., p. 61; Ex. "8," Fulkerson Depo., pp. 47-48; Ex. "11,"Rangel Depo., p. 27.

[4] Ex. "2," Creel Decl., ¶ 6.

[5] Ex. "2," Creel Decl., ¶ 7.

1.      The Towboat.

In essence, the towboat is the "anchor vessel" for each of the vessels in the unit tow, and it serves many functions for its crew, as well as for navigation and transportation of the tank barges.  The towboat provides all aspects of the accommodation for the towboat's crew, specifically, the crew's living quarters, social quarters, galley, cleaning facilities, restrooms, and dressing facilities.[7]  The towboat also contains the navigation controls (wheelhouse/bridge), machinery space and propulsion for the entire unit tow, and when under tow, the tank barges are secured to the towboat with a complex system of lines and wires.[8]  The towboat pushes the barges through inland waterways throughout the United States, and the towboat is the sole reason that the barges can move at all.  However, a towboat's contribution to transportation is negligible if the tank barges to which it is attached cannot move.[9]  And, to understand how a tank barge is navigated, one must understand the design of a tank barge.

2.      The Tank Barges.

Blessey Marine's tank barges are sophisticated pieces of machinery with one mission:  to safely transport liquid cargo.[10]  They do not have one open hold for stowing cargo; they have several tanks that are completely contained within the tank barge.[11]  As an example, this is a schematic of the side view of a typical Blessey Marine tank barge:

---

[6] Ex. "2," Creel Decl., ¶ 8.

[7] Ex. "2," Creel Decl., ¶ 5.

[8] Ex. "2," Creel Decl., ¶ 8.

[9] Ex. "2," Creel Decl., ¶ 8.

[10] Ex. "2," Creel Decl., ¶ 6; Ex. "3,"Clendenon Decl., ¶ 5.

[11] Ex. "3," Clendenon Decl., ¶ 5.



**The Length of a Football Field**

And, this is the view from the top, with the cover of the tank barge removed:[12]



**Six Different Tanks
Capable of Holding Cargo**

By loading each tank to a certain level depending on the total volume of product being loaded or the draft requirements of the waterway or the marine terminal, the tank barge will sit at the proper draft – or depth – in the water, which ensures safe and efficient transportation.[13]

>     B.     *The Vessel-Based Crew.*

Crew members of the vessels live on the towboat – they eat and sleep on it, and they spend 24 hours of every day during their hitch on the unit tow.  Depending on the vessel, crew members typically work a 2-for-1 day hitch, which means that they work 20 days on the vessel and have 10 days off.[14]  While on a hitch, each crewmember works two six-hour shifts per day –

---

[12] All Blessey Marine tank barges are constructed with internal tanks for stowing liquid cargo, but not all Blessey Marine tank barges have the same internal tank configuration.  *See* Ex. "3," Clendenon Decl., ¶ 8.  But, for every tank barge, the internal tanks must be loaded and discharged properly so that the tank barge maintains its stability.  Ex. "3," Clendenon Decl., ¶ 8.

[13] Ex. "3," Clendenon Decl., ¶ 9; *see also*, Ex. "2," Creel Decl., ¶¶ 15-16.

[14] *See, e.g.,* Ex. "8," Fulkerson Depo., p. 26.

known as the front or back watch.[15]   The crew of the towboat is responsible for the entire unit

tow; they ensure that the unit tow operates safely from one point to another.   Depending on the

size of the vessels, the crew could be as few as four or as many as ten.[16]

The person acting as wheelman (typically, the Captain or Relief Captain) is the Master of

the unit tow, and every other person in the crew works at his direction to ensure that the mission

of transporting cargo is carried out.   Those persons are either deckhands or tankermen, and the

natural order of promotion for these positions is deckhand to tankerman to pilot to Relief Captain

to Captain.[17]   Coast Guard regulations require the presence of a tankerman on Blessey Marine's

tank barges, just as they require a Master, Pilot, and other personnel.[18]

## C.   *The Tankerman.*

A "tankerman" designation is a special endorsement administered by the United States

Coast Guard to seamen who hold a Merchant Marine Credential ("MMC").[19]   As licensed

tankermen, the plaintiffs were responsible for the transfer of hazardous liquid cargo to and from

tank barges on navigable waters.[20]   The certification requirements for tankermen are set forth in

46 U.S.C. § 7317 and 46 C.F.R. Part 13, and the certification process involves training on "how

tankerman duties impact the tank barges as a means of transporting cargo."[21]   But, ultimately, a

tankerman "is a glorified deckhand."[22]

---

[15] *See*, *e.g.*, Ex. "5," Akins Depo., p. 68.

[16] Ex. "2," Creel Decl., ¶ 4-5.

[17] Ex. "2," Creel Decl., ¶ 5.; *see also*, Ex. "1," McWhorter Expert Report, p. 6; *See* 46 C.F.R. Part 13.

[18] 46 C.F.R. §§ 15.805 (Master), 15.812 (Pilots), 15.860 (Tankermen), 15.801-60 (other vessel personnel).

[19] 46 C.F.R. § 13.101, *et seq*.

[20] 46 U.S.C. § 7317; 46 C.F.R. Part 13.

[21] Ex. "1," McWhorter Expert Report, p. 8.

[22] Ex. "9," Jones Depo., pp. 142-43.

Specifically, every tankerman deposed in this case agreed that the following was an exhaustive list of the duties of deckhands:[23]

| 1. | Cleaning | 7. | Cooking | 13. | Painting |
|----|----------|-----|---------|------|----------|
| 2. | Handling lines | 8. | Purchasing supplies | 14. | Change oil in engines |
| 3. | Stand watch | 9. | Radio communications | 15. | Change engine filters |
| 4. | Make locks | 10. | Repair lines | 16. | Chipping |
| 5. | Putting out mooring lights | 11. | Troubleshoot barge engines | 17. | Change oil in generators |
| 6. | Handling running lights | 12. | Troubleshoot boat engines | 18. | Tying off to docks |
| | | | | 19. | Building tow |

As a matter of law, these deckhand duties are seaman duties under the FLSA.[24]

Every tankerman in this case explained that there is no deckhand duty he did not have to perform.[25]  But, as tankermen, the plaintiffs had additional duties that deckhands ordinarily did not have: (1) pumping out bilge water; (2) fueling the vessels; (3) adding lube oil; (4) preparing the barge for loading and unloading of liquid cargo; and (5) loading and unloading of liquid cargo.[26]  There is no dispute between the parties that the first three are seaman duties.  The

---

[23] Ex. "5," Akins Depo., pp. 78-90; Ex. "6," Coffin Depo., pp. 164-70; Ex. "7," Fox Depo., p. 68; Ex. "8," Fulkerson Depo., pp. 44-48; Ex. "9,"Jones Depo., pp. 81-86; Ex. "10," Latiolais Depo., pp. 113-16; Ex. "11," Rangel Depo., pp. 87-90; Ex. "12," Robinson Depo., pp. 81-86; Ex. "13," Villarreal Depo., pp. 75-79.

[24] *Louviere v. Standard Dredging Corp.*, 239 F.2d 164, 165 (5th Cir. 1956) (a deckhand on a tugboat is an exempt seaman).

