Page 93

1    A. About that.
2    Q. Okay. Well, let me break it down this way:
3 Obviously you weren't a port captain assigned to every
4 single vessel of all of the captains' logs you reviewed
5 for your analysis; correct?
6    A. That's correct.
7    Q. And the captains' logs reflect purported activity
8 on and about the vessel; correct?
9    A. That's correct.
10    Q. And you, yourself, you were not on the vessels
11 when any of that activity occurred; were you?
12    A. I was at certain times, yes.
13    Q. Okay. What's the percentage of time that you
14 were on actually on the vessel during any of the time --
15 strike that.
16       You reviewed thousands of captains' logs for your
17 analysis; right?
18    A. Correct.
19    Q. If you had to venture a guess -- and I'm not
20 going to hold you to it -- how many days out of all of
21 the hundreds and thousands captain logs?
22    A. Less than 30 days.
23       MR. GRIFFITH:
24          Object to the form.
25 BY MR. OBERTI:

Page 94

1    Q. Less than 30?
2    A. That's an estimate, less than 30.
3    Q. Obviously a very small percentage overall;
4 correct?
5    A. Correct.
6    Q. Okay. And I think you've already testified that
7 on some of the items we ticked off at the beginning
8 of the deposition you said there's not even a record
9 that that activity; right?
10    A. Correct.
11    Q. And so based on what Blessey requires of the
12 captains' logs to reflect, there's no requirement that
13 everything that the tankermen do be reflected on a
14 captain's log; right?
15       MR. GRIFFITH:
16          Object to the form.
17       THE WITNESS:
18          It's impossible.
19 BY MR. OBERTI:
20    Q. It's not required?
21    A. It's not required.
22    Q. So there's different activities that we talked
23 about involving maintaining the barge or checking the
24 barge that wouldn't be reflected in any document; right?
25    A. It wouldn't be necessary to document. Any of the

Page 95

1 crew members could have done them on any given day.
2    Q. Right. I get you, but my only point is, there's
3 no document of it; right?
4    A. It's not required.
5    Q. I'm not saying you should have done it. I'm just
6 saying it doesn't exist; right? There's no
7 documentation of it; right?
8    A. I'm not saying that I have any documentation of
9 it. It's not required of me.
10    Q. You don't know of any documentation of a lot of
11 things that people may have done associated with the
12 barges; correct?
13       MR. GRIFFITH:
14          Object to the form.
15       THE WITNESS:
16          Correct.
17 BY MR. OBERTI:
18    Q. And you would agree with me that the claimants
19 themselves are in a better position to say from personal
20 knowledge of what they actually did on a day-to-day
21 basis?
22       MR. GRIFFITH:
23          Object to the form.
24       THE WITNESS:
25          Not necessarily. I mean, I evaluated

Page 96

1 all of the logs and calculated the maximum number of
2 hours that would be possible for them to be in cargo
3 operations.
4 BY MR. OBERTI:
5    Q. Cargo transfers?
6    A. Cargo transfers; correct.
7    Q. As you defined it?
8    A. Right.
9    Q. Right. My question is not that narrow, though.
10 My question is, if you're trying to figure out what any
11 of those claimants did, not just for how you define
12 cargo transfers, but just what they were actually doing
13 on a day-to-day basis when they were on a vessel, they
14 would be in a better position to testify that from
15 personal knowledge; correct?
16       MR. GRIFFITH:
17          I'm going to object to the form.
18       THE WITNESS:
19          That's correct. I can't know what every
20 single person is doing.
21 BY MR. OBERTI:
22    Q. Had you ever been discipline while you were
23 employed by Blessey?
24    A. Yes.
25    Q. And what did you receive at Blessey?

24  (Pages 93 to 96)



**TORRES REPORTING & ASSOCIATES,** INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

## Page 97

1    A. I was terminated in 2001 for consensual sexual
2  conduct with a coworker during a company function.
3    Q. The conduct was during the company function?
4    A. No, it wasn't during the company function.
5    Q. All right. That's against company policy,
6  consensual sex?
7        MR. GRIFFITH:
8            I'm going to object to the form.
9        MR. OBERTI:
10           That's like no fun. Just kidding.
11 BY MR. OBERTI:
12   Q. So you were terminated in 2001. You were listed
13 eligible for rehire, I guess?
14   A. Correct.
15   Q. When did you go back to work for them?
16   A. Six months after that.
17   Q. And have you ever been terminated by any other
18 company?
19   A. Yes, as a matter of fact, I have.
20   Q. Who else?
21   A. I was terminated from Hollywood Marine Services.
22   Q. For what?
23   A. For allegedly mooning a civilian on a bank.
24   Q. On a river bank?
25   A. Yes.

## Page 98

1    Q. Mooning, just so that we're clear, meaning
2  pulling down your pants and showing them your ass?
3    A. That's correct.
4    Q. And, like, how did this bubble up into a
5  complaint that was somehow connected to your particular
6  rear end?
7    A. Myself and the pilot I was working with were
8  pranking some of the deckhands who were also working
9  with us, and apparently somebody on the bank saw us and
10 called in to the office.
11   Q. Okay. So you were mooning, but your intended
12 moonee was the deckhand, not this supposed civilian on
13 the river bank?
14   A. Sure. Yes.
15   Q. Have you been terminated by any other companies,
16 other than Blessey and Hollywood Marine?
17   A. No.
18   Q. Have you received any discipline at Blessey
19 Marine, other than the termination?
20   A. No.
21   Q. Okay. Now, when a vessel pulls up to a dock to
22 either load or unload, does the vessel first need to be
23 secured somehow?
24   A. Yes.
25   Q. Does the barge need to be secured?

## Page 99

1    A. Well, the tow in general.
2    Q. Okay. And I notice in the captains' logs, for
3  example, the captain's log will actually say, "Secure,"
4  and then there will be a number.
5        MR. GRIFFITH:
6            Which exhibit are you looking at?
7        MR. OBERTI:
8            Exhibit 21, for example.
9        MR. GRIFFITH:
10           We don't have anything in 21.
11       MR. OBERTI:
12           Oh, yes. I'm sorry.
13           Here. If you guys want to make some
14 copies of these.
15       MR. GRIFFITH:
16           Do you want to take a break.
17       MR. OBERTI:
18           Yes. We'll take a break.
19           (A recess was taken.)
20 BY MR. OBERTI:
21   Q. All right. We're back on the record.
22       Mr. Grenon, just for clarity, and I think we all
23 agree, obviously you didn't include any of the
24 tankermen's travel time as cargo transfers in your
25 analysis; correct?

## Page 100

1    A. No, I did not.
2    Q. It didn't play into your analysis at all;
3  correct?
4    A. No.
5    Q. Is that correct?
6    A. That's correct.
7    Q. And looking at Exhibit Number 21 here, this
8  appears to be a captain's log from the vessel Melvin
9  Todd for Sunday, September 20th, 2009; correct?
10   A. Which exhibit are you looking at?
11       MR. GRIFFITH:
12           21.
13 BY MR. OBERTI:
14   Q. Oh, I'm sorry. Hold on. Exhibit Number 21
15 appears to be a captain's log from the vessel Dreama
16 Klaiber for Friday, June 5th, 2009; correct?
17   A. Correct.
18   Q. And up top left is the name of Blessey
19 Marine Services and it's address; correct?
20   A. Yes.
21   Q. And they all have that, all of the captains' logs
22 have that up there?
23   A. Yes.
24   Q. And then they list the name of the vessel, in
25 this case, the Dreama Klaiber?



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

Page 101

1     A. Yes.
2     Q. And then there's a trip number assigned?
3     A. Yes.
4     Q. What does that reflect?
5     A. What that reflects is DK, meaning that it was
6  originally assigned to Dreama Klaiber. Each boat has a
7  two-letter code. 06 being the month. 09 being the
8  year. Number 1 being the first trip that it was
9  assigned to in the month of June. And the marketing
10 department creates that number.
11    Q. Okay. So then it says, "Fuel on board: 31,380",
12 correct?
13    A. Correct.
14    Q. That is that just -- does that mean...
15    A. That's just on the boat.
16    Q. Oh, not the barges?
17    A. That's just the boat.
18    Q. Meaning obviously fuels needed to power the boat
19 itself?
20    A. Correct.
21    Q. Gasoline?
22    A. Diesel fuel.
23    Q. It also says "Fuel purchases," nothing there.
24 "Lube on board", what's that?
25    A. That would be lube oil on board the vessel.

Page 102

1     Q. Stored somewhere or in active use?
2     A. That's stored.
3     Q. Okay. And then over here, we have the barges,
4  they have them identified as WEB 246 T and WEB 258?
5     A. Correct.
6     Q. And then Number 2 is next to them?
7     A. Yes.
8     Q. What does that mean?
9     A. I have no idea.
10    Q. So is it two barges assigned to this tow boat at
11 this time?
12    A. It would appear so, yes.
13    Q. And WEB, does that stand for Walter E. Blessey?
14    A. Yes, it does.
15    Q. And are all of the barges numbered?
16    A. Yes.
17    Q. Do they all start out with WEB?
18    A. I believe so.
19    Q. Does it reflect something?
20    A. Yes. "T" means that the barge is a trail piece
21 and it has a raked configuration on each end of the
22 barge, bow and stern.
23    Q. What is a "raked configuration"?
24    A. A barge either has a boxed end or a raked end
25 box, meaning a flat, horizontal box end, or a trail

Page 103

1  piece would be a -- to better cut through the water.
2     Q. Okay. Is there any numbering or lettering
3  associated with the barges that reflect whether or not
4  they're a heater barge?
5     A. Yes.
6     Q. Is there a designation for a heater barge?
7     A. All 200 series barges are 30,000-barrel-capacity,
8  black oil barges.
9     Q. A black oil barge is synonymous with a heater
10 barge?
11    A. Correct.
12    Q. What about clean chemical barge; is there a
13 numerical or...
14    A. Thirty-thousand-barrel, clean chemical barges are
15 300 series, 20 to 25,000 400 series, 10,000 barrel are
16 100 series barges.
17    Q. Is there any designation associated with
18 liquefied gas barges?
19    A. Yes, they're "P", that's the letter "P", 1
20 through 6.
21    Q. All right. So this captain's log reflects one
22 full day's activities?
23    A. Yes.
24    Q. And is each captain's log supposed to reflect one
25 full day's activities?

Page 104

1     A. Yes.
2     Q. Starting with essentially midnight?
3     A. Correct.
4     Q. And going to right before midnight --
5     A. Correct.
6     Q. -- the night before?
7     A. Correct.
8     Q. So the first entry says "Barges", and then it
9  lists the two barges; correct?
10    A. Yes.
11    Q. And then the next entry, it says, "ST/by Chevron
12 Pascagoula," meaning standby Chevron at Chevron
13 Pascagoula?
14    A. Yes.
15    Q. "Without DKSP", what does that mean?
16    A. Waiting on dock space.
17    Q. Okay. And then it says "An estimated 65 at
18 noon"?
19    A. Correct.
20    Q. Meaning that it's estimated that we'll be able to
21 start pumping then, or that's when the dock will come
22 open?
23    A. That's an estimate that the dock is giving them,
24 either that their dock is going to open up or that
25 they're going to start discharging.