[25] Ex. "5," Akins Depo., pp. 78-90; Ex. "6," Coffin Depo., pp. 173-74; Ex. "7," Fox Depo., p. 68; Ex. "8," Fulkerson Depo., p. 44; Ex. "9,"Jones Depo., pp. 81-86; Ex. "10," Latiolais Depo., pp. 117-18; Ex. "11," Rangel Depo., pp. 90-91; Ex. "12," Robinson Depo., pp. 86-87; Ex. "13," Villarreal Depo., pp. 79-81.

[26] *See, e.g.*, Ex. "5," Akins Depo., p. 90 ("Q.  All the duties of a tankerman are not held by deckhands, also?; A.  That's correct.; Q.  The differences we talked about are fueling the boat, adding lube oil, pumping out and the bilge, and cargo transfers.; A.  That's correct.")

dispute is whether preparing the barges for loading/unloading and the loading/unloading of cargo are seaman duties.[27]

        **D.**     *The Maintenance of Towboat and Tank Barges, i.e.,*
                  *Preparing Barges for Loading and Unloading Cargo.*

Every commercial vessel in the world – and towboats and tank barges are not exceptions – is subject to constant scrutiny to ensure that it is well-maintained and ready for transport.[28] The concept is the same for the sailboats in a harbor, just as it is for the tank barges in Blessey Marine's fleet. In Blessey Marine's fleet, it is a tankerman's duty to ensure that tank barges are capable of being used to transport cargo.[29]

To that end, before going to port, and even prior to departing a marine facility, tankermen must perform readiness inspections of the unit tow to ensure that it is in good and seaworthy condition and can safety enter port in order to perform cargo transfers.[30] These duties were not invented by Blessey Marine (or even the Coast Guard, which now requires them). Inspecting vessels for readiness has always been – and will always be – the essence of a seaman function.

With respect to the tank barges, tankermen must walk the barge to ensure that there is no damage to the barge or other condition that would prevent a safe and successful cargo transfer

---

[27] The plaintiffs were all paid pursuant to a pay system that has been in place for nearly every vessel crew member in the industry like themselves for decades. During a typical workweek, they worked 60 hours over the course of a five day period for Blessey Marine. And, as an example, Keith Coffin was paid $240/day for that work (which included his day rate and per diem), Ex. "6," Coffin Depo. p. 132, for total compensation of $1,200. If Mr. Coffin had worked those 60 hours at the minimum wage on shore, the FLSA would have ensured he was paid a total of $507.50. For reasons explained below, the FLSA was not enacted to protect him or his fellow tankermen.

[28] Tankermen must perform general tank barge and towboat maintenance in order to maintain the seaworthiness of the barge and towboat. Ex. "7," Fox Depo., pp. 69-71 (towboat is a tankerman's "house" and if not maintained it can "fall apart"), 95.

[29] Ex. "5," Akins Depo., pp. 85, 92-93; Ex. "8," Fulkerson Depo., pp. 44-48, 92-96; Ex. "9," Jones Depo., pp. 81-86; Ex. "12," Robinson Depo., pp. 30, 87-88.

[30] Ex. "5," Akins Depo., pp. 94-95 (Barge readiness checks are done "to assess that the barge is capable of undergoing a safe transfer, that you're not going to have any leaks of water coming in or product coming out and that everything will work like it should when you arrive at the dock," and, "[i]f those things do not work, then the barge is not capable of functioning as a vessel anymore."); Ex. "8," Fulkerson Depo., pp. 92-96.

9

and subsequent transportation of that cargo, and they must then fill out paperwork about the inspection.[31]   For instance, tankermen must oil greasefittings (similar to a door hinge) on barges – if they do not, the hinges on the barges will rust, stick, and no longer operate.[32]   Tankermen must check voids and other areas for debris and loose equipment – if they do not, the barge could be unsafe to operate.[33]   Tankermen must tighten all hatches – if they do not, the doors or hatches could pose a safety hazard.[34]   In sum, there are a host of things that tankermen must do to maintain a barge.[35]   If these things are not done, the barge cannot safely transport cargo.[36]

> ### E.   *The Cargo Transfer Process.*

Filling a tank barge is not like putting gas in a car.  It is a complex process that involves specific, lengthy tasks done in sequence to ensure that the tank barge is capable of transporting liquid cargo.[37]   There are three reasons the task must be performed by a Coast-Guard licensed tankerman:  (1) individual barges must remain trim and stable; (2) the barges must be of a similar draft; and (3) the barges must account for the characteristics of the particular ports and

---

[31] Ex. "13," Villarreal Depo., pp. 55-56.  *See also, Phillips v. Lesco Logistics, LLC*, No. 06-3297, 2007 WL 1644039, *3 (S.D. Tex. 6/5/07) (Atlas, J.) (employees conducting "daily routine pre-trip inspections" and Vehicle Inspection Reports are employees "whose work activities affect the safety of operation of that motor carrier," and, as a consequence, are exempt under the Motor Carrier Act).

[32] Ex. "8," Fulkerson Depo., pp. 92-93.  Tankermen must also tend to the running lights and mooring lights on the barge, which is ultimately done to make the barge visible so that it can be safely navigated.  Ex. "7," Fox Depo., p. 71.

[33] Ex. "5," Akins Depo., pp. 92-93.

[34] Ex. "8," Fulkerson Depo., p. 95.

[35] All of these maintenance and inspection tasks must be discharged properly to ensure that the tank barge can be navigated safely and that it maintains its seaworthiness at all times.  *See* Ex. "5," Akins Depo., pp. 92-93 (checking gauges, pump engines, valves, fire extinguisher, mooring lines, winch wires, voids for water, void hatches); Ex. "8," Fulkerson Depo., pp. 92-96 (oiling greasefittings, changing oil and filters on barge pump engines, cleaning barges of oil spots and debris, securing hatches and dogs, doing overall readiness inspections).

[36] Not coincidentally, as explained below, *every* Court to have ever considered whether or not vessel maintenance is a seaman duty has universally found that it is.

[37] Ex. "3," Clendenon Decl., ¶ 9.

waterways in which the unit tow operates.[38]   At a basic level, the primary function of the loading and discharging of cargo is to protect and to preserve the structural integrity of the hull and framing of the barge so that it can transport cargo.

### 1.   Trim and Stability.

First, each individual barge must be trim and stable.[39]   This means that it sits "flat" in the water, without a significant list (or "dip") to any particular side, and tankermen receive specialized education on these issues during their tankermen training classes.[40]   Tankermen are responsible for loading each of the tanks within a tank barge in particular order and in a manner so as to preserve the trim and stability of the tank barge.[41]   A tank barge that lists in the water may become unstable and may become incapable of being used efficiently in a unit tow.[42]

The barge could be unsafe if it lists even when sitting still at port:



In this condition, the tank barge could have its structural integrity compromised and even warp, break, or sink.[43]   In any of these situations, the ability of the barge or the unit tow to transport cargo is threatened.[44]

---

[38] Ex. "2," Creel Decl., ¶ 10.

[39] Ex. "9," Jones Depo., p. 74.

[40] Ex. "1," McWhorter Expert Report, p. 8.

[41] Ex. "13," Villarreal Depo., pp. 55-56.