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                          June 5, 2012

Page 105

1     Q.  So sometimes, like appears to be the case here,
2  the vessel will just be standing by outside of a dock
3  waiting for the dock to come open?
4     A.  Correct.  They may be waiting on the dock, they
5  may be in the fleeting area, they may be tied up in the
6  trees above and below the dock.  It just depends.
7     Q.  And meaning that apparently -- does this mean
8  somebody else is loading and unloading at the dock?
9     A.  Not necessarily.
10     Q.  It could be that it's not reedy for them for some
11  reason?
12     A.  Yeah.  There's a number of reasons.
13     Q.  So what happens on the vessel during this standby
14  period; just a bunch of waiting?
15     A.  Just all depends on if the captain has anything
16  for the crew to do.
17     Q.  So the captain might ask them to do some chores?
18     A.  Potentially, yes.
19     Q.  And obviously you've been on a vessel before in
20  this situation; right?
21     A.  Yes.
22     Q.  What usually happens?
23     A.  It really does all depend.
24     Q.  Okay.
25     A.  They may be sitting on the boat watching movies

Page 106

1  for a day.
2     Q.  Okay.  So sometimes you might be asked to do some
3  other type of work, and sometimes, if there's nothing
4  else to do, you might just be literally waiting?
5     A.  Correct.
6     Q.  Even if you're literally waiting, the tankermen
7  is still working his regular shift; right?
8     A.  He's working a watch; correct.
9     Q.  And obviously he's getting paid his normal day
10  rate?
11     A.  Correct.
12     Q.  Okay.  And according to this log, it appears that
13  the hose first went on barge number 258 at 9:15; is that
14  correct?
15     A.  Seems to be.
16     Q.  And it had been secured at 8:25?
17     A.  Correct.
18     Q.  Okay.  So it looks like in this case there was
19  about a 50-minute gap between the time the barge was
20  secured at the dock and the time that the hose actually
21  went on?
22     A.  Yes.
23     Q.  And is this one where they're loading or
24  unloading; can you tell?
25     A.  Yes.  I believe they're discharging.

Page 107

1     Q.  How do you know they're discharging?
2     A.  I can look down low on the log an I can see RPMs
3  and pressures.
4     Q.  Okay.  And does "DSG" mean discharge?
5     A.  Yes.
6     Q.  All right.  So is it typical or atypical for
7  there to be about a 50-minute gap between the time the
8  barge is secured and the time the hose actually goes on?
9     A.  It really does depend.
10     Q.  What's the range?
11     A.  It could be a day.
12     Q.  Why would it be a day?  Just basically --
13     A.  Depending on the dock, depending on what's going
14  on.  There are some docks that there's no other place to
15  tie off other than the docks, and when you get there,
16  you're tied off of the dock and secured and you may be
17  secured for over 24 hours.
18     Q.  I see what you mean.  It's essentially you're
19  standing by, but you happen to be secured?
20     A.  Correct.
21     Q.  And then it looks like it actually did start
22  discharging just as predicted at noon; correct?
23        MR. GRIFFITH:
24           Objection to the form.
25        THE WITNESS:

Page 108

1           No.
2  BY MR. OBERTI:
3     Q.  No?
4     A.  Looks like it started discharging at 10:20.
5     Q.  Oh, I'm sorry.  You're right.
6        Started discharging at 10:20, then what happened
7  at 11:00?
8     A.  Nothing.  It's just a recording of RPMs and
9  pressures.
10     Q.  And what happened at 12:00?
11     A.  Nothing.  It's just a traffic entry.
12     Q.  Oh, okay.  So meaning continuing to discharge?
13     A.  Correct.
14     Q.  Okay.  And then at 1 o'clock or 1300 military
15  time, it's just another reading?
16     A.  Just another -- correct, just another log entry.
17     Q.  And it finished discharging at 1550, meaning 3:50
18  p.m.?
19     A.  Correct.
20     Q.  And then hose went off at 1630, which is 4:30
21  p.m.?
22     A.  Correct.
23     Q.  So why would it take 40 minutes for the hose to
24  come off after the discharging is finished?
25     A.  I don't know.  It depends.  It depends on the

27  (Pages 105 to 108)

TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                                    June 5, 2012

---

Page 109

1  dock. It can depend on a lot of factors.
2      Q. I guess I'm just -- in my layman's mind, I'm
3  thinking, "Hey, you're done pumping, take the hose
4  down," or why would the hose need to be still secured
5  for 40 minutes?
6      A. They could be waiting -- sometimes you wait on
7  the inspector to give you an accurate barrel figure, so
8  he make have to go gauge a shore tank before you take
9  the hose off. You know, the dockman may not be
10  qualified to run the crane on the dock. They may have
11  to wait for somebody to come down and operate the crane.
12      Q. What's the crane necessary for; to take the hose
13  off?
14      A. Could be.
15      Q. What does this hose look like?
16      A. It depends. It really does. Sometimes it's a
17  hose. Sometimes it's a cast arm.
18      Q. How long is the hose or the arm?
19      A. It really depends. Sometimes they're 20-feet
20  long. It all depends.
21      Q. Okay. And for discharging, obviously the hose or
22  the -- what was the other thing it could be?
23      A. Could be an arm.
24      Q. The hose or the arm, one side of it is connected
25  obviously to the barge?

---

Page 110

1      A. Correct.
2      Q. Where is the other side connected to?
3      A. Connected to a pipeline that goes to a tank
4  inside either a tank farm or refinery or a pipeline.
5      Q. Okay. Does the hose or the arm come from Blessey
6  or somebody else?
7      A. Somebody else.
8      Q. Is the somebody else the customer?
9      A. No. Somebody else is the dock, the dock that
10  we're at.
11      Q. Okay. So are there three parties involved,
12  Blessey, the customer and the dock?
13      A. Potential.
14      Q. Who operates the dock?
15      A. It all depends. It all depends on what dock it
16  is.
17      Q. Like the Port of Houston, is that considered a
18  dock?
19      A. No. That's considered a port.
20      Q. Okay. What's the difference between a port and a
21  dock?
22      A. There's many docks inside of port.
23      Q. Is there any companies that specialize in running
24  docks?
25      A. I don't know.

---

Page 111

1      Q. You mentioned a dockman; what is a dockman?
2      A. A dockman is in charge of the shoreside operation
3  during a cargo transfer.
4      Q. Okay. And who employs the dockman?
5      A. Whatever dock he's at.
6      Q. Does Blessey employ dockmen?
7      A. No.
8      Q. What's the dockman's responsibilities?
9      A. I don't know. I've never been supervisor of
10  dockmen.
11      Q. Does the dockman have authority the tell Blessey
12  anything?
13      A. No, Not necessarily.
14      Q. Does the dockman have authority over that dock?
15      A. Over the dock, yes.
16      Q. So once Blessey is done discharging whatever
17  chemical fluid or liquid fluid that it's discharging,
18  does it need authority from somebody to remove the hose
19  or the arm?
20      A. It has to be an agreement.
21      Q. With?
22      A. The dockman and the boat crew.
23      Q. Okay. What about the customer?
24      A. Not necessarily.
25      Q. Okay. Is there usually a representative from the

---

Page 112

1  customer there while there's discharging occurring?
2      A. No.
3      Q. Okay. All right. So back to our Exhibit 21 here
4  looks like, like you said, the discharged finished at
5  1550, the hose came off at 1630, meaning 40 minutes
6  later; correct?
7      A. Correct.
8      Q. And that's not usual in your experience?
9      A. No.
10      Q. And then what's happening between -- according to
11  this captain's log, between 1630 and 1825?
12      A. Looks like they shifted their barges on their
13  dock, put the hose on the next barge.
14      Q. Okay. So now they're going to discharge the
15  second barge?
16      A. That's what it looks to be, yes.
17      Q. Do you have to move the barges around in some
18  fashion to make it happen?
19      A. Sometimes. They did -- apparently they did on
20  this dock.
21      Q. What would that entail, if you know?
22      A. Taking lines off of one barge and the boat would
23  shift the barge, face up to another barge, shift it up.
24      Q. Who is responsible for that?
25      A. The captain.

---

28  (Pages 109 to 112)



**TORRES REPORTING & ASSOCIATES,** INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                      June 5, 2012

Page 113

1    Q. But is the whole crew typically involved in it?
2    A. The whole crew is involved, yes.
3    Q. And obviously the whole point in this is so that
4    the barge could be discharged?
5    A. Correct.
6    Q. And then it looks like the hose went on the
7    second barge, according to this -- well, it looks like
8    the second barge was secured at 1710, meaning 5:10 p.m.;
9    correct?
10   A. Correct.
11   Q. And then the hose went on 40 minutes later;
12   correct?
13   A. Yes.
14   Q. And then it started discharging at 1825, which is
15   approximately 35 minutes after the hose went on;
16   correct?
17   A. Correct.
18   Q. And then it finished discharging at 2310, meaning
19   11:10 p.m.; correct?
20   A. That's correct.
21   Q. Okay. Now, for purposes of you calling something
22   or crediting working time toward a cargo transfer, you
23   didn't count time towards the cargo transfer merely
24   because the barge was secured to the dock; correct?
25   A. Correct. And I think what you're trying to say

Page 114

1    is, just because a barge was secured to the dock, I
2    didn't count that as transfer time.
3    Q. Right.
4    A. That's correct.
5    Q. Right. Instead, you started counting working
6    time towards transfer time -- well, I'm sorry. Let's
7    back up. And merely because the hose went on the barge,
8    that alone wasn't -- you didn't count that -- start
9    counting working time from that point forward as the
10   cargo transfer time?
11   A. That's correct. It could be hours before they
12   start. They could hook up a barge, and it could be
13   hours before they start a transfer.
14   Q. Right. And that's when you started counting
15   working time towards cargo transfer time, for purposes
16   of your analysis, is once, according to the captains'
17   logs, the discharging or the loading actually began?
18   A. Correct.
19   Q. And same thing with the end; you stopped counting
20   cargo transfer time once, according to the captain's
21   log, the discharge or the loading ended?
22   A. That's correct.
23   Q. And if there was more time, obviously, after
24   that, before the hose came off or the barge, you know,
25   moved from the dock, became unsecured, you didn't count