[42] Ex. "7," Fox Depo., pp. 52-55; Ex. "9," Jones Depo., p. 74; Ex. "10," Latiolais Depo., pp. 88-90; Ex. "11," Rangel Depo., pp. 25-29; Ex. "12," Robinson Depo., pp. 28-29; Ex. "13," Villarreal Depo., pp. 55-56.

[43] Ex. "13," Villarreal Depo., p. 58.

[44] Ex. "7," Fox Depo., pp. 52-55; Ex. "9," Jones Depo., p. 74; Ex. "10," Latiolais Depo., pp. 88-90; Ex. "11," Rangel Depo., pp. 25-29; Ex. "12," Robinson Depo., pp. 28-29; Ex. "13," Villarreal Depo., pp. 55-56.

On a collective basis, a unit tow cannot be assembled properly if the barges are not trim and stable.[45]  If the barges are not trim, this scenario could exist:



The Captain relies on the tankerman to ensure that a tank barge is loaded and unloaded in a manner that preserves its trim and stability.[46]  If that duty is not carried out correctly, the barges will not be trim or stable and may become unsuitable for transporting cargo.[47]

2.    <u>The Drafts of Barges.</u>

Second, all of the barges that will make up a unit tow must be of a similar draft (or depth) in the water to transport cargo efficiently.[48]  When barges are not of a similar draft, the unit tow does not transport cargo efficiently and, in extreme cases, can run aground, thereby preventing it from serving as a means of transporting cargo. [49]



Barges at Different Drafts

The water flowing under the last barge to the towboat will flow irregularly due to this draft, and the unit tow will not transport cargo efficiently.

Extra resistance while the unit tow is in transit.

---

[45] Ex. "7," Fox Depo., pp. 50-51; Ex. "10," Latiolais Depo., pp. 90-91; Ex. "11," Rangel Depo., pp. 29-30, 33, 34-36; Ex. "12," Robinson Depo., pp. 27-28.

[46] Ex. "7," Fox Depo., pp. 51-52; Ex. "9," Jones Depo., pp. 73-74; Ex. "10," Latiolais Depo., pp. 92-93; Ex. "11," Rangel Depo., pp. 30, 36-39; Ex. "12," Robinson Depo., pp. 28, 31; Ex. "13," Villarreal Depo., pp. 58-61.

[47] Ex. "7," Fox Depo., pp. 50-51; Ex. "10," Latiolais Depo., pp. 90-91; Ex. "11," Rangel Depo., pp. 29-30, 33, 34-36; Ex. "12," Robinson Depo., pp. 27-28.

[48] *Id.*

[49] *Id.*

The Captain relies on tankermen to ensure that a tank barge is loaded and unloaded in a manner so that the barges are at a similar draft.[50]

### 3.    The Ports and Waterways in Which the Unit Tow Operates.

Third, during the loading process, barges can only be loaded to the point that their drafts do not exceed allowable drafts for ports and waterways in which the unit tow will operate.[51] That allowable draft fluctuates depending on the time of year, waterway conditions, and port.[52] But, if the barges are not loaded so as to account for these limitations, they could run aground:[53]



**Barge Loaded to a 9 foot draft**

**Dock**

**Riverbed**

**Shallow Waterway with 8 foot draft limitation**

As required by Blessey Marine's Responsible Carrier Program, the Captain and tankerman must work together to ensure that a tank barge is loaded or discharged so that it is capable of transporting cargo through the waterways and ports where Blessey Marine operates.[54]

---

[50] *Id.*

[51] Ex "2," Creel Decl., ¶¶ 17-18.

[52] Ex "2," Creel Decl., ¶ 17.

[53] Ex. "10," Latiolais Depo., pp. 90-91; Ex. "11," Rangel Depo., p. 29.

[54] Ex. "7," Fox Depo., pp. 51-52; Ex. "9," Jones Depo., pp. 73-74; Ex. "10," Latiolais Depo., pp. 92-93; Ex. "11," Rangel Depo., pp. 30, 36-39; Ex. "12," Robinson Depo., pp. 28, 31; Ex. "13," Villarreal Depo., pp. 58-61; *see also* Ex. "1," McWhorter Expert Report, p. 5. These inspection items correspond with Blessey Marine's Responsible Carrier Program Cargo Handling Procedures, which require the tankerman to have a discussion with the Master/Captain regarding Cargo Planning and navigation transportation of the barge (BMS RCP A.7 C (5-6)), attached as Exhibit "15."

F.       *Catastrophic Effects of Improper Cargo Transfers.*

In addition to its navigational importance, transferring cargo correctly is critical to the preservation of the tank barge as a means of transporting cargo.  If the tank barge is not loaded properly, it can split, warp, and even sink.[55]

For example, if a tankerman fills the outer tanks of the tank barge too high and leaves the inner tanks too low,



the barge will hog:[56]



When a barge hogs, it warps and cannot carry out its mission of transporting cargo. In an extreme case, the barge can break or split.[57]

On the other hand, if the inner tanks of the barge are overloaded,

_____

[55] When the tank barge is unstable due to improper loading, the barge can hog, sag, and even break. Ex. "5," Akins Depo., pp. 60-61; Ex. "7," Fox Depo., p. 51; Ex. "9," Jones Depo., p. 143; Ex. "10," Latiolais Depo., p. 89; Ex. "13," Villarreal Depo., pp. 57-58.

[56] *Id.*

[57] *Id.*



Loading focused on the inner most tanks.

the barge can sag:[58]



In fact, in his report, Blessey Marine's expert discusses documented incidents in which tank barges improperly loaded by tankermen have actually split and sunk.[59]

### G. *Testimony from the Plaintiffs and the Expert.*

In response to this Motion, the plaintiffs will produce their form Declarations that claim cargo transfers are not important to aid the vessel as a means of transportation. But, their <u>actual deposition testimony</u> controls:[60]

Q.      Is it your responsibility, then, during the loading and unloading, to make sure that the barge maintains its ability to transport cargo?

A.      Right.

Q.      And so you're in charge of making sure that it maintains its ability to function as a transportation vehicle?

A.      Right.

---

[58] *Id.*

[59] Ex. "1," McWhorter Expert Report, pp. 20-22.

[60] *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th Cir. 1984) (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980)) (holding that "the nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony").

> Q.    Is there, you know, the services that you're performing in that regard, and they are primarily for making sure that the barge maintains its function as a transportation vehicle?
>
> A.    Right.[61]

As another tankerman explained:

> Q.    And so the tankermen make sure that the loading happens in a way so that the barge can transport cargo?
>
> A.    Yes.[62]

And another:

> Q.    Basically whatever the Captain asks you to do that went towards the operation of the vessel?
>
> A.    Yes.
>
> Q.    Same thing for loading and unloading cargo, right?
>
> A.    Yes.
>
> Q.    All those things we just talked about for the Jack Green, you had to do those for the Wayne Wood, also?
>
> A.    Yes, sir.
>
> Q.    Now, do any of those functions, in your opinion, not contribute to the vessel as a means for transportation?
>
> A.    No, sir.[63]

And still another:

> Q.    So with the liquid cargo that you're dealing with, what the tankerman is doing is making sure that the loading and unloading occurs in a way that the vessel maintains its ability to navigate; is that right?
>
> A.    Yes.