Page 115

1    that time towards cargo transfer time; correct?
2    A. That's correct.
3    Q. Now, is there also sometimes in the captains'
4    logs where during the transfer, where you were counting
5    cargo transfer time, for whatever reason, our transfer
6    temporarily stopped and then picked up and then some
7    time went by and then it picked up again?
8    A. Not necessarily.
9    Q. Does that ever happen?
10   A. Yes.
11   Q. What are some situations where that may happen?
12   A. They my do a line displacement where you may
13   discharge some product off of a barge and the dock shuts
14   you down for a matter of time for engaged tank. They
15   may -- you may fill up a shore tank, and they have to
16   swap between one shore tank to another shore tank, so
17   they shut the transfer down and they have to do
18   something internally in the refinery and then resume the
19   discharge, so it would depend.
20   Q. Okay. But for purposes of your analysis that you
21   did in this case as reflected in Exhibits 2 and 3,
22   anytime when you saw that a cargo transfer had been shut
23   down, even temporarily, you stopped counting that time
24   towards cargo transfer time; correct?
25   A. If it was 10 or 15 minutes, I don't think I

Page 116

1    stopped it; but, I mean, if it was anything greater than
2    30 minutes, then it did not count as cargo transfer
3    time.
4    Q. Okay. And so merely because a vessel was on dock
5    and the tankerman was on duty, that wasn't sufficient in
6    itself, in your mind, to count as his working time as
7    cargo transfer time; correct?
8    A. That's correct.
9    Q. Do tankermen have any duties -- well, on dock,
10   separate and apart from supervising the transfer of the
11   liquid?
12   A. When they're not transferring cargo?
13   Q. Well, let me ask you this: What does the
14   tankerman actually have to do to transfer cargo? What
15   are they doing?
16       MR. GRIFFITH:
17          Just to be clear, you're talking about
18   the actual product moving in the hose --
19       MR. OBERTI:
20          Right.
21       MR. GRIFFITH:
22          -- as opposed to anything else in that
23   timeframe?
24       MR. OBERTI:
25          Yes.



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON

June 5, 2012

Page 117

1  MR. OBERTI:
2      Q.  We've already talked about what they have to the
3  do prepare to load or unload; right?
4      A.  Right.
5      Q.  So what are they actually doing when cargo, like
6  Steve said, is actually moving?
7      A.  Monitoring lines on the barges, they're
8  monitoring pump pressures and RPMs, if they're
9  discharging, they're monitoring cargo levels inside the
10  cargo tanks, they may check the void tanks during load
11  or discharge, they're checking drafts, they're making
12  sure that, you know, the drafts match up bow and stern,
13  port to starboard, you know, there's no list.  They may
14  close down valves or open valves, depending on where
15  they're at in the process.
16      Q.  What's monitoring lines?  What type of lines?
17      A.  Monitoring lines between the barges and the
18  docks.  Typically if you go to dock and you're loaded
19  and you're going to discharge, you will be taking slack
20  up out of the lines, and if you're loading, then you
21  will be putting slack back into the lines as you're
22  coming down.
23      Q.  Okay.  You mean the lines actually attaching the
24  tow to the dock?
25      A.  Correct.

Page 118

1      Q.  What are these lines made out of?
2      A.  Typically cotton/polyester mix.
3      Q.  Like a rope?
4      A.  Correct.
5      Q.  And you said making sure there's no list?
6      A.  Correct.
7      Q.  No list in the barge or the vessel or...
8      A.  The barge that they're -- the barge.
9      Q.  Okay.  If, like you say, if you were to load it
10  in totally inapt fashion, the barge could list in some
11  fashion that would make it unseaworthy?
12      A.  It could, yes.
13      Q.  And then is there anything that the tankermen may
14  have to do, or that you did when you were a tankerman,
15  that has to do with interacting with the dockman?
16      A.  At what point in time?
17      Q.  At any time.
18      A.  Yeah.  Typically there's a VHF radio and there
19  will be VHF communication between the dock and the
20  barge.
21      Q.  And what's the purpose?
22      A.  So they can communicate.
23      Q.  Communicate about?
24      A.  About anything.
25      Q.  Okay.  I guess, let me ask you this:  We were

Page 119

1  looking at this captain's log and obviously, what
2  happened is, the tow pulled up and discharged two
3  barges; right?
4      A.  Yes, that's what it looks like.
5      Q.  Before they start the discharge process,
6  obviously they have to get secured and they have to hook
7  up the hoses; right?
8      A.  Sure.
9      Q.  But from a paperwork perspective with the dock,
10  does anything have to happen?
11      A.  Yeah.  They sign a DOI, Declaration of
12  Inspection.
13      Q.  All right.  Who signs that?
14      A.  The dockman and the tankerman.
15      Q.  Okay.  And what does that reflect; that there's
16  been some sort of inspection?
17      A.  It reflects that both parties are either ready to
18  receive or give cargo.  There's been a communication or
19  what they call a pre-transfer conference.  They've had a
20  conference, and they agree with the things on the DOI
21  and both of them sign the DOI.
22      Q.  Okay.  Is there any sort of inspection of the
23  barge or vessel or the tow before they sign that,
24  typically?
25      A.  It's a statement from the tankerman saying that

Page 120

1  everything on this DOI is true.
2      Q.  Okay.  And what does a DOI look like?
3      A.  It's a checklist.
4      Q.  It's not barge readiness checklist?
5      A.  No.
6      Q.  Is it one page or two pages?
7      A.  It's one page usually.
8      Q.  And the checklist, do you know what items are on
9  the list, or some of them?
10      A.  Yeah, I do.  That the barge is properly secured
11  to the dock, that the hose is properly secured, that
12  they've agreed upon a loading rate.  Those are some of
13  the items.
14      Q.  Okay.  And tankerman and dockman that sign off on
15  it?
16      A.  Yes.
17      Q.  And so you've signed off on them before as a
18  tankerman.
19      A.  Yes.
20      Q.  How does the process work?  You pull in and the
21  dockman walks up, who's typically got the copy of the
22  DOI?
23      A.  After it's signed, both.  It's a carbon copy.
24      Q.  Who produced it to begin with?
25      A.  The dock does.

30  (Pages 117 to 120)



**TORRES REPORTING & ASSOCIATES**, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                                June 5, 2012

Page 121

1   Q. So in your experience, I think you testified that
2   this typically only takes five minutes?
3   A. It could take five minutes, yeah.
4   Q. What's the longest it might take, at least in
5   your experience?
6   A. Ten minutes.
7   Q. Okay. And so it sounds like you're saying
8   typically, as part of this DOI, the dockman and
9   tankerman don't do some sort of like walk around
10  inspection together?
11  A. No.
12  Q. It's more or less the tankerman is making the
13  representation that these things have already been
14  checked out by him or her, and "I'm representing to you
15  that we're ready"?
16  A. Correct.
17  Q. Okay. And Blessey keeps a copy of it, the DOI?
18  A. No. They keep a copy on board the barges for 30
19  days.
20  Q. Then what happens?
21  A. They can throw them away.
22  Q. So they never actually get back to corporate
23  headquarters?
24  A. No.
25  Q. But the dockman keeps a copy?

Page 122

1   A. I don't know what the dockman does with his copy.
2   Q. Is this per barge or just each time a vessel
3   comes to dock?
4   A. Per transfer.
5   Q. Okay. So in this situation, we're looking at
6   Exhibit 21, the first page, there would have been two
7   DOIs executed?
8   A. That's correct.
9   Q. Okay. An you're saying you gave five minutes for
10  each barge that was either discharged or loaded? Do you
11  have to do it when you're loading, too?
12  A. Yes, you have to do a DOI when you're loading or
13  discharging.
14  Q. For purposes of your analysis, you added five
15  minutes -- I'm sorry. What did you do with the data?
16  A. I gave 30 minutes.
17  Q. For each time there was a transfer?
18  A. Commencing of transfer.
19  Q. Why did you give 30 minutes; just to be generous?
20  A. Yes. I mean, it's an estimate.
21  Q. Sure.
22      Now, how often, in your experience, is it that
23  the tow pulls up and immediately starts transferring
24  cargo versus there being a substantial amount of standby
25  time?

Page 123

1   A. I'm not even going to guess.
2   Q. I guess having hours of standby time or hours of
3   hours of standby time is not atypical?
4   A. I'm not even going to guess. I don't know. I
5   would have to analyze -- you know, I would have to have
6   some concrete data.
7   Q. Did you look at all of the captains' logs in this
8   case?
9   A. I sure did.
10  Q. Was there a lot of examples of standby time?
11  A. I wasn't looking for standby time.
12  Q. In your experience as a tankerman, were there
13  lots of times that you guys were on standby?
14  A. Sure, yes.
15  Q. Okay. And you've already testified some of the
16  times you're on standby and you're actually doing some
17  active work, and sometimes you're just standing by?
18  A. Correct.
19  Q. Okay. And you didn't credit any of the standby
20  time towards what you considered to be cargo transfer
21  time for purposes of your analysis?
22  A. No, I did not.
23  Q. Okay. I noticed in your declaration, if you go
24  back to Exhibit 3, paragraph 13...
25  A. Okay.

Page 124

1   Q. You're talking about assumptions that you made?
2   A. Yes.
3   Q. Well, let's start with paragraph 12 where it
4   says, "Each plaintiff could have only worked a front or
5   back watch on any given day." That's because they work
6   six on six off?
7   A. Correct.
8   Q. "However, the plaintiffs generally have not been
9   able to specifically identify which watch they worked on
10  on the days at issue"; do you see that?
11  A. Yes.
12  Q. That part I just read from, where did you get
13  that from, that the plaintiffs have generally not been
14  able to identify which watch they worked on on the days
15  at issue?
16  A. I was told that by Beau.
17  Q. Okay. And it says, "Based on my review of
18  personnel logs and captains' logs, I determined the
19  amount of time spent on cargo transfers both on the and
20  on the back watch vessel, and in doing so, I made three
21  assumptions," and then the first assumption you say,
22  "First I assumed that every plaintiff worked the full 12
23  hours of the front or back watch on every day of his
24  hitch, including the first and last day"; right?
25  A. Yes.

31  (Pages 121 to 124)



**TORRES REPORTING & ASSOCIATES**, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

Page 125

1    Q. So if the plaintiff came on his hitch on a
2  particular day, I assumed that he boarded the vessel at
3  midnight of that day and was there to perform any
4  tankering duties throughout the day. Assumingly, if a
5  plaintiff ended his hitch on a particular day, I assumed
6  that he disembarked the vessel at 11:59 p.m. and wasn't
7  available to perform any tankering duties until that
8  time. In my experience as a tankerman and as director
9  of operations, no crew member ever boards or disembarks
10  the vessel as part of the normal crew change at
11  midnight, therefore, this assumption artificially
12  inflates the calculation to the benefit of each
13  plaintiff"; correct?
14    A. Correct.
15    Q. But it actually artificially inflates two things,
16  by making that assumption, it artificially inflates the
17  amount of time they would be available, based on your
18  analysis, to perform cargo transfers; correct?
19    A. Potentially, yes.
20    Q. When they may not have, in fact, actually been
21  there; right?
22    A. That's correct.
23    Q. But it also artificially inflates the amount of
24  working time that you included for purposes of your
25  analysis; correct?