---

[61] Ex. "12," Robinson Depo., p. 30.

[62] Ex. "13," Villarreal Depo., p. 61.

[63] Ex. "8," Fulkerson Depo., pp 47-48.

> Q.     And that the barge maintains its ability to function as a transportation vehicle?
>
> A.     Yes.[64]

The testimony on these points went on and on.[65]  In addition to the plaintiffs' testimony, Blessey Marine's Director of Operations, Dustyn Grenon, was questioned by plaintiffs' counsel:  "[were you] asked to render an expert opinion on the percentage of working time a claimant spent on work rendered primarily as an aid in the operation of a vessel as a means of transportation"?  Mr. Grenon responded: "It all is.  All of their work."[66]

Finally, there is only one third-party expert in this case who can testify about this issue,[67] Tom McWhorter,[68] and he will agree with this conclusion:[69]

> I have witnessed and know from past experiences that navigation hazards, delays in navigation, and total destruction of vessels can be caused by the improper loading and discharging of cargo. Proper execution of the duties of a tankerman is essential to the primary purpose of the barge, which is to transport cargo safely in the navigable waterways. Simply put, if the barge is not loaded correctly, it can compromise its seaworthy condition, at which point it cannot serve its intended purpose as a transportation vessel for the cargo. If the barge is not maintained properly, it can comprise its seaworthy condition, at which point it cannot serve for the intended purpose as a transportation vessel for the cargo.

---

[64] Ex. "11," Rangel Depo., p. 27.

[65] Ex. "5," Akins Depo., pp. 60-61, 85, 90, 92-95; Ex. "7," Fox Depo., pp. 50-55; Ex. "9," Jones Depo., pp. 73-74, 81-86, 143; Ex. "10," Latiolais Depo., pp. 88-93.

[66] Ex. "4," Grenon Depo., pp. 56-57.  While being questioned by counsel for Blessey Marine, Mr. Grenon explained why this is the case in detail.  *Id.* at 218-28, 235-39.

[67] The plaintiffs have not designated an expert, and the deadline for filing a *Daubert* Motion has passed.

[68] Mr. McWhorter has worked in the Maritime Transportation Industry for over 30 years.  He trains tankermen, and he holds a "a valid United States Coast Guard License (USCG) as Master of Towing Vessel and a United States Coast Guard Merchant Mariners Document (MMD)," with a "Tankerman (Tank) Person-In-Charge (PIC), Dangerous Liquids (DL), and Tankerman PIC (DL) rating," among other ratings.  Mr. McWhorter began his career as a crewmember of towboats as a deckhand and later "worked on a towing vessel in the position of tankerman/deckhand until [he] received [his] United States Coast Guard Master of Towing Vessels License in late 1980's."  So, in addition to teaching experience, Mr. McWhorter has personally loaded and discharged tank barges.

[69] Ex. "1," McWhorter Expert Report, p. 4.

Mr. McWhorter's conclusion is supported by documented incidents in which the improper loading of tank barges by tankermen resulted in the tank barges sinking.

One such incident occurred in 1996, when "a Houston barge owned by Buffalo Marine split in half near the mouth of the Houston Ship Channel, spilling 210,000 gallons of thick fuel oil into the Gulf of Mexico."[70]  The United States Coast Guard used this incident to illustrate "how the loading of barges can cause undue stress on the barge which can cause it to split:"[71]

> During each incident, the *Buffalo 292* and *Buffalo 286* were loaded in a sagging condition. Imagine walking across a skinny piece of wood, such as an eight foot long two-by-four, that serves as a bridge across a stream; when you are half-way across, the wood sags under your weight. Similarly, although it is supported along its entire length by water, a barge that has its cargo concentrated near its middle, or midsection, will also sag. Physically, a sagging load condition causes the bottom plating and stiffeners of the barge to be in tension, or stretched, and the deck structure to be in compression, or squeezed.[72]

Accidents like this one illustrate the dire consequences of improper loading of tank barges by tankermen and the impact of their loading duties on tank barges as a means of transportation.

In sum, (1) the plaintiffs, (2) Blessey Marine, and (3) the only third party expert will all testify that tankermen duties are rendered primarily as an aid to Blessey Marine's tank barges as means of transporting cargo.  There will be no trial testimony to the contrary – any plaintiff who tries to testify to the contrary will be impeached, and the experts' uncontroverted testimony will be presented.  Given this overwhelming evidence, summary judgment is appropriate.

## V.    <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.

---

[70] *Id.* at 20.

[71] *Id.* at 21.

[72] *Id.* at 21-22.

R. Civ. P. 56(a).  Because summary judgment is an integral part of the Federal Rules of Civil Procedure and designed to secure the just, speedy, and inexpensive determination of every action, a non-movant cannot satisfy his burden under Rule 56 simply by showing "some metaphysical doubt as to the material facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1074, 1075 (5th Cir. 1994) (*en banc*) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## VI.  <u>Blessey Marine's Tankermen Are Seamen Exempt from the FLSA.</u>

Blessey Marine tankermen are properly considered seamen exempt from the FLSA for three reasons:  (1) they meet the legal definition of seaman; (2) they were intended to be excluded from the FLSA by Congress; and (3) the Supreme Court's recent decision in *Christopher v. SmithKline Beecham Corp.* confirms that they are seamen.

### A.  <u>*The Plaintiffs Meet the Legal Definition of Seamen.*</u>

Employees who are "employed as seamen" are exempt from the overtime provisions of the FLSA.  29 U.S.C. § 213(b)(6).  The FLSA does not define the phrase "employed as a seaman," but the Department of Labor's regulations set forth the following criteria:

> An employee will ordinarily be regarded as "employed as a seaman" if he performs, as a master or subject to authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character.

29 C.F.R. § 783.31.  Under this regulation, the employee must: (1) be the master or subject to the authority, direction, and control of the master of the vessel;[73] (2) perform service which is

---

[73] There is no dispute with the plaintiffs on this point. Ex. "5," Akins Depo., p. 62 (a tankerman is always working at the direction of the Captain of the towboat, including during the cargo transfer process); Ex. "13," Villarreal Depo., p. 51 (tankermen under authority of Captain during cargo transfer); *see also* Ex. "1," McWhorter Expert Report, p. 3 ("A Blessey Marine tankerman is working under the authority of the vessel's Master at all times."). A tankerman is always subject to the direction of the Master of the towing vessel. Some tankermen testified that they became the Master of the barge during cargo transfers. This assertion, while not entirely inaccurate, does not change the analysis.

rendered primarily as an aid in the operation of such vessel as a means of transportation; and (3) perform no substantial amount of work of a different character.[74]   And, it is the actual work performed that is relevant to this analysis.[75]   Based on the foregoing undisputed facts, the plaintiffs satisfy all three requirements.