Page 126

1    MR. GRIFFITH:
2      Can I get you to reask -- I'm not sure I
3  followed the last two questions.
4    MR. OBERTI:
5      Yes.
6  BY MR. OBERTI:
7    Q. The point you're making is essentially, "Hey, in
8  reality, on a day that the tankermen started their hitch
9  or ended their hitch, in reality they may not have
10  actually worked 12 hours," meaning they're two shifts;
11  right?
12    A. Correct.
13    Q. "But for purposes of my analysis, since we didn't
14  know the specifics, I just ran with that assumption,
15  which means that some of the cargo transfers I credited
16  towards them, they may not have actually done"?
17    A. That's correct.
18    Q. But my point is, in addition to that, by
19  including that assumption that they worked two shifts,
20  both on their first day on and their last day off,
21  meaning 12 hours, that also artificially inflates the
22  amount of working time you had in your analysis;
23  correct?
24    MR. GRIFFITH:
25      You mean the denominator in the

Page 127

1  fraction?
2    MR. OBERTI:
3      Yes.
4    THE WITNESS:
5      Yes.
6    MR. OBERTI:
7      Okay.
8    MR. GRIFFITH:
9      Can we go off the record for a second?
10  We don't have to go anywhere, but I just want to ask a
11  question.
12    MR. OBERTI:
13      Sure.
14      (A conversation was held off the record.)
15  BY MR. OBERTI:
16    Q. Let me put it this way: For purposes of your
17  analysis, each and every day that a tankerman was
18  assigned to their hitch, you credited them for 12 hours
19  of work?
20    A. That's correct.
21    Q. Okay. All right. If you go to paragraph 15,
22  you're basically saying here that some of the captains'
23  logs reflect two barges assigned to a vessel are being
24  discharged or loaded at the same time?
25    A. Correct.

Page 128

1    Q. You're saying that it's not possible for a
2  Blessey tankermen to be working on both of them?
3    A. Correct.
4    Q. Why is that not possible?
5    A. Because only one tankerman is on watch at any
6  given time, so what they would do is, if the two barges
7  were like in different locations, spotted in a different
8  spot on the barge, that they would call in a third-party
9  tankerman to do the barge.
10    Q. Was there ever two tankermen on duty at the same
11  time on any Blessey tow?
12    A. It's a possibility, yes. It is a possibility.
13  If each one of the -- if the transfer was going to take
14  under 12 hours and the crew were capable of doing it,
15  they could call in to the port captain and seek
16  permission to do so.
17    Q. Okay. So for purposes of your analysis, you
18  don't actually know what happened on any specific
19  situation, you just made the assumption that they must
20  have called an outside shore tankering company; correct?
21    A. No. I made the assumption that -- I made the
22  assumption that the Blessey tankermen did both of them,
23  because what would -- in the logs, it wouldn't -- like
24  if there was a start time and then a finish time, I used
25  that -- I said basically that the Blessey tankerman

**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                    June 5, 2012

Page 129

1 started the earliest barge and then finished the latest
2 barge, even if there was a third-party tankerman doing
3 one of the barges.
4      Q. Okay. Let me see if I got it right. Maybe I
5 don't. For purposes of your analysis, you assumed that
6 whichever barge took the longest to discharge or load,
7 that's the one that the Blessey tankermen was assigned
8 to?
9      A. Or if the one that finished or started before,
10 say -- I also used the assumption that if one barge
11 finished before, the Blessey tankermen would then
12 relieve the third-party tankerman and then finished that
13 barge, so he got credit for the barge that took longer.
14     Q. Okay. Do you know what percentage of times
15 within the captains' logs this dynamic occurred where
16 there was two barges loading and unloading at the same
17 time?
18     A. No, I do not.
19     Q. Was it a small percentage?
20     A. It would have been a small percentage, yes.
21     Q. Okay. Now, did you say in your experience when
22 which your were a tankerman, you would typically
23 either -- you would typically get off the boat before
24 3:00 p.m.?
25     A. Yes.

Page 130

1      Q. Okay. Meaning that you typically didn't work 12
2 hours on your last day on the boat?
3      A. Correct.
4      Q. Okay. Was there any particular time that you
5 would typically get back on the boat on your first day?
6      A. Anytime between 6:00 and noon, usually.
7      Q. Okay. So is there ever a time where there's two
8 tankermen, two Blessey tankermen -- did I ask this
9 already, where there's two Blessey tankermen on duty at
10 the same time?
11     A. That's a possibility, yes.
12     Q. Okay.
13     A. If there was an emergency on the boat that
14 required both of them to be up at the same time or a
15 lock required two tankermen to be up to transfer the
16 lock.
17     Q. Is it ever just, while they're on hitch, there's
18 three tankermen, so that way, two of them could be on
19 duty at the same time?
20     A. It occurs. If we have an extra tankerman on the
21 boat, there may be three tankerman on a boat.
22     Q. Okay. In the captains' logs you reviewed, did
23 you see any situation where there's three tankermen
24 assigned to that boat?
25     A. No.

Page 131

1      Q. Was that something you were looking for?
2      A. No, that was not something I was looking for.
3      Q. Sounds to me, from your declarations, you were
4 looking at the captains' logs strictly for the time that
5 a barge began discharging or loading and the time it
6 stopped discharging or the load finished?
7           MR. GRIFFITH:
8                Object to the form.
9 BY MR. OBERTI:
10     Q. That was your main focus?
11     A. Primarily, yes.
12     Q. Okay. Do you still have copies of the initial
13 drafts of the declarations that Mr. Bethune gave you?
14     A. I believe so.
15     Q. Do you know if those were produced in this case?
16     A. I don't know.
17     Q. Did you have any conversations with any of the
18 outside lawyers from Mr. Griffith's office about your
19 declarations?
20     A. No.
21           MR. GRIFFITH:
22                Let's put a timeframe on that, just to
23 be clear. At any time, or before they were produced?
24           MR. OBERTI:
25                Yes, before they were produced.

Page 132

1      THE WITNESS:
2           Before the declarations were produced,
3 had I talked to any --
4      MR. OBERTI:
5           Yes.
6      THE WITNESS:
7           No, I had not.
8 BY MR. OBERTI:
9      Q. Neither declaration was typed on your computer?
10     A. Neither.
11     Q. And you don't know who typed them?
12     A. No.
13     Q. And do you have a copy of -- I think we talked
14 pout this, that you provided the results of your
15 analysis to Mr. Bethune, and then later on, he circled
16 back with you and gave you the draft declarations?
17     A. Yes.
18     Q. Do you have a copy of what the results were you
19 gave to Mr. Bethune?
20     A. I believe I do.
21     Q. Can you describe what they look like?
22     A. It's on a word document. Basically how many days
23 each plaintiff worked, how many hours that could have
24 been, how many hours is spent tanking and what
25 percentage.

33 (Pages 129 to 132)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**

June 5, 2012

Page 133

1  Q. Okay.
2      MR. GRIFFITH:
3          You've got them.
4  BY MR. OBERTI:
5  Q. Okay. It's not an Excel spreadsheet?
6  A. No. It's initially a word document.
7  Q. It's basically what you just said, each plaintiff
8  maximum number of hours they would have worked, maximum
9  number of hours that would have been cargo transfer and
10  them the percentage of overall work you counted as cargo
11  transfer time?
12  A. That's correct.
13      MR. GRIFFITH:
14          And for the record, we have produced
15  that you.
16      MR. OBERTI:
17          Okay. Thanks.
18      THE WITNESS:
19          And I'll be ready for lunch any time
20  now.
21      MR. OBERTI:
22          You want to go to lunch? I probably
23  have an hour after lunch, and that's it.
24      MR. GRIFFITH:
25          If you're at the stopping point,

Page 134

1  let's...
2      MR. OBERTI:
3          Yes, we can stop.
4          (A recess was taken.)
5  BY MR. OBERTI:
6  Q. We're back from our lunch break.
7  Mr. Grenon, in preparing the declarations that
8  you prepared in this case, Exhibits 2 and 3, did you
9  have any sort of written process that you worked off of?
10  A. No.
11  Q. Did you talk to anybody else who had done what
12  you were doing before?
13  A. No.
14  Q. Had you ever done that before?
15  A. No. I had never done a specific analysis, but, I
16  mean, I've been looking at logs for 18 years, so...
17  Q. Right. As part of your ordinary duties?
18  A. Correct.
19  Q. But you hadn't previously engaged in an analysis
20  such as the ones set forth in Exhibits 2 and 3 where you
21  characterize percentages of someone's working time;
22  correct?
23  A. I had not done that before, no.
24  Q. Did you double check your numbers?
25  A. There were certain calculations that I double

Page 135

1  checked, yeah.
2  Q. Okay.
3  A. But it wasn't -- I didn't double check every
4  single number.
5  Q. Did you do this analysis by yourself?
6  A. I did this analysis solely by myself.
7  Q. For both Exhibits 2 and 3?
8  A. Yes.
9  Q. And so did anybody double check your work, to
10  your knowledge, in any way?
11  A. Not to my knowledge.
12  Q. What's your highest level of math in college?
13  Did you take a math class in college?
14  A. Algebra in college.
15  Q. Okay. Have you taken calculus?
16  A. No.
17  Q. Ever?
18  A. High school.
19  Q. How far did you go?
20  A. I don't know. That was 20 years ago, almost.
21  Q. Okay.
22      MR. GRIFFITH:
23          How far did he go in calculus?
24      THE WITNESS:
25          Whatever I learned in calculus was 20

Page 136

1  years ago.
2      MR. OBERTI:
3          Okay. Just asking.
4      THE WITNESS:
5          No problem.
6  BY MR. OBERTI:
7  Q. Was there a level after calculus?
8  A. No.
9  Q. Okay. Now, you know how we went over, I think,
10  Exhibit 21 that shows on that particular transfer there
11  was less than an hour, something like 40 minutes or so,
12  time gap between the time the hose went on and discharge
13  started occurring?
14  A. Yes.
15  Q. That's not uncommon; is it?
16  A. It's not uncommon.
17  Q. What would a tanker- -- did that ever happen to
18  you when you were on duty as a tankerman?
19  A. Yes.
20  Q. What would you be doing during that gap between
21  the time the hose goes on and the time the cargo
22  starts flowing?
23  A. It would depend. You could go back to the boat
24  and eat lunch, as an example. Go back to the boat,
25  smoke a cigarette, whatever the captain wanted you to

34  (Pages 133 to 136)



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                           June 5, 2012

Page 137

1  do, if he had something extra for you to do. A lot of
2  times, you have a radio, go back to the boat and wait
3  for the dock to call you on the radio.
4      Q. When the tankerman is on a six-hour shift, do
5  they get breaks?
6      A. Yes.
7      Q. Is there some specific number of breaks?
8      A. There's not a specific number of breaks, no.
9      Q. It's up to the captain?
10     A. Up to the captain and up to the fellow crew
11  members.
12     Q. Do you know typically whether or not they
13  typically eat their meals while they're on their shift
14  or off their shift?
15     A. It really does depend. It could depend on what
16  the boat is doing, depends on that person's eating
17  habits.
18     Q. What about you when you were a tankerman?
19     A. I would normally eat before I came on watch, but,
20  you know, maybe have a -- you know, depending on what
21  was going on. I've had times where a wheelman came out
22  and relieved me so I could go back to the boat for an
23  hour at a time.
24     Q. While you were on your six-hour shift?
25     A. Correct.