Additionally, "while work done by a seaman must be an 'aid in the operation of the vessel,' it need not be directly related to navigation."[76]   So, an employee "is not excluded from the category of crew members who 'aid in the operation of [the] vessel' simply because, like 'pursers, surgeons, cooks, and stewards,' her primary duty aboard the vessel is not directly involved with navigation."[77]   In *McLaughlin v. Harbor Cruises*, the court found that "[p]ursers, surgeons, cooks, and stewards may aid in the operation of the vessel by supporting its mission in their respective particular ways, but they do not generally have primary duties related to navigation."[78]   Thus, even assuming cargo transfer duties are not related to the navigation and transportation function of tank barges (which they clearly are), the plaintiffs would still be

---

[74] Blessey Marine's Director of Operations provided expert testimony that none of the plaintiffs spent "substantial" time on non-seaman duties, even assuming that loading/unloading barges is a non-seaman duty.  Given the plaintiffs' testimony about the purpose of loading and unloading cargo, that issue is moot.  But, if the Court were to deny this Motion, Blessey Marine will raise the issue of how much time was spent by the plaintiffs performing cargo transfers following the depositions of certain plaintiffs as discussed at the recent Status Conference.

[75] *Martin v. Bedell*, 955 F.2d 1029, 1035 (5th Cir. 1992).

[76] *McLaughlin v. Harbor Cruises LLC*, No. 06-11299, 2012 WL 3065380, at *7 (D. Mass. 7/20/12).  In support of this conclusion, the District Court in *McLaughlin* cited DOL regulation 29 C.F.R. § 783.33: "[O]ne is not employed as a seaman within the meaning of the Act unless one's services are rendered primarily as an aid in the operation of the vessel as a means of transportation, as for example services performed substantially as an aid to the vessel in navigation."  The court explained that, "[n]otably, 'aid to the vessel in navigation' is mentioned as one example of 'aid in the operation of the vessel,' not as a complete definition of that term."  *McLaughlin*, 2012 WL 3065380 at *7.

[77] *Id.* (citing 29 C.F.R. § 783.32, which gives some illustrations of the types of crew members who might meet the criterion of giving 'aid in the operation of the vessel," including "sailors, engineers, radio operators, firemen, pursers, surgeons, cooks, and stewards.").

[78] *Id.*

properly classified as seamen exempt from the FLSA because everything they do supports the mission of Blessey Marine's tank barges:  the safe transportation of liquid cargo.

Finally, Blessey Marine tankermen meet the Fifth Circuit test of whether an employee is a seaman exempt from the FLSA:  an employee is employed as a seaman if his duties are maritime in character and rendered on a vessel in navigable waters.[79]  The Fifth Circuit confirmed its test in *Owens v. SeaRiver Maritime, Inc.*, 272 F.3d 698, 702, n.5 (5th Cir. 2001).

### 1.   *Owens v. SeaRiver Maritime* – Shore-Based Personnel

In *Owens v. SeaRiver Maritime, Inc.*, a former tankerman filed suit under the FLSA for unpaid overtime.[80]  As a vessel-based tankerman, Mr. Owens had every one of the duties held by the plaintiffs in this case.[81]  But, Mr. Owens did not claim that he was non-exempt during the time he was a vessel-based tankerman.[82]  Instead, it was only when SeaRiver reassigned him to a shore-based position on a "Strike Team" that anyone even considered the possibility that he might not qualify for the seaman's exemption.

As the Fifth Circuit explained, once Mr. Owens was transferred to the shore-based Strike Team, he "attended the barges only for the purposes of loading and discharging product."[83]  He was a member of a shore-based team created to facilitate the loading and unloading of cargo from a permanently moored barge, and he "certainly spen[t] a good percentage of his time

---

[79] *Gale v. Union Bag & Paper Corp.*, 116 F.2d 27, 28 (5th Cir. 1940); *see also Bailey v. The Pilots' Ass'n for the Bay River Del.*, 406 F. Supp. 1302 (E.D. Pa. 1976) (applying the Fifth Circuit test).

[80] 272 F.3d 698, 700 (5th Cir. 2001).

[81] *Id.*

[82] *Id.* at 700 & 701.

[83] *Id.* at 701.

21

loading and unloading."[84]   When he did work on a vessel that came to his shore-based location, the <u>only</u> purpose was to load or unload that vessel.[85]

The parties even agreed that Owens' work as a vessel-based tankerman was seaman's work,[86] and the Fifth Circuit acknowledged this fact:  "[o]nly Owens's status while working on the Strike Team is disputed; Owens does not dispute his status as a seaman when he was a towboat crewman."[87]   The court repeatedly qualified its holding, limiting its finding of non-exempt work to Mr. Owens' work "as a member of the Strike Team."[88]

In addition, Mr. Owens did not meet the plain-language regulatory requirements of the seaman's exemption.   Under the regulations, regardless of whether his loading and discharging of cargo as a member of the shore-based Strike Team was seaman's work, Mr. Owens could not be classified as a seaman because the regulations:   (1) are "not intended to apply to any employee who is not employed on a vessel," and Mr. Owens was not employed on a vessel; (2) require that a seaman be a "member of the crew," and Mr. Owens was not a member of the crew; and (3) require that a seaman is "subject to the authority, direction, and control of the master aboard a vessel," and Mr. Owens did not answer to the master of a vessel.[89]   The plaintiffs in this case, on the other hand, meet each of these requirements.

---

[84] *Id.* at 703.

[85] *Id.* at 703.

[86] *Id*; *see also* Plaintiff's Appellate Brief, *Owens v. SeaRiver Maritime, Inc.*, No. 00-60048, 2000 WL 33981512, at *iv (5th Cir. 4/21/00) ("Mr. Owens contends that his employment with the Appellee, SeaRiver, consisted of times when he was exempt from the Fair Labor Standards Act, as a maritime worker, but also a period extending over nearly sixteen months when he was not exempt."); *see also, Id.* at *2 ("The question in this case is whether Bobby Owens was a seaman, within the meaning of the FLSA, when he was stationed onshore . . . .").

[87] *SeaRiver*, 272 F.3d at 701.

[88] *Id.* at 703-04.

[89] *See* 29 C.F.R. §§ 781.31 & 783.32; *SeaRiver*, 272 F.3d at 700; Plaintiff's Appellate Brief, *SeaRiver*, 2000 WL 33981512 at *14.

Finally, in contrast to the <u>evidence</u> in this case, the evidence in *SeaRiver* demonstrated that Mr. Owens' work did not aid in the actual operation of a vessel as a means of transportation, but "only *prepare[d]* the vessel for navigation," and was not seaman's work.[90]   Here, the performance of liquid cargo transfers by the plaintiffs was the core mission of their assigned towboats.[91]   As a result, this task was integral to the operation of Blessey Marine's tows as means of transporting cargo, and the plaintiffs' cargo transfer duties were – as they admitted – performed to assist the Captain with navigation and to ensure the vessel could transport cargo. Unlike Mr. Owens, who stood-by at dock until barges arrived, the plaintiffs here accompanied cargo in transport, discharged it in a safe manner, and assisted in all navigational and operational functions of the entire unit tow.   While *SeaRiver* only addressed the seaman status of a shore-based employee who loaded and discharged cargo, *Jordan v. American Oil Co.*, explicitly analyzed a vessel-based tankerman and established that such an employee is appropriately classified as a seaman under the FLSA.

### 2.   *Jordan v. American Oil* – Vessel-Based Tankermen

Only one federal court has ruled on the seaman status of a vessel-based tankerman for an inland tank barge company.[92]   In *Jordan v. American Oil Co.*, the court examined the FLSA

---

[90] *SeaRiver*, 272 F.3d at 704.