Page 138

1      Q. You don't punch out or anything like that?
2      A. No.
3      Q. In your opinion, is there any work that a
4  tankerman ordinarily does while their vessel is in dock
5  that is not primarily related to either loading or
6  discharging of the barges?
7          MR. GRIFFITH:
8              Object to the form.
9          THE WITNESS:
10             Can you ask it for me one more time?
11 BY MR. OBERTI:
12     Q. In your opinion, is there any work tankermen
13  regularly do when a vessel is in dock that is not
14  primarily related to either loading or discharging the
15  barges?
16         MR. GRIFFITH:
17             Object to the form.
18         THE WITNESS: Yes.
19 BY MR. OBERTI:
20     Q. Such as?
21     A. I mean, you could be at dock standing by.
22     Q. Okay. Anything else?
23     A. No.
24     Q. Okay. The things that you talked about earlier
25  that someone would need to do, that a tankerman would

Page 139

1  need do to prepare the barge for either loading or
2  unloading, the things you listed, for example, open the
3  valves, monitor the product level, so on and so forth,
4  you would agree that all of the that sort of work,
5  number one, that's work that occurs in the dock?
6          MR. GRIFFITH:
7              Object to the form.
8          THE WITNESS:
9              Not necessarily.
10 BY MR. OBERTI:
11     Q. Would you agree that that's work that's primarily
12  related to either loading or discharging the barges?
13         MR. GRIFFITH:
14             Object to the form.
15 BY MR. OBERTI:
16     Q. You're preparing the barges for either loading or
17  discharging; correct?
18         MR. GRIFFITH:
19             Object to the form.
20         THE WITNESS:
21             You're preparing them to transport
22  cargo.
23 BY MR. OBERTI:
24     Q. Well, I mean, you're specifically either loading
25  the cargo into the barge or discharging the cargo from

Page 140

1  the barge?
2      A. Or you're doing neither.
3      Q. Or you're doing neither.
4      A. Right.
5      Q. If you're doing neither -- right. The things
6  you -- when we first started the deposition, the things
7  you listed as preparing a barge for loading or
8  unloading, remember we started with the job description
9  that said something like the primary function of a
10  tankerman is preparing the barge for either loading or
11  unloading the discharge of the barge?
12     A. Right. Okay.
13     Q. All right. The things you listed, those things
14  are not actually cargo transferring themselves, rather,
15  they're preparing the barges for cargo transfer;
16  correct?
17     A. They're in preparation; that's correct.
18     Q. And the very nature of the duties are, in fact,
19  closely relating to either loading or unloading, in
20  fact, their ancillary duty is either loading or
21  unloading; correct?
22         MR. GRIFFITH:
23             Object to the form.
24         THE WITNESS:
25             Yeah. A tankerman could do them, a

35 (Pages 137 to 140)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                June 5, 2012

Page 141

1  deckhand could do them, you know, and they could be done
2  a day before you load or discharge or an hour before you
3  load or discharge.
4  BY MR. OBERTI:
5      Q. I'm not asking you who does them or when they're
6  done, but the nature of the duties themselves are
7  closely related to either loading or unloading the
8  barges?
9      A. Yes.
10     Q. Can a tankerman or -- I'm sorry.  Can a deckhand
11 open a valve?
12     A. Yes.
13     Q. Can a deckhand monitor the product level to
14 ensure it's level in a barge?
15     A. Absolutely.
16     Q. Can a deckhand hook up the hose to a barge?
17     A. Yes.
18     Q. Can a deckhand check hashes to ensure there's no
19 water in the barge?
20     A. Yes.
21     Q. Do you know as a practical matter, whether a
22 tankerman could do it, who typically does it, or does it
23 all depend?
24             MR. GRIFFITH:
25         I'm going object to the form.  I'm just

Page 142

1  not sure I follow.
2             THE WITNESS:
3         It really does depend.
4  BY MR. OBERTI:
5      Q. So is there somebody from Blessey's side that's
6  in charge of cargo transfers when they occur?
7      A. The captain of the vessel.
8      Q. Is the tankermen in charge of anything ever?
9      A. He is the person in charge of the -- he is the
10 person in charge of the cargo transfer, but ultimately
11 it's the responsibility of the captain.
12     Q. Okay.  Do all captains have current, valid
13 tankerman's licenses?
14     A. No.
15     Q. Do you know what percentage of the captains you
16 have do?
17     A. No.
18     Q. Do you know if any of the captains on the vessels
19 on which the claimants in this case served have
20 currently valid tankerman certificates or licenses?
21     A. I'm not really sure.  It's not really an issue.
22     Q. I'm not saying that you should know.  I'm just
23 asking if you do know, and you don't?
24     A. It's not a requirement.
25     Q. You don't know?

Page 143

1      A. I've never looked.
2      Q. I guess the point being is, somebody with a valid
3  tankerman certificate has to be in charge of the cargo
4  transfer; right?
5             MR. GRIFFITH:
6         Object to the form.  I don't think
7  that's what his testimony was.
8  BY MR. OBERTI:
9      Q. I'm sorry.  Your testimony is the tankerman was
10 in charge of the cargo transfer, but ultimately reports
11 to the captain?
12            MR. GRIFFITH:
13        No.  He used the term "person in
14 charge," which is a term of art, and I think you-all
15 were speaking in different languages, frankly.  He was
16 using the term of art, and I think you were just talking
17 as a layman in charge of something.
18 BY MR. OBERTI:
19     Q. I'm sorry.  What's the term of -- were you using
20 the "person in charge" as a term of art?
21     A. It's called the PIC.
22     Q. What does the term of art mean, PIC?
23     A. Person in charge.
24     Q. Okay.
25     A. And he's overseeing the cargo transfer operation.

Page 144

1      Q. From just a functional standpoint?
2      A. He's going to be the person that's going to be on
3  the barge from a functional standpoint.
4      Q. While it's transferring cargo?
5      A. Correct.
6      Q. Okay.  Whether or not the tankerman -- whether or
7  not the captain has a tankerman's license?
8      A. Correct.
9      Q. But you're saying ultimately all functions
10 relating to that vessels and it's barges, ultimately the
11 captain is responsible for?
12     A. That's right.
13     Q. Okay.  Now, is there any reason that a Blessey
14 vessel would be in dock, other than to discharge or load
15 cargo?
16     A. Yes.
17     Q. Why else?
18     A. Waiting on the weather.
19     Q. I'm sorry?
20     A. Waiting on weather.
21     Q. Like bad weather?
22     A. Waiting on bad weather to clear.  Waiting on good
23 weather, actually.
24     Q. Right.
25        So if it's bad weather, do sometimes they pull



**TORRES REPORTING & ASSOCIATES,** INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                          June 5, 2012

### Page 145

1  into the dock?
2      A. Or if you're at the dock, you won't leave.
3      Q. Okay. Any other reason that a Blessey vessel
4  with barges would be in dock, other than to load or
5  unload?
6      A. If there were a family emergency or some type of
7  incident that occurred and the boat wasn't crewed
8  properly.
9      Q. Any other reason?
10     A. Mechanical failure.
11     Q. Okay. Any other reason?
12     A. None that I can think of right now.
13     Q. In reviewing the captains' logs in order to
14  prepare Exhibits 2 and 3, did you see any times where
15  the vessel at issue had gone into a dock because of bad
16  weather or waiting for good weather?
17     A. I wasn't looking for that.
18     Q. Would that be on a captain's log?
19     A. It would.
20     Q. In your experience, does that happen a lot?
21     A. It happens.
22     Q. Occasionally or frequently, in your opinion?
23     A. It happens occasionally, yeah.
24     Q. Okay. Family emergency, did you see any evidence
25  of that on the captains' logs?

### Page 146

1      A. I wasn't looking for that when I analyzed the
2  logs.
3      Q. Hopefully that's a relative rare-occurring thing;
4  right?
5      A. It should be.
6      Q. Is it in your experience?
7      A. It's not as rare as I would like the be
8  sometimes.
9      Q. How many times a year do you have a family
10  emergency that requires a Blessey vessel to pull into
11  dock that it otherwise wouldn't?
12     A. Fifty times a year, possibly.
13     Q. Fifty?
14     A. (Witness nodding head).
15     Q. Okay. So that would be a little less than one
16  time per vessel, on average?
17     A. You're asking me to guess on something I'm not
18  prepared to answer.
19     Q. Strictly a guess; right?
20     A. And 50 is my guess.
21     Q. And less than a 100 for sure?
22     A. Nothing's for sure. You're asking me to guess,
23  which I've done, around 50.
24     Q. Okay. Which based on your guess would translate
25  to less than one time per vessel since Blessey has 62

### Page 147

1  vessels; right?
2          MR. GRIFFITH:
3              Object to the form.
4          THE WITNESS:
5              Once per vessel.
6  BY MR. OBERTI:
7      Q. And the last one you said, mechanical failure,
8  meaning on the to boat itself?
9      A. Yes.
10     Q. Does that happen frequently?
11     A. It happens occasionally.
12     Q. That's your guess. On an average 12-month
13  period, how many times does a tow boat have to go into
14  dock from because of mechanical failure from the Blessey
15  fleet?
16         MR. GRIFFITH:
17             Object to the form.
18         THE WITNESS:
19             I really don't know. It would only be a
20  guess if I had to tell you a number.
21  BY MR. OBERTI:
22     Q. Did you see any evidence that any of the vessels
23  in this case on the captains' logs you reviewed had gone
24  into the dock because of mechanical failure?
25     A. I wasn't looking for that.

### Page 148

1      Q. Okay. The three things you listed, these are all
2  not with Blessey's business to do at the dock, namely
3  wait out the weather, a family emergency or mechanical
4  failure, that's not Blessey's core business. These are
5  just things that may come up that may require them to go
6  into dock; right?
7      A. That's correct.
8      Q. The only reason that Blessey would be in the dock
9  as part of what it's core business is, is to either load
10  or unload cargo; correct?
11         MR. GRIFFITH:
12             Object to the form.
13         THE WITNESS:
14             We're in the business of transporting
15  cargo.
16  BY MR. OBERTI:
17     Q. So it could be either loaded or unloaded?
18         MR. GRIFFITH:
19             Object to the form.
20         THE WITNESS:
21             So it could be transported.
22  BY MR. OBERTI:
23     Q. Well, you're not just running cargo all around
24  transporting it, it's eventually being loaded or
25  unloaded; right?