[91] According to these plaintiffs, at Blessey Marine, all tankermen duties, including their duties related to the loading and unloading of liquid cargo, contribute to the safe operation and navigation of the unit tow.  Ex. "5," Akins Depo., pp. 85, 90; Ex. "8," Fulkerson Depo., pp. 44-48; Ex. "9," Jones Depo., pp. 81-86; Ex. "12," Robinson Depo., pp. 30, 87-88.

[92] In 1988, the Secretary of the Department of Labor did initiate an enforcement against King Welding, Inc. regarding its compensation of barge personnel that manned a barge moored up to oil rigs off the coast of California. Those tankermen hold different positions than Blessey Marine's vessel-based tankermen in that the King Welding tankermen simply "[rode] the tug while the barge [was] under tow and [were] not responsible for the navigation of the tug."  *McLaughlin v. King Welding, Inc.*, No. 86-1379, 1988 WL 81539, at *1 (C.D. Cal. 3/15/1988).  Blessey Marine's tankermen are never merely along for a ride; they are integral members of a towboat's crew and their duties directly impact the navigational capabilities of their assigned towboats and tank barges.  Based on the facts provided in the district court's opinion, the tankermen in *King Welding* are shore-based tankermen operating off of a rig, rather than vessel-based tankermen.

classification of a vessel-based tankerman[93] with the following duties:  gauging the barges before, during, and after loading liquid cargo; logging the barge movements; spotting the barge to make a connection with a shore hose and the barge hose; making steam hose connections to operate the pumps; and oiling the pumps.[94]  He was also responsible for loading and discharging liquid cargo from the barge, pumping bilge water, chipping and painting, standing watch, lighting the navigational lights, watching the lines, and other deckhand duties.[95]  The Court relied on Fifth Circuit precedent and found that the employee was properly classified as a seaman because his duties were maritime in character and rendered on a vessel in navigable waters.[96]  The facts of this case require the same conclusion.

The duties of Blessey Marine tankermen, as set forth above, are not in dispute.[97]  Like the plaintiffs' deckhand duties, these duties all contribute to the overall operation and maintenance of the unit tow and are necessary for its safe and operational control.[98]  In fact, *every single tankerman duty identified* has been previously found to constitute a seaman duty:

- 29 C.F.R. § 783.32 (seamen include members of a vessel crew, including radio operators, pursers, cooks, and stewards);

- 29 C.F.R. § 783.36 (seaman duties include attending to lines, putting out running and mooring lights, pumping out bilge water);

---

[93] The term "tankerman" did not exist in the regulations until 1965 when the Coast Guard added it. Ex. "1," McWhorter Expert Report, p. 7.  Therefore, the *Jordan* case describes an employee performing the tankerman's job without using that term.

[94] 51 F. Supp. 77, 78-79 (D.R.I. 1943).

[95] *Id.* at 78-79.

[96] *Id.* at 79 (citing *Gale*, 116 F.2d at 27).

[97] *See supra*, Section IV.C, p. 8.

[98] Ex. "6," Coffin Depo., p. 172; Ex. "7," Fox Depo., pp. 52-55; Ex. "9," Jones Depo., p. 74; Ex. "10," Latiolais Depo., pp. 88-90; Ex. "11," Rangel Depo., pp. 25-29; Ex. "12," Robinson Depo., pp. 28-29; Ex. "13," Villarreal Depo., pp. 55-56.

- United States Department of Labor Administrator's Opinion, FLSA 2006-44 (Nov. 30, 2006) (crew member performed no duties that were not "boat-related"; seaman duties include: performing maintenance, cleaning, making repairs, changing oil in the generator and engine, painting, mechanical and structural repairs, purchasing supplies, ensuring safety, adjusting the boat's moorings), attached as Exhibit "16";

- *McLaughlin v. Harbor Cruises LLC*, 2012 WL 3065380, at *7-8 (D. Mass. 7/20/2012) (duties unrelated to navigation are still seaman duties if they further the vessel's overall mission; concluded that galley attendants performing waiter and waitress duties were seamen);

- *Louviere v. Standard Dredging Corp.*, 239 F.2d 164, 165 (5th Cir. 1956) (seaman duties include: handling the lines, greasing, oiling, and repairing machinery; scrubbing the deck, and performing other duties routinely performed by a crew member);

- *Martin v. McAllister Lighterage Line, Inc.*, 205 F.2d 623, 625 n. 3 (2nd Cir. 1953) (seaman duties include tending to lines, displaying lights, pumping out bilge water, putting out fenders, examining vessel for damage and leakage, <u>supervising loading and unloading of cargo</u>, tending to lines);

- *Weaver v. Pittsburgh Steamship Co.*, 153 F.2d 597, 599 (6th Cir. 1946) (seaman duties include: repairing equipment, pipes, and gaskets; chipping; painting; cleaning; "sooging;" and turbining tubes);

- *Gale v. Union Bag & Paper Corp.*, 116 F.2d 27, 27 (5th Cir. 1940) (seaman duties include: all services usual to the occupation of a barge tender, attending to the lines and anchors, putting out running and mooring lights, pumping out bilge water);

- *Jordan v. American Oil Co.,* 51 F. Supp. 77, 78 (D.R.I. 1943) (seaman duties include: acting under the supervision of the Captain, primarily for the safety of the boat; standing watch; providing safety lighting; <u>loading and discharging a barge in a proper manner</u>; protecting the safety of the boat at all times; pumping the bilge water; chipping and painting barges; examining the boat for leaks; checking the running lights).[99]

---

[99] *Harkins v. Riverboat Servs. Inc.,* 385 F.3d 1009, 1104 (7th Cir. 2004) (seaman exemption applied to all members of a boat's crew where the boat was permanently moored to a dock and the plaintiff's duties included cleaning); *Levesque v. McGraw & Co.*, 165 F.2d 585, 586 (2nd Cir. 1948) (seaman duties include: navigation on a barge); *Bailey v. Pilots' Ass'n For Bay and River Delaware*, 406 F. Supp. 1302, 1307 (E.D. Penn. 1976) (seaman duties include: running the motor launches, general maintenance, and standing watch); *Bolan v. Bay State Dredging & Contracting Co.*, 48 F. Supp. 266, 270-71 (D. Mass. 1942) (seaman duties include: helping control vessel's movement in navigable water).

Although the plaintiffs were Coast Guard licensed, vessel-based tankermen, they performed all of the duties of deckhands[100] along with their exclusively tankermen duties. They were employed by Blessey Marine on unit tows, consisting of towboats and one or more tank barges, and the purpose of their work was to perform all activities necessary to the general maintenance of the tows so that they could operate safely and efficiently as means of transportation.[101]  Simply put, without the duties performed by the plaintiffs during the cargo transfer process and otherwise, the Blessey Marine tows to which they were assigned <u>could not have moved</u>.