37 (Pages 145 to 148)



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                                    June 5, 2012

Page 149

1    A. After we transport it.
2    Q. Right. And the only place it gets loaded and
3    unloaded is in docks; correct?
4    A. That's correct.
5    Q. So the only reason, the core company reason that
6    the company would be in dock is to load or unload cargo;
7    correct?
8        MR. GRIFFITH:
9            Object to the form.
10   BY MR. OBERTI:
11   Q. Right?
12   A. Yes. That's what we're in the business of doing.
13   Q. Okay. And has there ever been any accidents with
14   spills as a result of improper loading or unloading at
15   Blessey?
16   A. Yes.
17   Q. Anything catastrophic?
18   A. Any spill to the water is considered catastrophic
19   in my eyes.
20   Q. Have there been such spills at Blessey?
21   A. Yes.
22   Q. Like how many?
23   A. I'm not prepared to answer that question. I
24   don't know.
25   Q. Did anyone get fired off of them, if you know?

Page 150

1    A. Yes, tankermen have been fired before for
2    spilling cargo.
3    Q. Because apparently they did it the wrong way?
4    A. Either did it incorrectly or weren't paying
5    attention, yes.
6    Q. Has anybody other than a tankerman been fired as
7    a result of spillage?
8    A. Probably.
9    Q. Do you know for sure?
10   A. No, I don't know for sure. I can't tell you
11   right offhand.
12   Q. But you do know tankermen have been fired for it
13   for sure?
14   A. Yes.
15   Q. Did you ever see a videotape of Keith Coffin or
16   Eric Jones in this case?
17   A. I did see it. Not related to this case, but I
18   have seen that video.
19   Q. Did you see it before this case even existed?
20   A. Yes.
21   Q. What did you see?
22   A. I sue a YouTube video of Keith Coffin and Eric
23   Jones at a dock in Birmingham, Alabama with a dockman.
24   Q. What were they doing? Obviously the tape speaks
25   for itself, but whatever you recall.

Page 151

1    A. Hamming it up for the camera.
2    Q. Like, what do you mean?
3    A. Have you seen the video?
4    Q. I don't know if I've seen it. I can't really
5    recall what you're talking.
6    A. Okay.
7    Q. So tell me what you mean, "hamming it up"?
8    A. They're hamming it up in front of a video camera
9    with the dockman when they're supposed to be loading or
10   unloading.
11   Q. Okay. What do you mean "hamming it up";
12   telling jokes or...
13   A. I can't recall exactly what they're doing in the
14   video.
15   Q. Was there a spill related to that video?
16   A. No.
17   Q. Was there any incident that somehow harmed the
18   company or the customer?
19   A. Potentially.
20   Q. Any actual harm occur to either the company or
21   the customer?
22   A. I'm unaware.
23   Q. Okay. Now, how is what a tankerman is supposed
24   to do while they're on shift communicate to them; in
25   writing, or is it all verbal?

Page 152

1    A. Both.
2    Q. What part is in writing?
3    A. It would depend. Sometimes captains have a
4    specific watch duty list spelled out for each six-hour
5    watch that they want done every six-hour watch. Other
6    times, it's just verbally communicated to the crews.
7    Q. Does Blessey have any sort of policy or practice
8    on that?
9    A. No, other than the master or the wheelman that's
10   on watch is over the crew of the vessel.
11   Q. Okay. So it's up to that individual to decide
12   whether they want to create a list of duties or not?
13   A. Correct.
14   Q. If they do, Blessey has never had, to your
15   knowledge anyway, any requirement that they mandate they
16   somehow retain that list?
17   A. No.
18   Q. Okay. And have you ever seen such a list
19   yourself?
20   A. Yes.
21   Q. When you were out on the vessel as a tankerman?
22   A. Yes, and as a port captain.
23   Q. What about as being director of operations?
24   A. Yes.
25   Q. What is the case that saw it; at your office, or



**TORRES REPORTING & ASSOCIATES**, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                                June 5, 2012

---

Page 153

1   out on a vessel?
2   A. Out on a vessel.
3   Q. Have any of them come into the office?
4   A. No.
5   Q. And you're employed at the company's
6   headquarters?
7   A. Yes.
8   Q. Okay. I notice that in your analyses you didn't
9   include Freddie McLemore or Eric Jones, and you said you
10  didn't do that as a result of being told by Blessey
11  Marine's counsel not to include them; correct?
12  A. I believe so. What page is that?
13  Q. It's Footnote 1 of Exhibit 3 on page two.
14  A. What number was it?
15  Q. Footnote 1 there.
16  A. Footnote 1.
17  Q. Right there (indicating).
18  A. Okay. Got you.
19      Yeah.
20  Q. Have you ever run any sort of analysis on Eric
21  Jones or Freddie McLemore?
22  A. You know what, I can't recall. I'm not sure if I
23  did or not.
24  Q. Okay. Did anyone tell you why -- and this is
25  before May 29th, 2012 -- why you weren't doing an

Page 154

1   analysis on them?
2   A. If they did, I don't remember.
3   Q. Okay. Now, prior to May 29th, 2012, which is
4   basically last week sometime, were you aware that the
5   percentage -- the numerical percentage of time you claim
6   that these claimants spent on cargo transfers, were you
7   aware that that conclusion might have anything to do
8   with who wins this lawsuit?
9       MR. GRIFFITH:
10          Object to the form.
11      THE WITNESS:
12          Not necessarily.
13  BY MR. OBERTI:
14  Q. What did you think the number was relevant to, if
15  anything, or did you know?
16  A. I mean, I knew what the number was relevant to.
17  Q. Which was?
18  A. But I think there's more factors than just -- you
19  know, the number isn't a win or lose number. I think
20  there's many more aspects to this.
21  Q. Okay. What did you believe that number was
22  relevant to prior to May 29th, 2012?
23  A. It was relevant to the fact that I was asked to
24  do an analysis of the hours spent doing cargo transfers,
25  so, I mean, I knew the relevance of the number.

Page 155

1   Q. Right. And I'm not trying to be tricky here.
2   I'm just saying, do you know whether or not the number
3   you came up with has any relevance to who wins or loses
4   this lawsuit?
5   A. I would assume that it does.
6   Q. Well, that would be right, but do you actually
7   know?
8   A. I'm not involved in a lawsuit. I'm not a lawyer.
9       Are you asking --
10  BY MR. OBERTI:
11  Q. Is that just an assumption, or did someone tell
12  you, "Here's why it's relevant"?
13      MR. GRIFFITH:
14          Are you asking if he knows the legal
15  significance?
16      MR. OBERTI:
17          Yes, the legal significance.
18  BY MR. OBERTI:
19  Q. Did anyone tell you what the legal significance
20  was?
21      MR. GRIFFITH:
22          I'm going to object to the form.
23      THE WITNESS:
24          No, not really.

Page 156

1   BY MR. OBERTI:
2   Q. Okay. Regarding today's deposition, you are
3   partially -- I think I got this right -- partially
4   designated on Item Number 4 as a corporate
5   representative, which has to do with the issue about
6   exclusive contracts.
7       MR. GRIFFITH:
8           Yes.
9       THE WITNESS:
10          Okay.
11  BY MR. OBERTI:
12  Q. If you look at that -
13      MR. OBERTI:
14          And just for the record, Mr. Grenon is
15  looking at the 30(b)(6) notice, and reading Item Number
16  4.
17      THE WITNESS:
18          Sure.
19      MR. GRIFFITH:
20          And also for the record, Mr. Voss was
21  designated yesterday and spoke to some of the billing
22  side and those aspects impacted by topic 4. Mr. Grenon
23  has also been designated to the extent that it's an
24  operations issue related to it.
25  BY MR. OBERTI:

39  (Pages 153 to 156)

---



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                                    June 5, 2012

Page 157

1     Q. I was just curious, what did you know about that?
2     A. Specifically?
3     Q. Yes.
4     A. I mean, what do you mean, what do I know about
5   that?
6     Q. What do you know about any -- well, first of all,
7   does Blessey have exclusive contracts entered into with
8   certain of its customers, anything that you guys refer
9   to as "exclusive contracts" with any of your customers?
10    A. No.
11    Q. Okay.  You sat through Mr. Voss' testimony
12  yesterday --
13    A. Yes.
14    Q. -- where he said those don't exist?
15    A. Yes.
16    Q. Do you agree with that?
17    A. Yes.
18    Q. Are you familiar with the contracts that Blessey
19  enters?
20    A. Somewhat.
21    Q. How so?
22    A. I'm somewhat familiar in that I know that we
23  don't have any exclusive contracts that forbid us from
24  doing business with any other customer.
25    Q. But, I mean, have you actually read all of the

Page 158

1   contracts that Blessey enters?
2     A. No.
3     Q. Who negotiates those contracts?
4     A. Our marketing guys and, specifically, Walter
5   Blessey and Clark Todd.
6     Q. Like how many customers, roughly, does Blessey
7   have?
8         MR. GRIFFITH:
9             I'm going to object to the form.
10            I mean, if you know, you can answer.
11        THE WITNESS:
12            I mean, roughly, 15 customers.
13  BY MR. OBERTI:
14    Q. Okay.  These are typically big companies, like
15  Shell, Exxon Mobil, that sort of thing?
16    A. Typically, but we also deal with some traders.
17    Q. Some traders?
18    A. Yes.
19    Q. Okay.  When you were a tankerman out on a vessel,
20  did you ever have any responsibility for maintaining the
21  captains' logs --
22    A. No.
23    Q. -- either handwritten or typed ones?
24    A. No.
25    Q. Okay.  Were you aware that there was a captain's

Page 159

1   log on your vessel?
2     A. Yes.
3     Q. And who filled it out; the captain himself?
4     A. Either the captain or the wheelman on watch.
5     Q. Okay.  And was there any other sort of records
6   that you were aware of when you were a tankerman out on
7   a vessel for Blessey that were regularly kept in writing
8   by Blessey?
9     A. No.
10    Q. All right.  If you look at Exhibit 1 real quick,
11  have you ever seen this in your life before?
12    A. Yes, I have.
13    Q. When did you first see it, if you remember?
14    A. Yesterday.
15    Q. Did you read the whole thing?
16    A. Yeah.  Yes.
17    Q. Do you know Mr. Tom McWhorter?
18    A. I do.
19    Q. How do you know him?
20    A. In the industry.  I've bumped into him at some
21  industry functions when I worked at Florida Marine
22  Services.
23    Q. Has Blessey ever done business with Mr. McWhorter
24  before or any other company he's associated with?
25    A. Not that I know of.