      B.     *Tankermen Were Intended to be Excluded from the FLSA*
                         *with the Enactment and Amendment of the Seaman's Exemption.*

The seaman exemption was intended to apply *to all vessel-based personnel*:

> The exemption recognizes that at sea, with a normal life impossible, working more than 40 hours a week is an appropriate work norm, as distinct from the situation in most ordinary employments, where, because 40 hours is the norm, requiring the employer to pay time and a half for overtime encourages him to

---

[100] There is no dispute that a Deckhand is a "seaman" exempt from the provisions of the FLSA, and there also does not appear to be any reasonable dispute that Captains, Relief Captains, and Pilots in charge of a vessel are also exempt under the Fair Labor Standards Act.  Consequently, the plaintiffs' theory of the case is somewhat nonsensical.  For the plaintiffs to prevail, the Court would have to be persuaded that this was the only industry in America where an individual would be promoted out of an exempt position (as a Deckhand) to a non-exempt position (as a Tankerman) and then promoted into an exempt position (as a Relief Captain or Steersman).

The argument has even less credibility if the Court considers that to become a tankerman, one is trained in the following skill sets:  draft (how deep the barge is in the water), trim (how much allowance for draft from front to back), list (how much allowance of difference in draft from side to side), stability and stress (how to load the barge and not cause stress on the barge that could cause hull fracture while loading or while in transport), compatibility of cargos (not only for loading but while in transit), hull condition, structural failures, navigation markings, warning signs and lighting, ballasting and deballasting, and reporting of causalities such as groundings.  Ex. "1," McWhorter Expert Report, p. 5.  These sets of knowledge are critical to perform seaman duties.

[101] *See also Phillips v. Lesco Logistics, LLC*, No. 06-3297, 2007 WL 1644039, *3 (S.D. Tex. 6/5/07) (Atlas, J.) (employees conducting "daily routine pre-trip inspections" and Vehicle Inspection Reports are employees "whose work activities affect the safety of operation of that motor carrier," and, as a consequence, are exempt under the Motor Carrier Act).

spread the work by hiring enough workers to minimize the need and resulting expense of overtime.[102]

At Congressional hearings in 1960, Congress revisited the viability of the seaman exemption, and a worker representative explained, "if we in the river industry wanted to work an 8-hour day or 40-hour week, we would be working on the banks in factories or garages."[103]  Another worker representative testified that Congress, in 1938, "determined that rules and regulations that might be readily applicable to shoreside employment were not practical of application to seamen."[104]

The FLSA was "designed to raise substandard wages and to give additional compensation for overtime work . . . thereby helping to protect this nation 'from the evils and dangers resulting from wages too low to buy the bare necessities of life . . . .'"[105]  If this Court were to apply the overtime provisions of the FLSA to tankermen, it would offend the purpose of the FLSA.

First, Blessey Marine tankermen are very well compensated, realizing more than twice the compensation that they would receive in shore-based employment at the minimum wage for the number of hours worked.[106]  Second, Blessey Marine's towboats cannot carry more than two sets of personnel to man the vessels; therefore, every crew member must work twelve hours per day for every day of his hitch.  Third, given the limited living quarters on Blessey Marine towboats, it is not possible for Blessey Marine to hire more personnel to work on the unit tow –

---

[102] *Harkins*, 385 F.3d at 1102 (citing *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1543-44 (7th Cir. 1987); *Donovan v. Crisostomo*, 689 F.2d 869, 876 (9th Cir. 1982); *Mitchell v. Brandtjen & Kluge, Inc.*, 228 F.2d 291, 292-94 (1st Cir. 1955)).

[103] *Hearings Before the H. Subcomm. on Labor Standards, of the Comm. on Edu. and Labor on H. 4488*, 86th Cong., p. 939 (1960), attached as Exhibit "17."

[104] *Id.* at 930.

[105] *U.S. v. Rosenwasser*, 323 U.S. 360, 361 (1945) (quoting Sen. Rep. No. 884 (75th Cong., 1st Sess.)).

[106] At Blessey Marine, under the pay system for which they all elected to work, they were paid $1,200 for 60 hours of work in five days.  If they had worked those 60 hours at the minimum wage on shore, they would have been paid a total of $507.50.  The FLSA was not enacted to protect this group of workers.

there is no place for them to sleep (and it may violate Coast Guard regulations to exceed the number of allowable crew on some towboats). In short, removing some or all tankermen from the seaman exemption would be inconsistent with Congress' intent in enacting the FLSA.[107]

Finally, in 1960, when Congress amended the seaman exemption, vessel-based employees performing tankerman duties were universally determined by courts to be exempt under the FLSA.[108] When Congress amends a statute, it is presumed to know of federal courts' intervening interpretations, and this Court should presume Congress did not intend to alter the seaman exemption scope if the statute was not amended.[109] The Court should not make that change now.

> ### C.    *Christopher v. SmithKline Beecham Corp.*
> Confirms the Tankermen are Seamen.

Recently, the United States Supreme Court rejected the argument that a category of employees that has always been classified as exempt under the FLSA should be subjected to a new, broader interpretation of the exemption at issue.[110] In *Christopher*, the Supreme Court was asked to determine whether the term "outside salesman" included pharmaceutical sales

---

[107] A finding that *all* tankermen are not exempt from the FLSA would produce a host of inequitable results, including: (1) crew assignments on vessels with limited sleeping quarters would be impossible; and (2) the imposition of an incredible administrative burden of tracking the specific times and hours that tankermen boarded or left their vessels (crew changes take place at various times of the day depending on transportation capability, location of the vessel, and other factors).

Likewise, a finding that only *some* tankermen are not exempt from the FLSA will create even more burdens: (1) competition among tankermen for certain vessel assignments; and (2) constant shifting of pay methodology every time a vessel receives new orders from a Blessey Marine customer for a new route. The duties of Blessey Marine vessels constantly change, and, if a vessel-by-vessel analysis were required, the ability to predict whether tankermen on a certain vessel will or will not be exempt under the FLSA would be impractical and temporary at best.

[108] *Jordan v. American Oil*, 517 F. Supp. 77, 78-79 (D.R.I. 1943) (persons performing tankerman duties); *Gale v. Union Bay & Paper Corp.*, 116 F.2d 27, 27 (5th Cir. 1940); *see also* cases cited on pages 24-25 & n. 101.

[109] *Allen v. Coil Tubing Services, LLC*, 846 F. Supp. 2d, 678, 691 (S.D. Tex. 2012) (Atlas, J.) (citing *Ankenbrandt v. Richards*, 504 U.S. 689, 700-01 (1992)).

[110] *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012).

representatives.[111]   Although *Christopher* did not deal with the seaman exemption, the Court's analysis is on all fours with the analysis before the Court here.

1.      A Finding for the Plaintiffs Would
Undermine the FLSA and DOL Framework.

The Supreme Court initially observed that "[t]o defer to the [new DOL] interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'"[112]   The Court concluded that deferring to a new DOL interpretation, which would result in the pharmaceutical sales representatives at issue falling outside the exemption, "would result in precisely the kind of 'unfair surprise' against which our cases have long warned."[113]   That point applies here.