Page 160

1     Q. Okay.  He says here on page 4 of 23, he says --
2   under Conclusion Number 2, he says -- I guess it's the
3   third sentence, he says, "Simply put, if the barge is
4   not loaded correctly, it could compromise it's
5   seaworthiness condition, at which point it could not
6   service it's intended purposes as a transportation
7   vessel for the cargo"; correct?
8     A. Yes.
9     Q. And I think you agree with that, and that's why
10  you say that even cargo transfers themselves are a
11  seaman's work?
12    A. Yes.
13    Q. And that would be the same logic that you have
14  for why any of the work associated with preparing the
15  barges for loading and unloading would be seaman's work?
16    A. That's correct.
17    Q. Same argument for why any of the duties that we
18  ticked off associated with maintaining the heaters or.
19  doing a barge inspection would also be considered, in
20  your mind, seaman's work?
21        MR. GRIFFITH:
22            Object to the form.
23        THE WITNESS:
24            They all lend to the seaworthiness of
25  the vessel.

40  (Pages 157 to 160)



**TORRES REPORTING & ASSOCIATES,** INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                    June 5, 2012

---

Page 161

BY MR. OBERTI:
1. Q. Okay. Even with the loading and unloading
itself?
2. A. That lends to the seaworthiness of the vessel,
yeah, absolutely.
3. Q. Right. All right. Exhibit Number 2, you signed
off on this report regarding Mr. Coffin on June 30th,
2011; correct? It's on page six.
4. A. Page six?
5. Q. Yes.
6. A. Yes. June 30th, 2011.
7. Q. Do you know when you actually finished your
analysis itself?
8. A. No, I don't.
9. Q. I think you said before you actually came up with
the number, in this case, 13 percent, and then later on,
Mr. Bethune came back to you with the actual declaration
to sign; right?
10. A. Correct.
11. Q. Do you know how much time passed roughly between
you coming up with the percentage and then the
declaration being signed?
12. A. No, I don't.
13. Q. Days, weeks, any idea?
14. A. I have no idea.

*(Numbered lines 1–25)*

1    BY MR. OBERTI:
2        Q. Okay. Even with the loading and unloading
3    itself?
4        A. That lends to the seaworthiness of the vessel,
5    yeah, absolutely.
6        Q. Right. All right. Exhibit Number 2, you signed
7    off on this report regarding Mr. Coffin on June 30th,
8    2011; correct? It's on page six.
9        A. Page six?
10       Q. Yes.
11       A. Yes. June 30th, 2011.
12       Q. Do you know when you actually finished your
13   analysis itself?
14       A. No, I don't.
15       Q. I think you said before you actually came up with
16   the number, in this case, 13 percent, and then later on,
17   Mr. Bethune came back to you with the actual declaration
18   to sign; right?
19       A. Correct.
20       Q. Do you know how much time passed roughly between
21   you coming up with the percentage and then the
22   declaration being signed?
23       A. No, I don't.
24       Q. Days, weeks, any idea?
25       A. I have no idea.

---

Page 162

1        Q. Okay. Now, do you remember the name of the
2    vessel or vessels that you were assigned to when you
3    were a tankerman at Blessey?
4        A. I do.
5        Q. What were they?
6        A. Motor Vessel Laney Blessey, Motor Vessel Laura
7    Anne Blessey, Motor Vessel, Lamar B. Hirsch, and I
8    believe that was it as a tankerman.
9        Q. Is there -- I assume all 62 of the Blessey
10   Vessels have some name associated with them?
11       A. Yes. Every boat has a name.
12       Q. And each name is also the name of an actual human
13   being?
14       A. No, not necessarily.
15       Q. Oh, there are some that are named after something
16   else?
17       A. We have some that are named after dogs.
18       Q. They're all named after living or once living
19   organism?
20       A. I have to think about that, but I believe so.
21       Q. None named after you yet?
22       A. None named after me.
23       Q. But the barges aren't named anything, they're
24   just the WEB and the number or letter?
25       A. Strictly a number or letter designation.

---

Page 163

1        Q. Do you know the areas in America in which Blessey
2    operates?
3        A. Yes, I do.
4        Q. Obviously the Mississippi River; right?
5        A. Yes.
6        Q. And what other tributaries or rivers?
7        A. The Arkansas, the Black Warrior.
8        Q. Black Warrior?
9        A. Yes.
10       Q. Where is that?
11       A. Alabama.
12       Q. Okay.
13       A. The Alabama River, the Tenn-Tom, Tombigbee, the
14   Allegheny, Sam Bernard, Colorado, ICW, the ICW East.
15       Q. What states?
16       A. Texas, Alabama, Arkansas, Oklahoma, Mississippi,
17   Tennessee, Kentucky, Illinois, Indiana, Ohio, West
18   Virginia, Pennsylvania, Minnesota, Wisconsin, Iowa,
19   Florida. I think that's...
20       Q. Nothing in New York or California?
21       A. And Louisiana.
22       Q. I'm sorry. And Louisiana.
23       A. No New York. What was the other question?
24       Q. Nothing in California?
25       A. No.

---

Page 164

1        Q. Nothing up the West Coast?
2        A. Nothing up the West Coast.
3        Q. Do other tow boat companies operate in those
4    areas?
5        A. Yes.
6        Q. Why did you guys decide to focus on especially
7    what appears to be more or less -- what would you call
8    it; the Mississippi?
9        A. Distributaries.
10       Q. That's what you guys focus on?
11       A. Yes.
12       Q. And as I understand it, some of the hauls that
13   y'all do could take like a couple of weeks or more;
14   correct?
15       A. Correct.
16       Q. So a tankerman is on a vessel with barges and not
17   doing any loading or unloading for two weeks or more;
18   correct?
19       A. That's correct.
20       Q. And I'm assuming that would typically be a pretty
21   long haul?
22       A. Yes.
23       Q. For example, somewhere from like Mississippi up
24   to Joliet, Illinois?
25       A. Yes.

---

41 (Pages 161 to 164)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON

June 5, 2012

Page 165

1    Q. But other vessels focus more on shorter hauls?
2    A. It really depends.  It depends on the boat.
3    Q. Well, I guess my question is, does the same
4    vessel typically run the same routes over and over
5    again, or are they mixed up?
6    A. We have some different classifications of
7    vessels.  Normally the boats there are going to run up
8    north are going to be of a bigger horsepower, say, above
9    2000 horsepower.
10   Q. Okay.  Is there anything in the name of the boat
11   that would indicate it's horsepower?
12   A. No.
13   Q. How would you know it's horse power?
14   A. By looking at an equipment list.
15   Q. When you say MV, like MV Laura Ann Blessey, "MV"
16   means motor vessel?
17   A. Yes.
18   Q. What is a motor vessel?
19   A. A motor vessel is a vessel that's propelled by
20   motors.
21   Q. Okay.
22   A. Diesel powered.
23   Q. Are all Blessey's vessels motor vessels?
24   A. Yes.
25   Q. Okay.  So --

Page 166

1    A. As well as our barges, but they're not considered
2    motor vessels, but they're vessels as well.
3    Q. Sure.  Meaning they can navigate within water?
4        MR. GRIFFITH:
5            I'm going to object to the form.
6        THE WITNESS:
7            Yeah.  They have paperwork spelling out
8    what waterways they can run.
9        BY MR. OBERTI:
10   Q. Sure.  But on that point, the only time a vessel,
11   at least intentionally, from Blessey's perspective, is
12   moving down the river is when it's connected to an
13   actual tow boat; true?
14       MR. GRIFFITH:
15           Object to the form.
16       THE WITNESS:
17           Correct.  A barge is moved by a towing
18   vessels.
19       BY MR. OBERTI:
20   Q. You would hope they're never just floating off by
21   themselves?
22   A. You would hope so.
23   Q. That would be a bad thing?
24   A. That wouldn't be a good thing.
25   Q. Does that happen, that they get disconnected from

Page 167

1    their tow?
2    A. It happens.
3    Q. So I guess as a general matter, you're agreeing
4    that Blessey has some typically more high-powered tow
5    boats that operate these long hauls, multi-day,
6    multi-week hauls, then there's other ones that may run
7    from Louisiana to Texas more regularly; right?
8    A. That's right; correct.
9        MR. GRIFFITH:
10           Object to the form.
11       BY MR. OBERTI:
12   Q. Okay.  And you haven't done obviously an analysis
13   of the percentage of time that a worker spends
14   performing what you define as cargo transfers, other
15   than the claimants in this case; right?
16   A. That's correct.
17   Q. Okay.  So as you sit here today under oath, you
18   can't categorically say that any particular tankerman --
19   or that no tankerman at Blessey has ever regularly spent
20   more than 20 percent of their time on what you call
21   cargo transfers; can you?
22       MR. GRIFFITH:
23           Object to the form.
24       THE WITNESS:
25           I can only speak to the guys that I

Page 168

1    looked at.
2    BY MR. OBERTI:
3    Q. Okay.  How long have you been -- you've been the
4    director of operations since 2010?
5    A. Yes.
6    Q. When did you get that job; October?
7    A. I think October.
8    Q. Okay.  And generally speaking, what are the
9    duties and responsibilities of the director of ops at
10   Blessey?
11   A. I oversee the day-to-day operations of all of the
12   vessels and the vessel employees.
13   Q. Okay.
14   A. I oversee the personnel department and the crew
15   changes.
16   Q. Does Reggie Barnes report to you?
17   A. No.
18   Q. When you say you oversee the personnel
19   department, does somebody in there report to you?
20   A. Yes.
21   Q. Who?
22   A. Rick Pumphrey.
23   Q. Humphrey or Pumphrey?
24   A. Pumphrey, with a "P".  He's my personnel
25   manager -- our personnel manager.