In *Christopher*, the Court noted that, "[u]ntil 2009, the pharmaceutical industry had little reason to suspect that its longstanding practice of treating detailers as exempt outside salesmen transgressed the FLSA," and "[t]he [FLSA] and regulations certainly do not provide clear notice of this."[114]   In this matter, neither the FLSA nor the applicable DOL regulations provide that vessel-based tankermen should not be classified as seamen exempt under the FLSA.   While the regulations provide various examples of the sorts of employees that are appropriately paid as exempt seamen, the relevant regulatory provisions do not specifically address vessel-based tankermen or even a similar position.   For as long as there have been tankermen, the inland tank

---

[111] *Id.* at 2161.

[112] *Id.* at 2167 (quoting *Gates & Fox Co. v. Occupational Safety and Health Review Comm'n,* 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.); citing *Phelps Dodge Corp. v. Federal Mine Safety and Health Review Comm'n,* 681 F.2d 1189, 1192 (9th Cir. 1982); *Kropp Forge Co. v. Secretary of Labor,* 657 F.2d 119, 122 (7th Cir. 1981); *Dravo Corp. v. Occupational Safety and Health Review Comm'n,* 613 F.2d 1227, 1232–1233 (3rd Cir. 1980); *Diamond Roofing Co. v. Occupational Safety and Health Review Comm'n,* 528 F.2d 645, 649 (5th Cir. 1976); 1 R. Pierce, Administrative Law Treatise § 6.11, p. 543 (5th ed. 2010)).

[113] *Id.* (citing *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 170–71 (2007); *Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 158 (1991); *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 295 (1974)).

[114] *Id.*

barge industry has operated with the understanding that the historical practice of compensating vessel-based tankermen as seamen is in compliance with the FLSA.[115]

Additionally, and "[e]ven more important, despite the industry's decades-long practice of classifying pharmaceutical detailers as exempt employees, the DOL never initiated any enforcement actions with respect to detailers or otherwise suggested that it thought the industry was acting unlawfully."[116]   The Court explained:

> As the Seventh Circuit has noted, <u>while it may be "possible for an entire industry to be in violation of the [FLSA] for a long time without the Labor Department noticing," the "more plausible hypothesis" is that the Department did not think the industry's practice was unlawful.</u>[117]

In the inland tank barge industry, vessel-based tankermen have always been classified as seamen exempt under the FLSA, and nearly every inland tank barge and towboat company pays its vessel-based tankermen a day rate.   Until this lawsuit was filed, none of those companies had any reason to believe that their pay practices were in violation of the FLSA.   Thus, according to *Christopher*, the "more plausible hypothesis" is that the industry's pay practice is lawful.

2. Tankermen's Work is Appropriately Exempt from the FLSA Because it Does Not Lend Itself to a 40 Hour Work Week.

The Supreme Court concluded that its holding in *Christopher* "also comports with the apparent purpose of the FLSA's exemption for outside salesmen."[118]   The exemption was based on the "thought that exempt employees performed a kind of work that 'was difficult to standardize to any time frame and could not be easily spread to other workers after 40 hours in a

---

[115] Blessey Marine's expert, who serves in a capacity with the agencies charged with addressing and revising Coast Guard regulations when necessary, describes in his report the history behind tankermen regulations. He concludes that tankermen were never intended to be treated differently (for pay or any other purpose) than other vessel-based members of a crew.  Ex. "1," McWhorter Expert Report, p. 7.

[116] *Id.* at 2168.

[117] *Id.* (emphasis added) (internal citations omitted).

[118] *Id.* at 2173.

week, making compliance with the overtime provisions difficult and generally precluding the potential job expansion intended by the FLSA's time-and-a-half overtime premium.'"[119]  After noting that the pharmaceutical sales reps spent between 10 and 20 hours a week working outside of normal business hours, the Court found that "it would be challenging, to say the least, for pharmaceutical companies to compensate detailers for overtime . . . without significantly changing the nature of the position."[120]

Here, Blessey Marine tankermen do not work a typical 40 hour week.  The plaintiffs worked hitches, which typically consisted of 20 days on their assigned towboat and 10 days off.  While on their hitches, the plaintiffs would work two six-hour shifts per day – either the front watch or the back watch – every day.  They did so because the vessels to which they were assigned (and nearly every other vessel in the industry) could not accommodate more crew members, and the vessels were required to have certain crew on duty at all times.  This schedule does not comport with a standard work week.  As a result, Blessey Marine's vessel-based tankermen are exactly the sort of employees for which an exemption is appropriate.

> 3.    Tankermen Are Not the Sort of
>        <u>Employees the FLSA Was Intended to Protect.</u>

In *Christopher*, the Supreme Court also noted that the outside salesman exemption is premised on the belief that exempt employees "'typically earned salaries well above the minimum wage' and enjoyed other benefits that 'set them apart from the nonexempt workers entitled to overtime pay.'"[121]  The Court observed that pharmaceutical sales reps "earned an

---

[119] *Id.* (citing 69 Fed. Reg. 22124).

[120] *Id.*

[121] *Id.* (quoting 69 Fed. Reg. 22124).

average of more than $70,000 per year" and, thus, "are hardly the kind of employees that the FLSA was intended to protect."[122]

Similarly, Blessey Marine tankermen are paid more than twice what they could expect to receive in minimum wage compensation for the same hours worked at a shore-based job.  The plaintiffs were compensated pursuant to a pay system that has been in place well-before the FLSA even existed, and one that is used throughout the industry.  The FLSA was not designed to change that system for vessel-based crew members, and the seaman exemption exists for the express purpose of preserving it.  The plaintiffs should not be permitted to alter and disrupt this legal and regulatory framework now.

**VII.** **Conclusion**

The plaintiffs were properly classified and compensated by Blessey Marine as seamen under the FLSA.  The plaintiffs' claims should be dismissed with prejudice.

Respectfully submitted,

**BAKER DONELSON BEARMAN**
**CALDWELL & BERKOWITZ, PC**


BY:  ____*s/Steven F. Griffith, Jr.*____
STEVEN F. GRIFFITH, JR. (La. Bar 27232)
*(Pro Hac Vice Admission)*
201 St. Charles Ave., Suite 3600
New Orleans, Louisiana  70170
Telephone:  (504) 566-5200
Facsimile:  (504) 636-4000
E-mail:  sgriffith@bakerdonelson.com

**ATTORNEY-IN-CHARGE FOR DEFENDANT,**
**BLESSEY MARINE SERVICES, INC.**

---

[122] *Id.*

OF COUNSEL:

Thomas J. "Beau" Bethune, IV
(U.S.D.C - S.D. Tex. Fed. I.D. No. 1100930)
General Counsel
Blessey Marine Services, Inc.
1515 River Oaks Rd. E.
Harahan, Louisiana  70123
Telephone:  (504) 734-2616
Facsimile:  (504) 734-2903
E-mail:  bbethune@blessey.com

ATTORNEY FOR DEFENDANT,
BLESSEY MARINE SERVICES, INC.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 22nd day of October, 2012, I electronically filed the foregoing with the Clerk of the Court using ECF system which sent notification of such filing to the following:

Mark J. Oberti (mark@osattorneys.com)
Edwin Sullivan (ed@osattorneys.com)
ATTORNEYS FOR PLAINTIFF

and I hereby certify that I have mailed by United States Mail, postage prepaid, the document to the following non-ECF participants:

None.

This the 22nd day of October, 2012.

_s/Steven F. Griffith, Jr._
STEVEN F. GRIFFITH, JR.