**TORRES REPORTING & ASSOCIATES,** INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**

June 5, 2012

Page 169

1    Q. Does Reggie Barnes report to Pumphrey?
2    A. No.
3    Q. Do they have some sort of relationship in an
4    organizational scheme?
5    A. We all do.
6    Q. Right. What's Reggie's relationship to Pumphrey?
7    A. Reggie Barnes is the HR manager.
8    Q. Is he in the personnel department?
9    A. No.
10   Q. Different department?
11   A. Different department.
12   Q. You don't supervise the HR department; do you?
13   A. No.
14   Q. I'm sorry. You're in charge of day-to-day
15   operation of the vessels and their crews, the personnel
16   department, crew changes, what else?
17   A. That's pretty much the gist of it.
18   Q. It's fair to say that as part of your job as
19   director of operations, it's not been regularly
20   something you focus on as -- something you've regularly
21   focused on is not the percentage of time tankermen
22   perform doing any particular duty; right?
23   A. Can you ask that question again?
24   Q. Yes.
25       Blessey and you specifically, as director of

Page 170

1    operations, as part their day-to-day operation of thee
2    business don't regularly focus on the percentage of
3    working time tankermen spend doing any particular duty;
4    correct?
5    A. That's correct.
6    Q. Now, you say here in Exhibit Number 3, paragraph
7    number 4, you say that, "It is Blessey Marine's policy
8    consistent with the logs to maintain accurate captains'
9    logs regarding vessel activity; correct?
10   A. Where is this? Exhibit 3?
11   Q. Paragraph number 4 of Exhibit 3.
12       MR. GRIFFITH:
13           Page 2.
14       THE WITNESS:
15           Read it again. I'm sorry.
16       MR. OBERTI:
17           It's the second sentence.
18       THE WITNESS:
19           Okay. Yes.
20   BY MR. OBERTI:
21   Q. It says, "It is Blessey's Marine's policy
22   consistent with the logs to maintain accurate captains'
23   logs regarding vessel activity"; correct?
24   A. That's correct.
25   Q. Earlier today you testified you know what

Page 171

1    Blessey's policy requires that be on captains' logs;
2    correct?
3    A. Yes.
4    Q. But is it accurate to say you don't know what the
5    law requires?
6    A. No. I know what the law requires. I can't
7    repeat it to you verbatim.
8    Q. Is there anything in addition to what you said
9    Blessey requires?
10   A. No.
11   Q. Is there anything, to your knowledge, that
12   Blessey requires that the law doesn't require?
13   A. No.
14   Q. Do you know what law you're actually referring
15   to?
16   A. No, I couldn't tell you which law it is.
17   Q. So how do you know about this law?
18       MR. GRIFFITH:
19           Object to the form.
20           Are you asking for a citation to the
21   law?
22       MR. OBERTI:
23           No. I'm saying how does he know what
24   the law is?
25   BY MR. OBERTI:

Page 172

1    Q. I mean, how did how did you find out about it?
2    Did somebody tell you?
3    A. I guess I was trained.
4    Q. Why who?
5    A. By the captains that I worked with.
6    Q. Okay. Did they train you what the law was?
7    A. Every time I've been board by the Coast Guard,
8    they did have a problem with the logs that they saw,
9    so...
10   Q. Okay. Then you say in Number 5, "All of the
11   cargo transfers performed by the crews aboard Blessey
12   Marine's vessels are reported in each vessel captain's
13   law"; correct?
14   A. Uh-huh.
15   Q. Yes?
16   A. Yes.
17   Q. "But given the thousands of cargo transfers
18   performed by Blessey annually, it is conceivable that on
19   rare occasions, a cargo transfer for the customer on a
20   dock might not be recorded on a captain's log"; correct?
21   A. It's conceivable.
22   Q. Okay. Then you say, "Based on my analysis of
23   captains' logs in connection with the preparation of the
24   analysis contained in this Supplemental Declaration, I
25   have been unable to identify any instance in which this

43 (Pages 169 to 172)





**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**

June 5, 2012

---

Page 173

1  occurred on a vessel in which a plaintiff was based";
2  correct?
3     A. Correct.
4     Q. To be fair, you didn't even look for that; right?
5  That wasn't part of your job, was to identify or
6  determine whether or not you can identify such a
7  situation; was it?
8        MR. GRIFFITH:
9           Object to the form.
10       THE WITNESS:
11          I could certainly tell by looking at
12  the -- I could tell by looking at the logs. I didn't
13  identify any areas where a transfer could have been done
14  and not been recorded in a log.
15  BY MR. OBERTI:
16     Q. Well, how would you know? Just from the
17  captains' logs you wouldn't know; right? That's the
18  whole point, if it's not on the captains' logs, you
19  wouldn't know; right?
20     A. If it's not on the captains' logs, then it didn't
21  happen.
22     Q. But you say it's conceivable that on rare
23  occasions it could happen and not been captain's log;
24  right? That's what you said; right?
25     A. That's what I said, yes.

---

Page 174

1     Q. I'm not trying to trick you with my question, but
2  as part of your declaration here, Exhibit 3, you didn't
3  make it your mission to go --
4     A. That wasn't my mission, no.
5     Q. You've got to let me finish. I know you know
6  where I'm coming from, just for the court reporter.
7        It wasn't part of your mission to go and
8  investigate and confirm whether or not a cargo transfer
9  ever occurred that wasn't on a captain's log; correct?
10    A. Correct.
11       MR. GRIFFITH:
12          Object to the form.
13  BY MR. OBERTI:
14    Q. Now, when you were you a relief captain?
15    A. 1998, '99.
16    Q. Okay. For how long?
17    A. Eighteen months.
18    Q. All right. And what's your current pay from
19  Blessey?
20    A. I think it's $125,000 a year.
21    Q. You get paid a salary?
22    A. Yes, I do.
23    Q. When was the last time you got a raise?
24    A. April the 1st.
25    Q. Of two-thousand...

---

Page 175

1     A. 2012.
2     Q. Okay. What was the percentage of the raise?
3     A. I don't remember.
4     Q. But what were you making before you were
5  making --
6     A. I don't remember. I make around $125,000 a year.
7     Q. Okay. Did you receive a bonus in 2012?
8     A. Yes, I did.
9     Q. What was the amount of the bonus?
10    A. I think it was $13,000.
11    Q. Is that the same bonus that tankermen are
12  eligible for as well?
13    A. No.
14    Q. What bonus is that that you're eligible for?
15    A. My bonus is depending on what the president and
16  the COO of the company decide to give me.
17    Q. Okay. So it's a discretion-based, merit-based
18  bonus?
19    A. I don't know what they base it on. I'm not privy
20  to that information.
21    Q. Okay. The tankermen, are they eligible for
22  bonuses?
23    A. Yes, they are.
24    Q. What's that based upon?
25    A. It's based upon a number of things. It's based

---

Page 176

1  upon safety of the specific boat that they were assigned
2  to. There's a cost control portion of it, where the
3  boat that they're on, if they stay under budget on
4  certain items, then there's a profit-sharing bonus, and
5  that profit-sharing bonus is basically just based on a
6  discretionary amount that the owner of the company
7  decides to give out.
8        MR. GRIFFITH:
9           And I just want to note for the record,
10  he's not been designated for that topic, so I don't have
11  a problem with him testifying to the best of his
12  knowledge, but I don't want to suggest that he's
13  speaking for them company in case he leaves something
14  out.
15  BY MR. OBERTI:
16    Q. So when you were a tankerman, you received a day
17  rate; correct?
18    A. That's correct.
19    Q. Did you get a per diem, that you recall?
20    A. Not that I remember.
21    Q. Do the tankermen at Blessey now receive a per
22  diem?
23    A. Yes, they do.
24    Q. And is that all rolled into what the company
25  calls the day rate?

---

44  (Pages 173 to 176)



**TORRES REPORTING & ASSOCIATES,** INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                                                 June 5, 2012

| Page 177 | Page 179 |
|---|---|

**Page 177**

1    A. Yes.
2    Q. And do the tankermen have to spend money out of
3  or their own pocket for food while they're on duty?
4    A. Not if they don't want to.
5    Q. Because?
6    A. Because food is provided on the boat.
7    Q. Who pays for the food?
8    A. Blessey Marine.
9    Q. Where do y'all get it?
10    A. Depends on where they're at. We get it from a
11  grocery vendor.
12    Q. Oh, okay. Does somebody from the grocery store
13  come deliver the food?
14    A. It depends. Sometimes they do. Other times, the
15  crew goes to the grocery store and go shopping
16  themselves.
17    Q. Just take a cab?
18    A. Take a cab, take a crew truck, take a driver.
19    Q. Does Blessey have crew trucks at these ports?
20    A. We have a truck that's available for use in
21  Houston.
22    Q. Okay. And obviously the tankermen don't incur
23  any personal expense charge for lodging expenses, while
24  they're on duty at Blessey; do they?
25    A. No.

**Page 178**

1    Q. Their living quarters are provided for them?
2    A. Yes.
3    Q. Okay. Is there anything else that Blessey
4  provides to the tankermen while they're on their hitch,
5  you know, other than food and living quarters, like
6  shampoo, soap, that sort of thing?
7    A. No. That's provided by them.
8    Q. Okay. Do you know whether or not they actually
9  buy that when they're buying groceries?
10    MR. GRIFFITH:
11      Object to the form.
12    THE WITNESS:
13      I don't know.
14  BY MR. OBERTI:
15    Q. Would that be against Blessey's policy if they
16  did?
17    A. They would normally pay for that themselves.
18    Q. But my question is, if the crew went to a dock,
19  decided they were low on food, so they took a cab down
20  to the grocery store, and while they're in the grocery
21  store, they said, "Hey, dude, pick up a tube of
22  toothpaste," would that be a violation of any Blessey
23  written policy?
24    A. I don't know if that's a written policy or not.
25    Q. Do y'all have any policy in writing, to your

**Page 179**

1  knowledge anyway, on permissible expenditures to
2  Blessey?
3    A. Not to my knowledge.
4    Q. Do y'all require the tankermen to turn in any
5  evident of expenses that they've incurred in order to
6  justify the per diem?
7    MR. GRIFFITH:
8      I'm going to lodge another objection,
9  because, again, he's not been designated to speak on
10  this topic. My understanding is that you didn't intend
11  to question any witnesses on this topic. I know you
12  questioned Mr. Voss at length about it yesterday, so
13  Blessey stands by that testimony. Now, if Mr. Grenon
14  knows something personally, speaking on his own behalf,
15  I'm not going to shut down the deposition over that. I
16  just want to be clear that he's not testifying on behalf
17  of the company here. If he knows, he can testify on his
18  own accord.
19    MR. OBERTI:
20      Okay. That's fine.
21  BY MR. OBERTI:
22    Q. I mean, as director of operations, I assume you
23  know these things; right?
24    MR. GRIFFITH:
25      Object to the form.

**Page 180**

1    THE WITNESS:
2      What things?
3  BY MR. OBERTI:
4    Q. Whether or not a tankerman has to turn in
5  receipts or some sort of evidence before they can get
6  paid their per diem.
7    A. Not that I'm aware of.
8    Q. Is the per diem $47 dollars a day?
9    A. I don't know.
10    Q. Do you oversee the payroll department?
11    A. No.
12    Q. Is the payroll department within the personnel
13  department?
14    A. No.
15    Q. Okay. What is a tankerman trainee?
16    A. Tankerman trainee is a guy who's training to
17  become a tankerman.
18    Q. As far as the actual duties associated with
19  transferring cargo, can a tankerman trainee do them?
20    A. He can basically do everything, except sign the
21  DOI, under supervision of a turned-loose tankerman.
22    Q. Okay. All right. Exhibit Number 4, I'm assuming
23  you've never read this affidavit of Keith Coffin before?
24    A. No. I've read it.
25    Q. Okay. When did you read it?

45 (Pages 177 to 180)



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE