**DUSTIN GRENON**

June 5, 2012

Page 181

1    A. I couldn't tell you.
2    Q. All right. Well, it was filed in court on
3 January 27th, 2012; do you see that up at the top?
4    A. Yes.
5    Q. And so did you read it before you -- well,
6 obviously, then, it was filed after you did you
7 declaration on Coffin. You did your declaration on
8 Coffin last June; correct?
9    A. Right.
10    Q. What was the purpose of reading this, if you
11 know?
12    A. I've reviewed it.
13    Q. Okay. You haven't gone back and in any way
14 revised the Exhibit 2 analysis that you finished on June
15 30th, 2011 on Keith Coffin; have you?
16    A. No.
17    Q. Okay. Is there -- you've already talked about
18 the DOI; is there something else called a Certificate of
19 Inspection?
20    A. There is. There's one on each one of our barges.
21    Q. What is that?
22    A. It basically states when the barge was built,
23 where it was built, who owns the barge, where it can
24 operate, to what drafts it can operate. It's renewed
25 every five years.

Page 182

1    Q. Okay. Is there any necessity of signing off on
2 that document when there's a cargo transfer?
3    A. No.
4    Q. And if you go to paragraph 16 of Exhibit 4 --
5    A. Okay.
6    Q. -- and it identifies some of the duties we
7 already talked about there, through little a through
8 little e; do you see that?
9    A. Yes.
10    Q. And then later on in the paragraph, it says,
11 "There are no records that I'm aware of that capture
12 these activities"; do you see that?
13    A. Yes.
14    Q. Is that an accurate statement, to your knowledge?
15    A. Yeah, that's accurate.
16    Q. Same thing on Exhibit 17, he talks about --
17    MR. GRIFFITH:
18      Exhibit 17?
19 BY MR. OBERTI:
20    Q. I'm sorry. Exhibit 4, paragraph 17, he talks
21 about some things he allegedly did, Mr. Coffin does,
22 related to some heater barges; do you see that?
23    A. Yes.
24    Q. He says some of the things we talked about. He
25 claims he checked the pressure gauge for the fuel,

Page 183

1 checked outgoing temperature, checked incoming
2 temperature, checked for leaks, maintained the
3 generator, blah, blah, blah; correct?
4    A. Correct.
5    Q. And in the second to last sentence of the
6 paragraph, he said, "There are no records that I'm aware
7 of that capture these activities and the time I spent
8 doing them"; is that accurate, to your knowledge?
9    A. Yes, that's accurate.
10    Q. Now, I don't know if this is something that
11 Blessey has ever thought about before, but when
12 somebody -- let me just ask you as director of
13 operations, when a tankerman is traveling from their
14 vessel to their house or from their house to the vessel,
15 do y'all consider that working time?
16    MR. GRIFFITH:
17      Object to the form.
18    THE WITNESS:
19      I haven't thought about it.
20 BY MR. OBERTI:
21    Q. Okay. On paragraph 21 of the 4th exhibit, he
22 talks about that he did some work as a shore-based
23 tankerman for BMSO; does -- I think Mr. Voss testified
24 to this. Sounds like you're saying BMSI does not
25 employee or never has employed, to your knowledge,

Page 184

1 tankermen that are permanently shore-based; correct?
2    A. That's correct.
3    Q. But sometimes some tankermen do do some
4 shore-based work on their days off?
5    A. If they elected to.
6    Q. Did you ever do that?
7    A. No.
8    Q. Okay. Have you ever heard the phrase "under the
9 radar" used at Blessey?
10    A. No.
11    Q. Or "ghost ships"?
12    A. No.
13    Q. And during the time you worked on -- well, do you
14 have personal knowledge of anybody doing a cargo
15 transfer at Blessey that wasn't reflected on the
16 electronic captain's log?
17    A. No.
18    Q. Okay. Exhibit 5, have you ever read this
19 affidavit of Dustin Akins before?
20    A. Yes, I have.
21    Q. And do you remember when you read it?
22    A. No, I don't.
23    Q. Okay. Would you have read it before May 29th,
24 2012?
25    A. Possibly.

46 (Pages 181 to 184)



**TORRES REPORTING & ASSOCIATES,** INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

June 5, 2012

Page 185

1  Q. Okay.
2  A. I'm not sure.
3  Q. Well, May 29th, 2012 was --
4  A. Last week.
5  Q. Yes.
6  A. Sure. I can't tell if you if I read it last week
7  or not.
8  Q. Do you remember what the reason was that you were
9  reading this affidavit?
10 A. Because Dustin Akins was involved in a lawsuit
11 suing Blessey Marine Services.
12 Q. Okay. So it wasn't part of your preparation of
13 your declaration?
14       MR. GRIFFITH:
15            Object to the form.
16       THE WITNESS:
17            Not that I'm aware of.
18 BY MR. OBERTI:
19 Q. I think I already asked you what you relied on
20 when you prepared your declarations, Exhibits 2 and 3,
21 and you said, "The only thing I relied on was the
22 captains' logs."
23 A. Yes, that's correct.
24 Q. Okay. But at some point, either before or after
25 May 29th, 2012, you don't remember if you read Exhibit

Page 186

1  4, which was the Coffin affidavit?
2  A. The question was -- right -- have I read the
3  affidavit, and the answer is yes. Exactly what day did
4  I read it, I can't tell you what day that I read it.
5  Q. Right. You can't even tell me if it was
6  definitely before May 29th, 2012 or not; correct?
7  A. That's correct.
8  Q. Same thing with Keith Coffin's affidavit, Exhibit
9  4, you don't know for sure you read it before May 29th,
10 2012 or not?
11 A. That's correct.
12 Q. Okay. And, in fact, in your declarations, you
13 didn't include anything specifically to try to rebut
14 Mr. Coffin's affidavit; did you?
15 A. No.
16 Q. Or Mr. Akins' affidavit?
17 A. No.
18 Q. Or any other affidavits that you've read;
19 correct?
20 A. No. That's correct. All of my analysis was done
21 before reading any of the affidavits.
22 Q. The analysis both in Exhibits 2 and 3?
23 A. Yes.
24 Q. Okay. So you finished your analysis, came up
25 with the numbers on percentage of working time spent on

Page 187

1  cargo transfers for everybody that you did such an
2  analysis on and then subsequent, you read all of these
3  affidavits?
4  A. That's correct.
5  Q. And now that you've read all of the affidavits,
6  do you think you should go back and change any of your
7  analyses or results?
8  A. No.
9  Q. Okay. Affidavit of Cody Duke, Exhibit 6, have
10 you read that before?
11 A. Yes.
12 Q. Okay. And once again, it was after you finished
13 your analysis as reflected in Exhibits 2 and 3?
14 A. That's correct.
15 Q. Exhibit 7, have you read Josh Fox's affidavit
16 before?
17 A. Yes, I have.
18 Q. Once again, you read it after you completed your
19 analysis in Exhibits 2 and 3?
20 A. That's correct.
21 Q. And Exhibit 8, Mason Fulkerson's affidavit, have
22 you read that before?
23 A. Yes, I have.
24 Q. And once again, you read that after you completed
25 your analysis reflected in Exhibits 2 and 3?

Page 188

1  A. That's's correct.
2  Q. And Exhibit 9, affidavit of Zachary Latiolais,
3  have you read that before?
4  A. Yes, I have.
5  Q. And you read it after you completed your analysis
6  as reflected in Exhibits 2 and 3?
7  A. Yes.
8  Q. And Exhibit 10, affidavit of Jose Rangel, have
9  you read that before?
10 A. Yes, I have.
11 Q. And you read it after you completed your analysis
12 set forth in Exhibits 2 and 3?
13 A. Yes.
14 Q. And Exhibit 11, you read the affidavit of Gregory
15 Robinson?
16 A. Yes.
17 Q. After you completed the analysis set forth in
18 Exhibits 2 and 3?
19 A. Yes.
20 Q. And Exhibit 12, affidavit of Jason Villarreal,
21 have you read that before?
22 A. Yes, I have.
23 Q. And you read it after your analysis set forth in
24 Exhibits 2 and 3?
25 A. Yes.



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                    June 5, 2012

Page 189

1  Q.  And how did you get these affidavits?
2  A.  I was given them by Beau -- no.  Actually, I
3  haven't seen these before yesterday.
4  Q.  Okay.
5  A.  I mean, I don't think I've seen these before
6  yesterday.
7  Q.  Okay.  So the affidavits reflected in Exhibits 4
8  through 12, the first time you saw any of them was
9  yesterday?
10  A.  I'm not prepared to say that.  I haven't seen
11  these -- I'm not prepared to say that.  I can't tell you
12  what date I've seen these.
13  Q.  Just can't remember?
14  A.  I can't remember the specific date that I was
15  given these to review.
16  Q.  Okay.  But you do see that -- you're not changing
17  your testimony where you said that you hadn't seen any
18  of these --
19  A.  No --
20  Q.  -- affidavits --
21  A.  -- I'm not.
22  Q.  -- until -- hold on.
23  You haven't seen any of the affidavits reflected
24  in Exhibits 4 through 12 until after you completed the
25  analysis set forth in Exhibits 2 and 3?

Page 190

1  A.  Absolutely, that's correct.
2  Q.  And no one's asked you, I assume, but let me
3  confer with you, to somehow modify or revise or edit the
4  analyses you've provided?
5  A.  That is correct.
6  Q.  Okay.  So whenever you saw the affidavits, do you
7  know what the purpose was of your seeing them?  Was
8  there some purpose or just curiosity or what?
9  A.  Preparation for my deposition.
10  Q.  Okay.  Fair enough.
11  MR. GRIFFITH:
12  Take a break?
13  MR. OBERTI:
14  Yes.  I think I'm almost done.
15  (A recess was taken.)
16  BY MR. OBERTI:
17  Q.  We are back on the record.
18  If you go to Exhibit Number 18, this is a
19  declaration that you signed prior to the Court's ruling
20  on Collective Certification back in April of 2011; do
21  you remember that?
22  A.  Yes.
23  Q.  Okay.  And do you know who typed this one up?
24  A.  No, I don't.
25  Q.  Did you type it up?

Page 191

1  A.  I did not.
2  Q.  How did it get in front of you?
3  A.  It was either e-mailed to me or handed to me in
4  print.
5  Q.  By?
6  A.  Mr. Bethune.
7  Q.  Okay.  Did you make any changes?
8  A.  I don't recall.  I don't remember if I any
9  changes or not.
10  Q.  Okay.  So do you know what the person who typed
11  this up was relying on to draft it in the first place?
12  A.  Yeah.  He was relying on conversations with me.
13  Q.  Mr. Bethune was?
14  A.  Yes.
15  Q.  Okay.  So I assume that it's accurate to say that
16  the declaration here that's attached as Exhibit 18 isn't
17  word-for-word your exact words, but rather Mr. Bethune's
18  typed up interpretation of your words that you reviewed
19  and found to be generally accurate?
20  A.  That's correct.
21  Q.  And you say in paragraph 19 that, "As a
22  consequence of Mr. Coffins' assignment, he most likely
23  has no personal knowledge about the specific day-to-day
24  activities of any other tankerman during the time he was
25  on board the Laura Ann Blessey"; correct?

Page 192

1  A.  Correct.
2  Q.  And likewise, you would say that you have no
3  personal knowledge of specific day-to-day activities of
4  any other tankerman either; right?
5  A.  Not specifically, no.
6  Q.  And you make the point in paragraph 13 that
7  certain liquids could be safely loaded at a quicker rate
8  that other liquids?
9  A.  Yes.
10  Q.  Does that go from unloading, too?
11  A.  No.  They pretty much discharge at the same rate.
12  I mean, there's different factors, I guess, that come
13  into play of discharging, that would be length of the
14  tank from the barge, diameter of the pipeline.
15  Q.  Okay.  When it comes to loading, I'm assuming
16  probably clear chemical versus, like, asphalt, it takes
17  longer?
18  A.  It really depends.  There's a number of factors
19  that come into play.
20  Q.  Any idea what's the longest time of consecutive
21  loading that you ever personally witnessed as a
22  tankerman?
23  A.  Maybe around 24 hours.
24  Q.  What about unloading?
25  A.  Eighteen to 24 hours.

48  (Pages 189 to 192)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                          June 5, 2012

**Page 193**

1    Q. What about the shortest?
2    A. An hour.
3    Q. Are you just pinching something off here or...
4    A. No. I've loaded a barge in an hour before.
5    Q. The whole barge wasn't empty and then full; was
6    it?
7    A. Yes.
8    Q. In an hour?
9    A. In an hour and 10 minutes.
10   Q. Okay. What was the liquid?
11   A. Diesel fuel.
12   Q. So why would it take anywhere from an hour to 24
13   hours to load a barge?
14   A. The dock I was at -- I had a small barge. It was
15   a 10,000-barrel barge, and I was loading at 10,000
16   barrels an hour.
17   Q. So the barges are at different capacities?
18   A. Yes.
19   Q. What's the range at Blessey?
20   A. Ten-thousand barrels to 30,000 barrels.
21   Q. Do you know how many of each?
22   A. Not right offhand.
23   Q. Do you know which size barges were attached to
24   the vessels that the claimants in this case worked on?
25   A. I can certainly review and tell you.

**Page 194**

1    Q. Do you know now?
2    A. No, I don't know offhand.
3    Q. Is it always the same barges attached to the same
4    vessel, or are they -- obviously they're interchangable?
5    A. They're interchangeable.
6    Q. Okay. Depending on whatever the client's need
7    are probably?
8    A. Depending on client's needs, depending on where
9    they are, if a charge barge goes into maintenance.
10   Q. Okay. Paragraph 24, you say, "I am aware of the
11   assertions of Mr. Coffin in this lawsuit about the
12   loading and discharging of cargo on Blessey Marine
13   vessels, and I believe they are not accurate"; correct?
14   A. Correct.
15   Q. What assertions are you talking about, if you can
16   remember now?
17   A. The assertions that he was tanking barges over 20
18   percent of the time.
19   Q. That's the assertion that you believed was not
20   accurate?
21   A. Yes.
22   Q. Okay. And you signed this particular declaration
23   on April 13th, 2011; correct?
24   A. Yes.
25   Q. The affidavit that you signed specifically

**Page 195**

1    regarding your analysis of Mr. Coffin's working time was
2    signed on June 30th, 2011; correct?
3    A. Okay.
4    Q. Exhibit 2.
5    A. Yes. All right.
6    Q. So had you already performed the actual analysis
7    reflected in Exhibits B and C, 2 B and C, as of April
8    11th, 2011?
9    A. No, I don't believe so.
10   Q. Okay. So how did you know whether or not you
11   agreed or disagreed with Mr. Coffin's assertion that he
12   had spent more than 20 percent of his time performing
13   non-seaman's work as of April 13th, 2011?
14        MR. GRIFFITH:
15            Object to the form.
16   BY MR. OBERTI:
17   Q. Do you understand my question?
18   A. I do. I understand it. Because I believe that
19   all tanking duties are seamen's duties.
20   Q. Okay. So that was the intention of what you were
21   saying --
22   A. Yes.
23   Q. -- in paragraph 24?
24   A. Yes.
25   Q. Okay. And you believe all tankermen's job duties

**Page 196**

1    or seamen's duties under the Fair Labor Standards Act;
2    correct?
3        MR. GRIFFITH:
4            Object to the form.
5        THE WITNESS:
6            I'm not familiar with the Fair Labor
7    Standard Act.
8    BY MR. OBERTI:
9    Q. That's kind of my point. You don't even know
10   what seamen's duties are defined as under the Fair
11   Standards Labor Act; do you?
12   A. I do defined under the CFRs.
13   Q. So you do know what the definition of seamen's
14   duties are under the CFRs?
15   A. Under the CFRs, yes.
16   Q. Okay. What the definition?
17   A. I can't recite them verbatim.
18   Q. I think you told me already you thought it was
19   something along the lines of, they perform their work
20   under the immediate direction and supervision of a
21   master of a vessel?
22        MR. GRIFFITH:
23            I'm going to object. I don't think that
24   was his testimony. Whatever it was, it was, but I don't
25   think that is it.

49 (Pages 193 to 196)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON

June 5, 2012

Page 197

1    BY MR. OBERTI:
2    Q. Was that it?
3        MR. GRIFFITH:
4            Object to the form.
5        THE WITNESS:
6            I can't tell you if that's what I said
7    verbatim this morning.
8    BY MR. OBERTI:
9    Q. Okay. What is your definition of seamen's duties
10   other than -- your understanding?
11   A. Sure. I think a seaman's duties, he's
12   responsible for the master of the vessel or he is the
13   master of the vessel, and the duties that he performs
14   are directly related to the transportation -- safe
15   transportation of the vessel.
16   Q. Okay. And then you say even loading and
17   unloading is related to the safe transportation of the
18   vessel because if you do it improperly, the barge itself
19   could sink?
20   A. Absolutely.
21   Q. Okay. And where did you get that understanding
22   of the what a seaman's duties are under the Fair Labor
23   Standards Act?
24   A. I read it.
25   Q. Where did you read it?

Page 198

1    A. I read it in a document that was given to me by
2    Beau.
3    Q. What was the document?
4    A. I don't recall exactly what the document was.
5    Q. It was from the Code of Federal Regulations?
6    A. I believe so.
7    Q. So it wasn't something that your attorneys
8    prepared?
9    A. No.
10   Q. Okay. And did you read anything about how the
11   courts interpreted what the definition of seamen's work
12   is under the Fair Labor Standers Act?
13   A. I did.
14   Q. Okay. Do you remember any of the names the cases
15   the Court recited?
16   A. No, not offhand.
17   Q. Do you know specifically whether or not any court
18   has addressed whether or not loading and unloading of
19   barges is seamen's work?
20   A. No.
21   Q. You don't know?
22   A. Beg pardon?
23   Q. You don't know?
24   A. I don't know.
25   Q. Okay. Exhibit 19, go to page 23.

Page 199

1    A. I'm sorry. Exhibit 23?
2    Q. Exhibit 19, page 23.
3    A. Oh, Exhibit 19. Got you.
4    Q. Okay. There's a sentence in the document that
5    says at the top, "There is a tremendous difference
6    between preparing the barge to receive or unload cargo
7    and the actual loading and unloading of cargo"; correct?
8    A. That's correct.
9    Q. In the context of this analysis that you did in
10   Exhibits 2 and 3, what you claim you counted towards
11   cargo transfer was simply and only the actual loading
12   and unloading of cargo; correct?
13       MR. GRIFFITH:
14           I'm going to object to the form.
15       THE WITNESS:
16           That's correct, because the preparation
17   of the barge could be done by an unlicensed tankerman.
18   BY MR. OBERTI:
19   Q. Okay. Then there's a footnote here on page 23,
20   Footnote 26, it says, "The merits are not relevant to
21   the resolution of this motion, but Blessey Marine notes
22   that every tankerman is Cost Guard certified to be
23   specially trained to ensure that barges remain seaworthy
24   during and after receiving and discharging cargo"; do
25   you see that?

Page 200

1    A. Yes, I do.
2    Q. What special training is that? Is that part of
3    the certification to become a tankerman or some other
4    training?
5    A. That's part of the certification.
6    Q. Do you know are deckhands, is there any
7    certification requirement for deckhands?
8    A. No, there isn't.
9    Q. So can just anybody off the street, assuming
10   they're physically able, be hired as a deckhand?
11   A. Yes.
12   Q. And does Blessey put them through any sort of
13   training?
14   A. Yes, we do.
15   Q. How long is the training to a deckhand?
16   A. Ten to 12 days.
17   Q. And is there anything -- do you know what the
18   training consist of?
19   A. It's broad-based. They go through operations,
20   safety training, line handling, basic terminology of the
21   boat and barges.
22   Q. Are deckhands given any special training to
23   ensure that barges remain seaworthy during and after
24   receiving discharging cargo?
25       MR. GRIFFITH:

50   (Pages 197 to 200)



**TORRES REPORTING & ASSOCIATES,** INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                    June 5, 2012

Page 201

1        I'm sorry. Did you say are deckhands?
2        MR. OBERTI:
3            Yes.
4        THE WITNESS:
5            Any specific training, no.
6    BY MR. OBERTI:
7        Q. Only tankermen are?
8        A. The tankermen are trained in their 40-hour
9    training class.
10       Q. That goes towards their certification?
11       A. That's correct.
12       Q. And it says, "If the tankerman does not perform
13   his job duties, the barges are at risk of becoming
14   unseaworthy due to hogging or sagging, two consequences
15   of improper loading or unloading of cargo";
16   correct?
17       A. Correct.
18       Q. And I'm guessing -- what is hogging?
19       A. Hogging is if you were to load the bow or the
20   stern without putting enough cargo into the center
21   tanks. And sagging would be opposite, if you load the
22   center of the barges loaded with the ends being not
23   loaded.
24       Q. Okay. What are these barges made out of?
25       A. Steel.

Page 202

1        Q. How thick is the steel?
2        A. I don't know.
3        Q. Okay. Well, to your knowledge, has there ever
4    been any barges that hogged or sagged at Blessey?
5        A. Not while owned by Blessey Marine Services, no.
6        Q. What about any of the other companies that you
7    worked at?
8        A. Yes.
9        Q. What happened, hogged or sagged?
10       A. There was a barge -- I don't know if it was
11   hogged or sagged. It was loaded at Linedale Pasadena,
12   and it sank at the dock because it was loaded
13   improperly.
14       Q. Who manufactures Blessey's barges?
15       A. We use a couple different shipyards.
16       Q. Do those shipyards manufacture barges for other
17   companies in the industry as well?
18       A. Yes.
19       Q. Do you know if the barge that you're familiar
20   with that hogged or sagged in Pasadena was manufactured
21   by one of the same companies Blessey gets its barges
22   from?
23       A. I'm not aware of that.
24       Q. Okay. Then you say -- then the footnote goes on
25   the say, "In that vain, the very act of making sure the

Page 203

1    barge and thereby the tug boat remains seaworthy renders
2    Coffin is well within the scope of what a seaman's duty
3    is in FLSA"; right?
4        A. Yes.
5        Q. Which is the same thing you've been saying;
6    correct?
7        A. Yes.
8        Q. Okay. All right. Exhibit Number 20, this letter
9    is dated July 1st, 2011; correct?
10       A. Correct.
11       Q. And you see in the first -- I'm sorry -- second
12   paragraph, "Yesterday, an analysis of all captains' logs
13   regarding the nature of Mr. Coffin's work was completed,
14   and it conclusively established that Mr. Coffin spent no
15   more than 13 percent of his time on cargo transfer
16   work"; correct?
17       A. Correct.
18       Q. And that refers to the declaration attached as
19   Exhibit 2 that you signed on June 30th, 2011; correct?
20       A. Correct.
21       Q. All right. I think I get it now is that you had
22   reached the 13 percent conclusion regarding Mr. Coffin's
23   time spent on cargo transfer before June 30th, you just
24   didn't sign the declaration that day; correct?
25       MR. GRIFFITH:

Page 204

1            Object to the form. I don't think
2    that's what the testimony was.
3    BY MR. OBERTI:
4        Q. Is that what your testimony was?
5        A. I'm not sure.
6        Q. Okay. Well, let's go back to Exhibit 2 real
7    quick.
8        A. Sure.
9        Q. Okay. You signed declaration on June 30th, 2011;
10   right?
11       A. That's correct.
12       Q. But you had already previously drawn the
13   conclusion that Mr. Coffin had spent 13 percent maximum
14   of his work hours doing cargo transfers; right?
15       A. Yes.
16       MR. GRIFFITH:
17           I'm going to object to the form because
18   I don't think that was his testimony earlier.
19   BY MR. OBERTI:
20       Q. That was your testimony; right?
21       MR. GRIFFITH:
22           I think what he testified to earlier --
23   you're talking about the April declaration compared to
24   this; right?
25       MR. OBERTI:



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                              June 5, 2012

Page 205

1    No. No. I'm not comparing the April
2  declaration to this.
3  BY MR. OBERTI:
4    Q. I'm just saying, it's not like on June 30th,
5  that's when you first concluded Mr. Coffin had spent 13
6  percent of his working hours on cargo transfers; right?
7    A. I don't know what day it was.
8    Q. Well, it was obviously before June 30th --
9    A. Yes.
10   Q. -- that some time passed before your conclusion
11 and the draft declaration and Mr. Bethune coming back to
12 you; correct?
13   A. That's correct.
14   Q. But you don't know how much time passed?
15   A. I don't know,
16   Q. All right. If you turn to Exhibit 20 B, which is
17 two pages up, I'm assuming at as director of operations,
18 you saw this letter that went out to -- this is one
19 example of the letter, but it's one of the letters that
20 went out to your current tankermen?
21   A. I was aware of the letter.
22   Q. Back in August 2011?
23   A. Yes.
24   Q. From your outside counsel in this case?
25   A. Yes.

Page 206

1    Q. And it says that, if you go to the third
2  paragraph, it says, "In the future, if the court
3  determines that Blessey Marine must pay tankermen on an
4  hourly basis, Blessey Marine will calculate an hourly
5  rate for you that will be equivalent to what you are
6  being paid now on a day rate. In other words, your
7  future pay will not change much, if at all, based on the
8  lawsuit"; correct?
9    A. Yes.
10   Q. Is that truthful?
11       MR. GRIFFITH:
12          Object to the form.
13 BY MR. OBERTI:
14   Q. A truthful statement?
15   A. I didn't draft the letter.
16   Q. Well, I mean, as director of operations there,
17 are you aware that Blessey has already concluded that if
18 the court finds that tankermen must be paid on an hourly
19 basis, the Blessey Marine plan is to calculate an hourly
20 rate for the tankermen equivalent to what they're being
21 paid now on a day rate?
22   A. That wasn't the scope of my responsibility.
23   Q. So if that plan exists, you dont know about it?
24   A. That's correct.
25   Q. Do you know that in finds with the court, Blessey

Page 207

1  has represented that there could be some sort of adverse
2  financial consequences to the company if the court rules
3  against them? Are you aware that Blessey has made that
4  representation to the court?
5    A. Yeah. That's common knowledge, I would assume.
6    Q. Have y'all done any sort of financial projections
7  to determine what impact a loss in this case would have
8  on the company?
9        MR. GRIFFITH:
10         I'm going to object and ask him not to
11 answer. I don't know if it exists, but to the extent it
12 does, it's likely work product or something prepared in
13 defensive litigation.
14 BY MR. OBERTI:
15   Q. Have you done such a thing separate and apart
16 from counsel or any lawyer telling you to do it?
17       MR. GRIFFITH:
18         I'm comfortable with him answering
19 whether Dustin Grenon has done an analysis of financial
20 impact in this case without direction from counsel. I'm
21 happy for him to answer that question, because I
22 candidly don't know the answer to it.
23       THE WITNESS:
24         No, I have not.
25 BY MR. OBERTI:

Page 208

1    Q. Okay. Has any tankerman or former tankerman at
2  Blessey asked you any questions about the lawsuit?
3    A. No.
4    Q. You would agree with me, obviously, that if you
5  counted -- under your definition of cargo transfer, if
6  you counted from secured -- from barges secured to the
7  dock to unsecured from dock, obviously the percentage
8  that would be considered a cargo transfer time for each
9  claimant could go would go up; correct?
10       MR. GRIFFITH:
11         Object to the form.
12       THE WITNESS:
13         Yes. The percentage would go up.
14 BY MR. OBERTI:
15   Q. And, likewise, if you counted from hose on to
16 hose off, it would go up; correct?
17   A. It would go up.
18   Q. But you don't know how much it would go up
19 because the only analysis you ran is cargo transferring
20 through the hose till cargo stopped transferring through
21 the hose; correct?
22   A. That's correct.
23   Q. Okay. If you go to Exhibit 24, is this something
24 called a Blessey Marine Services, Inc., Barge Readiness
25 Checklist?

52 (Pages 205 to 208)

**TORRES REPORTING & ASSOCIATES**, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                June 5, 2012

---

### Page 209

1   A. Yes, it is.
2   Q. What's the point of this document?
3   A. Primarily it's a guide for the tankermen to
4   ensure that the barge is ready before it gets to dock.
5   Q. Okay. Ready for what; loading or discharging?
6   A. Correct.
7   Q. Okay. And is it required that they fill it out
8   and sign it before landing in dock for loading or
9   unloading?
10   A. It is required.
11   Q. Looks like they sign it and the captain signs it?
12   A. That's correct.
13   Q. I'm sorry if I forgot. What happens to this
14   document later on?
15   A. If it gets done, it gets sent into the office.
16   Q. Okay. Do y'all preserve them in some organized
17   fashion?
18   A. Yes, we do.
19   Q. Do you keep them for some designated time?
20   A. If so, I can't tell you for how long.
21   Q. Okay. And did you make any effort to see if
22   there was Barge Readiness Checklists on any of the
23   vessels that any claimants in this case worked on?
24   A. I did.
25   Q. What did you find?

### Page 210

1   A. There weren't.
2   Q. Any?
3   A. No.
4   Q. None?
5   A. None.
6   Q. But we know that the claimants each did do some
7   cargo transfers as tankermen; correct?
8   A. Yes.
9   Q. And so presumably they filled out the Barge
10   Readiness Checklists because it's required; right?
11   A. You would presume, yes.
12   Q. And so any idea where the Barge Readiness
13   Checklists are?
14   A. No.
15   Q. Okay. And it sounds to me that -- is it fair to
16   say, Blessey doesn't have any organized -- or doesn't
17   have any definitive rule as to where or how long these
18   Barge Readiness Checklists have to be maintained; is
19   that correct?
20   A. I don't know. It's not under my realm of
21   responsibility.
22   Q. Whose realm of responsibility would that be
23   under?
24   A. I believe our Corporate Compliance Department.
25   Q. Who is that headed by?

### Page 211

1   A. Angie Fay.
2   Q. Okay. Did you talk to Angie about trying to find
3   these Barge Readiness Checklists on the claimants?
4   A. I don't believe so.
5   Q. What did you do to try to find them?
6   A. I asked the person that works with Jessie
7   Thompson.
8   Q. And Jessie, I guess, looked around and told you
9   she couldn't fine any?
10   A. Correct.
11   Q. Okay. All right. Exhibit 25, is this an example
12   of a situation where a discharge started apparently at
13   5:50 then was suspended at 7:30 and then was resumed at
14   8:45?
15   A. That's correct.
16   Q. And am I correct in saying that you didn't
17   include as cargo transfer time the time between 7:30 and
18   8:45 because cargo wasn't actually flowing; correct?
19   A. That's correct.
20   Q. Okay. If you go to Exhibit 27, this is your
21   handwriting here, the 5.5?
22   A. Yes.
23   Q. Where do you come up with 5.5 hours from?
24   A. They were loading at midnight.
25   Q. Right.

### Page 212

1   A. And finished loading at 5:35, so I just made a
2   note on the margin there, 5.5 hours.
3   Q. Where does the .5 further down on the page come
4   from?
5   A. I don't know if that's a .5 or a five. I'm
6   assuming that's a .5, just because they took off the
7   hose, because that's all they did after 6:00.
8   Q. Okay. But, I mean, I guess the reason I was
9   questioning that was, is it accurate to say that you
10   didn't symptomatically assign .5 towards cargo transfer
11   for every time they took the hose off; did you?
12   MR. GRIFFITH:
13       Object to the form.
14   THE WITNESS:
15       If that was all that was done on a
16   watch, but they took off the hose -- I'm not sure --
17   these notes on the side are simply notes that I made
18   while doing an analysis. What I did was looked at each
19   one of the watches, I made notations and then I made
20   different lists of the totals and that was used. I
21   didn't go to each one of these pages and re-tally it. I
22   made a watch total for each day.
23   Q. I think if you go to Exhibit 2 B -- I'm sorry --
24   C, you created a something like this for each claimants?
25   A. No. That was just for Coffin.

---



**TORRES REPORTING & ASSOCIATES, INC.**
COURT REPORTING & LITIGATION SERVICES
tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                    June 5, 2012

Page 213

1    Q. Okay.
2        MR. GRIFFITH:
3            You've got his work papers for everybody
4    else.
5        MR. OBERTI:
6            Right.
7        MR. GRIFFITH:
8            And even Coffin, for that matter.
9        MR. OBERTI:
10           Yes.
11   BY MR. OBERTI:
12   Q. All right. I guess what I'm asking is -- and
13   maybe you've already answered it. I think you have.
14   Let me just put it all together here. On a lot of your
15   work papers in the analysis that you created that is
16   dated May 29th of 2012, there's handwritten numbers on
17   the captains' logs; right?
18   A. Yes.
19   Q. And that's your handwriting?
20   A. That's my handwriting, yes.
21   Q. Those numbers don't nec- -- are you saying those
22   numbers don't necessarily correspond to the number that
23   you ultimately put into the analysis for the purposes of
24   crediting them for cargo transfer time.
25   A. The number in the analysis was a combination of

Page 214

1    whatever watches they were on because I separated into
2    six different watches, the front watch and the back
3    watch.
4    Q. But in order to double check your ultimate
5    number, you can't just add up your handwritten numbers
6    on the captain's log because that's not what you did; is
7    that accurate?
8    A. There's some days where I didn't write anything
9    on there.
10   Q. Okay. Even thought there was a cargo transfer,
11   you just looked at it and figured it in?
12   A. There were days where there was a transfer going
13   on a complete 24 hours and there was no need for me to.
14   Q. Okay. I got it. All I'm saying is, it sounds
15   like what you're telling me, we really can't interpret
16   anything from your handwritten notes?
17       MR. GRIFFITH:
18           Just to be clear, you're talking about
19   notes on Exhibit 27? Because there's a separate set of
20   notes for each of those guys that you have.
21   BY MR. OBERTI:
22   Q. Well, I'm talking about notes where you put times
23   on the side of the captain's log, it's not like there's
24   any special significance to those times, you can't add
25   them up and come up with the whole transfer time; can

Page 215

1    you?
2    A. It's strictly a note.
3    Q. Okay. To yourself?
4    A. That's correct.
5    Q. Okay. So Number 28, if you look at where it
6    says, 2015, it says, "Start load, WEB 316"; right?
7    A. 2015, "Start loading WEB 316"; correct.
8    Q. But then later on at 2330, it says, "Hose on WEB
9    318"; correct?
10   A. That's correct.
11   Q. How could the have started to load barge WEB 316
12   without the hose being on first? That's got to be some
13   sort of mistake; right?
14   A. It has to be a clerical error.
15   Q. Okay.
16   A. Because in the next line of -- two lines down or
17   whatever, 2359 says, "Standing by to get the hose on
18   316."
19   Q. Right. And, you know, hey, errors happen;
20   correct?
21   A. They happen.
22   Q. Do you know if you credited time for cargo
23   transfer between 2015 and 2330?
24   A. Between 2015 and 2030?
25   Q. Between 2015 and 2330.

Page 216

1    A. I'm sure that I did. If there was transfer being
2    conducted, then I was crediting time.
3    Q. All right. But you didn't put any number in
4    handwriting off to the side, although that doesn't mean
5    anything; right?
6    A. Just like I said, there wouldn't necessary be a
7    note.
8    Q. How could we double check whether you actually
9    credited that time as cargo transfer or not?
10   A. I guess you could analyze all of the logs that I
11   analyzed.
12   Q. And see if we come up with the same number?
13       MR. GRIFFITH:
14           Just to be clear, are you talking about
15   is there a another way to do it independent of his
16   notes?
17       MR. OBERTI:
18           No. Just period. Are there some others
19   notes that you have that would somehow shed light on
20   that?
21       MR. GRIFFITH:
22           Well, we've produced to you any other
23   notes.
24       MR. OBERTI:
25           We're just asking him. I know you said

54 (Pages 213 to 216)



**TORRES REPORTING & ASSOCIATES,** INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                          June 5, 2012

## Page 217

1   there are, but...
2           MR. GRIFFITH:
3           Well, I gave them to you. I know there
4   are.
5           MR. OBERTI:
6           Okay. Great. What is --
7           MR. GRIFFITH:
8           Well, he doesn't know what it looks
9   like. He didn't review the production before we gave it
10  to you. He doesn't know that you have in your
11  possession his handwritten notes that came from us.
12  That's all I'm trying to convey.
13  BY MR. OBERTI:
14      Q. Are there some handwritten notes that somehow
15  shed some light on this that you created?
16      A. The only other notes that were created were
17  created on a small tablet and I tabulated each watch,
18  front and back watch.
19      Q. Okay. For each claimant?
20      A. That's correct.
21      Q. Okay. What year it was it that you got
22  terminated by Hollywood?
23      A. 1996.
24      Q. And have you ever been convicted of any crime,
25  other than a minor traffic offense?

## Page 218

1       A. No.
2           MR. OBERTI:
3           All right. Well, thank you for your
4   time and attention here today. I very much appreciate
5   it, and I'll pass the witness.
6           MR. GRIFFITH:
7           Let me take a quick break and then
8   I'll -- I do have some questions. Let's take a break.
9           (A recess was taken.)
10  EXAMINATION BY MR. GRIFFITH:
11      Q. Mr. Grenon, I have a few questions to follow up
12  on based on the testimony today so far.
13          Let's talk about duties that were discussed
14  earlier to prepare the barges for loading and unloading
15  as Mr. Oberti characterized it. One of the duties that
16  was mentioned was changing oil filters on barges; do you
17  recall that?
18      A. Yes.
19      Q. Is that something deckhands can do?
20      A. Yes.
21      Q. In your experience, do deckhands or tankermen
22  typically do that?
23      A. Could be either/or, both.
24      Q. Is that something that tankermen are expected to
25  do instead of deckhands on a regular basis?

## Page 219

1       A. No, not necessarily.
2       Q. Changing the oil filters on the boats, as an
3   example, what's the consequence if you don't change the
4   oil filters?
5       A. If you don't change the oil filters on the boat?
6       Q. Correct.
7       A. You could potentially seize an engine.
8       Q. What's the consequence if you don't change the
9   oil filters on a barge?
10      A. You could seize an engine.
11      Q. If you seize an engine on a barge, do you have
12  the ability to transport cargo?
13      A. No, you don't.
14      Q. Oiling grease fittings is something you
15  discussed?
16      A. Yes.
17      Q. Why do you oil grease fittings?
18      A. You oil the grease fittings for different
19  purposes, but the grease fittings on valves, if they're
20  not greased and the valve doesn't spin freely, you could
21  potentially break a valve stem or you couldn't open or
22  close a valve.
23      Q. Do you only oil hinges on valves?
24      A. No.
25      Q. Or there is a --

## Page 220

1       A. There are valves, PTOs, there's grease fittings
2   on the winches, and all of those are necessary to meet
3   the barges together or to get product on or off of the
4   barges to transport the cargo.
5       Q. Is that something that has to happen on every
6   vessel, to your knowledge?
7       A. Yes.
8       Q. Are there any vessels with hinges that do not
9   require grease fittings to be oiled?
10      A. No.
11      Q. Or rather hinges to be oiled?
12      A. No.
13      Q. And are there any hinges or valves that you
14  oil -- I'm not asking that very well. Let me ask it a
15  different way.
16          Who's responsible for oiling grease fittings?
17      A. The captain is ultimately responsible, but he can
18  pass that responsibility on to the deck crew, either the
19  tankermen or deckhands.
20      Q. In your experience, is a tankerman or deckhand
21  that perform that work?
22      A. Could be either/or. They're both qualified to do
23  that work.
24      Q. What about cleaning oil spots and debris; who
25  does that work?

TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                                June 5, 2012

Page 221

1      A.  Everybody on the vessel is qualified for it, the
2  deckhands, tankermen and captain if the boat is standing
3  by.
4      Q.  It's not a tankerman-specific duty?
5      A.  No.
6      Q.  And are you aware of any vessel on the planet
7  that does not require cleaning?
8      A.  No.
9      Q.  It's just the nature of being a vessel?
10     A.  It's the nature of the beast.
11     Q.  General maintenance of the vessel?
12     A.  Yes.
13     Q.  You talked about hatches having to be tool tight?
14     A.  Yes.
15     Q.  Is that something that deckhands or tankermen can
16 do?
17     A.  Either can do.
18     Q.  It's not a tankerman-specific duty?
19     A.  No.
20     Q.  Is that something that has to happen on every
21 vessel, to your knowledge?
22     A.  Yes, it is.
23     Q.  If it doesn't happen, I think you described a
24 scenario that a boat sunk.
25     A.  Yes.

Page 222

1      Q.  But that's an extreme situation; right, but it
2  can happen?
3      A.  Yes, it can happen.
4      Q.  Readiness inspections, we spent a bunch of time
5  on that.  Who performs those, deckhands or tankermen?
6      A.  Both can do it.
7      Q.  So it's not specific for tankermen?
8      A.  No.
9      Q.  And we talked about readiness checklists in this
10 particular case, and I believe you said Blessey policy
11 is that those regular checklists are supposed to be
12 created prior to every transfer; is that right?
13     A.  That's correct.
14     Q.  In your experience, are these readiness
15 checklists performed prior to each transfer?
16     A.  No, they're not.
17     Q.  Are these forms completed before each transfer?
18     A.  No, they're not.  I wish they were.
19     Q.  So the fact that there are no readiness transfer
20 forms filled out for any of the plaintiffs in this case,
21 does that suggest that they did not do them?
22     A.  One would assume.
23     Q.  And I'm sorry if I asked this, but if it does
24 occur, it could be either a deckhand or a tankerman that
25 does it?

Page 223

1      A.  That's correct.
2      Q.  We talked at length about issues related to
3  heater barges, checking pressure gauges, draining water,
4  other duties that are related to the heaters; are those
5  duties performed by tankermen or deckhands?
6      A.  They can be performed by deckhands or tankermen or
7  an engineer.  I've seen some of those performed by an
8  engineer.
9      Q.  So there's nothing about those duties that are
10 specific to tankerman?
11     A.  No.
12     Q.  What happens if the heaters are not maintained?
13     A.  It could be catastrophic.
14     Q.  Describe that, please.
15     A.  So, for instance, the barges are heated with
16 thermal heating fluid, if water happens to get into the
17 lines, once that heater is turned on, that water can
18 expand and become steam.  It could bust a thermal oil
19 line.  If the barge has got asphalt in it and then you
20 introduce water into this barge, if it's trying to
21 expand into a steam and has no place to go, it can spray
22 asphalt out of the tank, the barge can catch on fire.  I
23 mean, there's a number of things that could happen.
24     Q.  If the heaters are not maintained, does the barge
25 maintain its ability to transport cargo?

Page 224

1      A.  No, it does not.  The cargo would solidify in the
2  tank and you wouldn't be able get it in or out of it.
3      Q.  Would you be able to -- if you're not maintaining
4  the heaters and the heaters aren't operating, would you
5  be able to even transport cargo from a to b?
6      A.  No.
7      Q.  The visual inspections that we described that
8  occur related to the heaters, is that a deckhand duty or
9  tankermen duty?
10     A.  Any crew member could perform these duties.
11     Q.  Nothing about it specific to tankermen?
12     A.  No.
13     Q.  And that's all general maintenance of the barge?
14     A.  That's considered general maintenance.
15     Q.  We talked about engine maintenance on the barges
16 as well, and I think we talked about consequences if
17 those are not maintained, that the barge could no longer
18 transport cargo; is that right?
19     A.  That's correct.
20     Q.  You discussed in your earlier testimony that one
21 of the reasons that water is drained from the voids, you
22 said that the barge is loaded in a particular fashion;
23 am I remembering that correctly?
24     A.  You would keep water out of the void for that
25 reason, because you discharge a barge in a particular

56 (Pages 221 to 224)

TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                        June 5, 2012

Page 225

1  fashion.
2      Q. And as the barge is being loaded and discharged,
3  it's moving?
4      A. It's moves in and up out of the -- it moves up or
5  down out of the water.
6      Q. And when all of the cargo is in, the barge has
7  certain drafts at specific points; is that right?
8      A. It's a specific part of the load orders when they
9  go to the boat. It will have a specific draft that they
10 load to depending on the destination of the cargo.
11     Q. And does the draft that the barge have at its
12 different points impact the ability of the captain to
13 navigate that barge in certain waterways?
14     A. Yes.
15     Q. In what way?
16     A. Different ports -- different waterways are
17 maintained at different depths, so you wouldn't be able
18 to get certain drafts into certain ports. It would
19 depend on where the product was going to go.
20     Q. So during the loading process, the reason you pay
21 attention to the drafts is because it impacts the
22 navigation?
23     A. That's correct.
24     Q. And it affects the ability to move the barge at
25 all?

Page 226

1      A. Absolutely.
2      Q. Some of the other duties that were discussed were
3  checking pressure gauges on heater barges, that's
4  maintenance of the heaters that we talked about a little
5  while ago?
6      A. That's maintaining the heater, yes.
7      Q. That's done to make sure the barge can still
8  service and transport the cargo?
9      A. Correct.
10     Q. Is the same true for outgoing and ingoing
11 temperatures as well?
12     A. Yes.
13     Q. Tell me a little bit about the safety
14 considerations of what happens if the barge is not
15 heated prior to the receipt of cargo at a different
16 temperature?
17     A. If we have a cold barge, the barge has not been
18 preheated in any way, and they introduce cargo that can
19 be 300 degrees into that barge, when the hot cargo goes
20 into the barge, it can pop welds and it can twist the
21 barge. What will happen is, is that cargo hits that
22 barge so quickly that -- you know, the barge at such a
23 different degree, that it can twist a barge and then pop
24 welds, and it can ruin a barge.
25     Q. When you say twist a barge, and a barge is the

Page 227

1  size of a football field and made out of steel, what
2  does that mean?
3      A. There's -- all of our barges are double hull
4  barges and they have all sorts of framing into -- below
5  the tanks and on the side of tanks and all of that steel
6  will contract or expand and pop welds and put a visible
7  twist in the barge.
8      Q. Quite literally, the barge, the huge structure,
9  will twist?
10     A. It will twist.
11     Q. Does that impact the ability to move the barge?
12     A. Yes.
13     Q. Does that impact the ability of the captain to
14 navigate the barge in the waterways?
15     A. Yes.
16     Q. Does that impact the ability for the barge to
17 leave the dock?
18     A. Potentially. Even the Coast Guard would have to
19 issue an 835 for us to proceed.
20     Q. So if the heater systems are not maintained, then
21 the Coast Guard may prevent the barge from leaving and
22 transporting?
23     A. Absolutely.
24     Q. We talked about monitoring generator cycles and
25 voltage. If the generators are not operatic correctly,

Page 228

1  what's the consequence of the barge?
2      A. Potentially a fire on the barge.
3      Q. If there's a fire on the barge, can the barge
4  transport cargo?
5      A. No.
6      Q. Draining water on expansion tanks; what's the
7  consequence if you don't drain water on expansion tanks?
8      A. Expansion tank is where the thermal oil is
9  located, and if there's water introduced into the
10 system, you could explode one of the heater's lines. If
11 you've got cargo inside the barge, you could have, you
12 know, an explosion of product come up out of the barge.
13     Q. If that happens, can the barge continue to serve
14 as a means of transportation?
15     A. No.
16     Q. All of these duties we just discussed, checking
17 pressure gauges, monitoring outgoing and ingoing
18 temperatures, maintaining the heater systems,
19 maintaining generator cycles and voltage, draining water
20 in expansion tanks, which of those duties are only
21 performed by tankermen?
22     A. None of these duties.
23     Q. Who else performs these duties?
24     A. Deckhands, and boats that are equipped with
25 engineers and tankermen trainees.



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**

June 5, 2012

---

Page 229

1    Q. In other words, anybody other than a wheelman?
2    A. A wheelman could, too.
3    Q. Tell us a little bit about the general crew make
4  up on a Blessey Marine unit.
5    A. Well, depending on where the boat runs and
6  depending on what size boat there is, a boat will always
7  have typically -- and this is in case -- barring any
8  emergencies -- two wheelman and two tankerman onboard at
9  a minimum. Most of our boats keep a deckhand as well.
10  A deckhand will work the call watch. The wheelman and
11  the tankerman will be -- they will work a square watch,
12  six hours on, six hours off watch. Some of the bigger
13  boats have an engineer on them as well. And boats may
14  also have a steersman on board, and a steersman is a guy
15  training to become a wheelman.
16    Q. Is there any duty that a tankerman has that a
17  deckhand does not also have?
18    A. Yes.
19    Q. What duty?
20    A. Loading and discharging the cargo.
21    Q. Are you talking about the signing of the DOI, or
22  are you talking about the entire loading process?
23    A. Basically just signing the DOI, because a
24  tankerman trainee or a deckhand can do any of the duties
25  on the barge.

Page 230

1    Q. Well, then let's talk about some of these duties
2  during the transfer process that you discussed earlier.
3  You said that while a transfer is taking place,
4  somebody's monitoring the lines for the barge?
5    A. Yes.
6    Q. Who does that, deckhands or tankermen?
7    A. Both.
8    Q. And what's the purpose?
9    A. In ordered to give slack or take slack up. I
10  mean, you could -- if the barge has got too much slack
11  in the lines and it's getting bounced up against the
12  dock, a hole could be knocked in the dock, the dock
13  could get damage to it. If all of the lines broke, the
14  barge could get ripped away from the dock, then you
15  would have a spill.
16    Q. If any of those things happen, could the barge
17  continue to transport cargo?
18    A. No.
19    Q. What about checking the vessel -- I can't read my
20  handwriting. I think it says check vessel tanks.
21    A. Void tanks.
22    Q. Pardon me. Checking void tanks, who does that?
23    A. Both tankermen and deckhands.
24    Q. And if that's not done correctly, could the barge
25  continue to transport cargo?

Page 231

1    A. You do that in order to detect a problem. If the
2  barge happened to be taking on water.
3    Q. And so deckhands and tankermen can do that;
4  right, if I heard you right?
5    A. Yes.
6    Q. Checking drafts, we talked about that a little
7  bit, but that's a deckhand and tankerman duty?
8    A. Yes.
9    Q. Checking for lists?
10    A. The deckhands help out with that as well.
11    Q. In your experience, do the tankermen delegate
12  many desks to deckhands?
13    A. Yes.
14    Q. For what purpose do they do that?
15    A. The deckhands are there to help. A lot of times,
16  the deckhands want to learn the tankerman role itself,
17  so they're out there during a transfer asking questions
18  and lending a hand, basically.
19    Q. Well, in that vain, you're talking about opening
20  and closing valves; do deckhands open and close valves?
21    A. Yes.
22    Q. Do deckhands operate the engines on the barges?
23    A. Yes.
24    Q. Is there anything on the barge that the deckhand
25  doesn't operate?

Page 232

1    A. There isn't anything on the barge that a deckhand
2  cannot operate.
3    Q. So the only thing in the entire process that is
4  specific to the tankermen is just the John Hancock
5  signature on the DOI?
6    A. That's correct.
7    Q. What about monitoring product levels; is that
8  something the deckhands can also do?
9    A. Yes.
10    Q. What about checking hatches for water?
11    A. Yes.
12    Q. Deckhands do that as well?
13    A. Yes.
14    Q. Making sure that you have the proper lighting or
15  the flag?
16    A. Yes.
17    Q. Deckhands can do that?
18    A. Yes.
19    Q. What about ensuring the engines are in good shape
20  and prepared for cargo transfer?
21    A. They can do that, yes.
22    Q. When you say "they," who are we talking about?
23    A. Deckhands and tankermen.
24    Q. Checking oil and oil levels; is that something
25  deckhands can do?

58  (Pages 229 to 232)

**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON

June 5, 2012

## Page 233

1    A. Yes.
2    Q. And that's true on the boat and the barge?
3    A. Yes.
4    Q. What about on the boat; is there something on the
5  boat that a deckhand would do that a tankerman would not
6  do?
7    A. No. Or vice versa.
8    Q. Okay. So a tankermen is doing everything the
9  deckhand is doing, plus he signs the DOI?
10    A. Correct.
11    Q. And that's the only difference?
12    A. Yes.
13    Q. What about the blowback time? We talked about
14  how it was included in some of the calculations, but the
15  process of this blowback, is that something that
16  deckhands can do?
17    A. Yes.
18    Q. In your experience, is that something deckhands
19  do?
20    A. Yes.
21    Q. I may have written this down incorrectly when you
22  testified, so I apologize if I'm asking this again to
23  something you've already testified to. In your
24  experience at Blessey Marine, are your handwritten logs
25  the same or different from what's on the electronic

## Page 234

1  logs?
2    A. The same.
3    Q. If there were any differences at all, can you
4  thing of any examples where that might occur, if there
5  are any?
6    A. No, I can't.
7    Q. In your experience, are you aware of any
8  situation where the handwritten log reflected
9  information that was not in the electronic log?
10    A. No.
11    Q. What about vice versa; anything in the electronic
12  log that's not in the handwritten log?
13    A. No.
14    Q. Tell me a little bit about the use of shore-based
15  tankermen or a third-party tankerman, like through you
16  or otherwise, why do you-all use shore-based tankermen?
17    A. A couple of different reasons. One of the reason
18  may be that the dock -- if we're loading or discharging
19  breasted up or doubled up, side-by-side, the dock or
20  depending on what port we're in or the customer will
21  require a tankerman per barge, so what we'll do is,
22  we'll contract an outside shore tankerman service to do
23  one barge while our two tankerman will rotate on and off
24  and do the other barge. And another instance would be
25  if we have high H2S, they would call out a shore

## Page 235

1  tankerman to do H2S. Sometimes that's a customer
2  requirement. Or anytime we have over 400 parts per
3  million of H2S, we shut the transfer down and shore
4  tankermen are called out to finish the transfer.
5    Q. Let's talk a little bit more about the transfer
6  itself, while the transfer is taking place. Are the
7  tankermen expected to have any knowledge of the drafts
8  to which the barges are to be loaded?
9    A. Yes.
10    Q. And why is that?
11    A. Because that's one of the requirements if you're
12  loading, you know what draft you're supposed to load to.
13  It's going to depend -- it's going to greatly depend on
14  what the barge's destination is.
15    Q. We talked already about how draft can impact the
16  ability of going in and out of certain inland waterways,
17  but we haven't talked about if it has any relevance at
18  all to build a tow; does it?
19    A. It does. If the barges aren't -- for instance,
20  if you're not doing an inner-harbor move, say, if you're
21  doing something 30 minutes away, it really doesn't
22  matter if the barges aren't going to match up perfectly;
23  but if you're going to go for any length over an hour,
24  the barges are going to need to match up, so the draft
25  on the sterns of the barges need to be even and precise

## Page 236

1  in order to build a tow properly.
2    Q. When you say "match up," what do you mean,
3  though?
4    A. Barges -- our barges have pins. They're called
5  pin barges, and when the barges come together, if
6  they're loaded to the same drafts, the pins will catch
7  and make it easier to build the tow and you'll have a
8  stronger unit.
9    Q. What about matching barges to the tow boats; is
10  there any benefit to making sure your drafts are at a
11  certain level in that regard?
12    A. Yes. If the barges aren't loaded level, it can
13  adversely affect the performance of your tow.
14    Q. When you say "performance," what do you mean?
15    A. The ability to be able to push it through the
16  water safely and efficiently.
17    Q. So the actual movement of the barges?
18    A. That's correct.
19    Q. During the loading and the unloading process
20  itself, what happens if a deckhand or a tankermen are
21  not opening and closing the valves?
22    A. We don't know. I mean, you know, if you're not
23  monitoring the cargo levels and not opening or closing
24  the valves and the product may -- you may load one
25  tank -- if you loaded, one you could hog or sag the

59  (Pages 233 to 236)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON

June 5, 2012

---

Page 237

1 barge, you could break a barge in half, you could twist
2 a barge.
3    Q. Tell us a little bit about the structure of the
4 barge itself. I mean, is it just one empty unit, like a
5 bathtub?
6    A. No. Our barges are double hull barges. The
7 easiest way to explain it, it's a barge within a barge,
8 and each one of the tanks are segregated, so you'll
9 have -- the inner-barge structure, it may have four
10 tanks or, like I said, up to 12 tanks, but primarily, it
11 will have eight separate tanks. And the reason for
12 having a double hull is, if there was any kind of
13 penetration, it would flood one void tank, and product
14 wouldn't be released into the environment.
15    Q. And I think everybody in the room has seen
16 Titanic, and as we've seen in Titanic where they talk
17 about the gets into certain compartments, then the whole
18 Titanic will sink; is that the same concept here?
19    A. That's the same concept, yes.
20    Q. And if I go out there and I start to tank a barge
21 and I don't know what I'm doing and I put all of the
22 product in the three tanks at the rear of the barge,
23 what could happen?
24    A. If you put all of the product into the three
25 tanks in the rear, the barge would be -- you know, the

---

Page 238

1 bow of the barge would be up in the air and the stern
2 down in the water, you couldn't take it anywhere.
3    Q. Would it impact the ability of that barge to
4 serve as a means of transporting cargo?
5    A. Yes.
6    Q. Would it prevent it from being able to transport
7 cargo?
8    A. Yes. You would need to discharge back to the
9 dock before you took off from the dock.
10    Q. Could the boat tie up to a barge in that
11 condition and push it anywhere?
12    A. You may be able to push it on the dock, but you
13 wouldn't want to leave port with that.
14    Q. What would happen if you did?
15    A. You could potentially sink it.
16    Q. I think you talked about the boat that sank as a
17 consequence of hatches not being tightened; are you
18 aware of any situations where barges have sunk or
19 otherwise been damaged because of improper loading?
20    A. Yes.
21    Q. Can you tell us some examples that you can
22 recall?
23    A. Yeah. Actually, there's a bunkering company in
24 Houston, Buffalo Marine, they use to load their
25 barges -- they bunker ships primarily, so they would

---

Page 239

1 load separate cargoes in each of their tanks, so
2 depending on what the ship needed, the barges would be
3 heavy on the stern and their bows would be up in the air
4 and they pushed those barges like that for quite some
5 time and they broke two barges in half in the Houston
6 Ship Channel in the mid '90s.
7    Q. And this may seem obvious, but what's the
8 consequences if you break those barges? Do they have
9 the ability to move barges in and out anymore?
10    A. No.
11    Q. Can they transport cargo anymore?
12    A. No.
13    Q. Can those barges serve any purpose at all?
14    A. No.
15    Q. Let's talk about your expert conclusions for a
16 moment, and tell us -- I mean your declarations speak
17 for themselves. I'm not going to ask you to go back
18 over these; but before you signed the declarations, what
19 ended up in it, I want to understand a little bit about
20 that process a bit better. Did you just receive these
21 declarations out of the blue?
22    A. No.
23    Q. Did you have any idea they were coming?
24    A. Yes.
25    Q. Tell us a little bit about what your expectation

---

Page 240

1 was and how they turned from your thoughts onto the
2 paper that you were provided.
3    A. I analyzed each one of the tankermen's hours, I
4 submitted that analysis to Beau and a document was
5 created using my methodology and the analysis that I
6 came up with to put it all in one, basically
7 all-encompassing. I was asked to review it and there
8 were some changes that were made to each one of them, I
9 believe, and once the changes were made, they were
10 resubmitted to me, where I reviewed them again, printed
11 them off and signed off on them.
12    Q. Did you explain to Mr. Bethune what you were
13 doing, the analysis that you were performing?
14    A. Yes.
15    Q. So the contents of the declaration that explains
16 your analysis, is that accurate or inaccurate?
17    A. It's accurate.
18    Q. Let look at. I'm not going to go over all of the
19 assumptions, but let's look at one the exhibits and I'll
20 ask you how that played into your analysis. Let's look
21 at Exhibit 21, captain's log for the Dreama Klaiber. On
22 the second page of Exhibit 21 -- let me know when you've
23 got it.
24    A. Okay.
25    Q. The document is Bates labeled BM 008010, and it's

---

60 (Pages 237 to 240)



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

Page 241

1  also labeled, because these are your work papers, Grenon
2  1152. Based on your review here -- and you can take a
3  minute if you need to -- who performed the cargo
4  transfer on the WEB 246?
5      A. It would appear that a shore tankerman did.
6      Q. Somebody with SGS, if I'm reading that correctly,
7  that boarded at 0300?
8      A. Right. Garian Josh with SGS, which is an outside
9  tankerman service, boarded at 300. 3:05, there's a log
10  entry that states, "Chevron says product has high H2S
11  and that three tankerman are required."
12      Q. And it looks like three shore-based tankermen
13  came on to deal with it; right?
14          MR. OBERTI:
15              I'm going to object, leading.
16  BY MR. GRIFFITH:
17      Q. Well, let me ask it this way: How many tankerman
18  boarded the vessel at 0300?
19      A. Three tankermen with SGS.
20      Q. What barge did the three tankermen tend to?
21      A. 246 T.
22      Q. And when did they start dealing with the 246 T.
23      A. Well, they came on board at 0300, and at 0320,
24  they started loading.
25      Q. When did they finish loading the 246?

Page 242

1      A. 0705.
2      Q. Did they get off at that point?
3      A. I don't show an off time.
4      Q. Well, what's the next activity with any barge?
5      A. They took the hose off of the 246 T and they
6  shifted the 246 T and the 258.
7      Q. And what does it mean when they said, "0740,
8  spotting WEB 258"?
9      A. It means that the WEB 258 is being spotted to get
10  it ready to load.
11      Q. What does the term "spotted" mean, being spotted?
12      A. They would line the pipeline of the barge up with
13  the pipeline or hose or loading arm on the dock.
14      Q. What happened to the 258 after that?
15      A. The hose was put on and they started to load it.
16      Q. And when did the loading end on 258?
17      A. At 12:10 that afternoon.
18      Q. When did the tankermen from SGS get off?
19      A. There's an line entry, "Tankermen off at 12:30."
20      Q. So based on your analysis of this log, is there
21  any possibility that Cody Duke or Josh Fox actually
22  performed any tanking duties on June 6th, 2009?
23      A. No.
24      Q. In your analysis, did Cody Duke or Josh Fox
25  receive credit for tanking duties on June 6th, 2009?

Page 243

1      A. Yes.
2      Q. Which one got credit?
3      A. Both.
4      Q. So both of them got credit for a transfer we know
5  neither one of them handled?
6      A. That's correct.
7      Q. And any of the work that would have lead up to
8  this, whether it's a Barge Readiness Checklist, checking
9  voids or otherwise, I see that there's a deckhand on
10  this particular boat?
11      A. Yes. The Dreama primarily runs with a four-man
12  deck crew.
13      Q. What boat was Keith Coffin primarily assigned to;
14  do you recall?
15      A. The Laura Ann Blessey primarily.
16      Q. What runs was the Laura Ann making during the
17  time that Keith Coffin was assigned to it primarily, if
18  you recall?
19      A. Maybe on the river. I believe they ran up north
20  up to Joliet, which is in the Chicago area.
21      Q. And we heard earlier in your testimony
22  that it's about a two-week run?
23      A. Yes.
24      Q. Assuming the locks are available when you pull up
25  to them?

Page 244

1      A. Yes.
2      Q. So is it possible that Keith Coffin would have
3  spent 20 percent of his time loading and unloading
4  barges while he was on the Laura Ann, even without
5  analyzing captains' logs?
6      A. No.
7      Q. If it takes two weeks to get up there and you do
8  a transfer and two weeks to get back, there's no way you
9  could spend 20 percent of your time doing tanking?
10      A. Correct.
11      Q. In your analysis, the percentage conclusions that
12  you reached -- and it will just probably be easier if I
13  just look at one. Let's look at Exhibit 3. Let's talk
14  about Cody Duke, just as an example, because I have to
15  open up to him. Paragraph 23.
16      A. What page is that on?
17      Q. It's on page 7.
18          Do you see the conclusion for Mr. Duke on page 7,
19  paragraph 23?
20      A. Yes.
21      Q. Is the conclusion that he did spend 13.08 percent
22  of his time tankering barges, or is that the maximum
23  amount of time?
24      A. No. That is the maximum amount of time that
25  could have been spent on the front watch tanking barges.

61 (Pages 241 to 244)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                          June 5, 2012

---

**Page 245**

1    Q. So the question we had earlier where Mr. Oberti
2  spent some time running through the written notations on
3  the captains' logs, and I don't have all of the Cody
4  Duke work papers in front of me, but there are numbers
5  like that on all of those logs; is that fair?
6    A. Yes.
7    Q. And you took those and turned them into the other
8  handwritten notes that were provided; is that right?
9    A. That is correct.
10   Q. As you were doing that, were you rounding numbers
11 up or down?
12   A. I always rounded up.
13   Q. For what reason?
14   A. To give the tankermen the benefit of the doubt.
15   Q. In every instance?
16   A. Every instance.
17   Q. Some of the activities that we talked about
18 earlier during cargo transfers, whether it's filling out
19 paperwork, attending to lines, monitoring different
20 things, in your experience, do dockside personnel ever
21 handle any of those things?
22   A. No.
23   Q. What about attaching hoses?
24   A. Yes, some docks specifically have hose gangs that
25 will come hook up the hose for you.

**Page 246**

1    Q. And so in the logs where it says "hose on," that
2  doesn't mean a Blessey marine tankerman did anything; is
3  that right?
4    A. No, it doesn't indicate.  A shore tankermen could
5  be out there hooking up the hose.  It could be a hose
6  gang.
7    Q. And if there's no hose gang or a shore tankerman,
8  we know a Blessey Marine employee did it, that still
9  doesn't mean a Blessey Marine tankerman did it; right?
10   A. No.
11   Q. It could have been who else?
12   A. It could have been the captain, could have been
13 any of the wheelmen, could have been a deckhand
14 tankermen trainee.
15   Q. Is there anything that a tankerman trainee can do
16 that a deckhand can't do?
17   A. No.
18   Q. So is there any difference at all between a
19 deckhand and a tankerman trainee?
20   A. A pay grade.
21   Q. So they get paid a little bit more?
22   A. Yes.
23   Q. Do they get paid as much as tankerman?
24   A. No.
25   Q. Look at Exhibit 22.  These are one of the

**Page 247**

1  captains' logs from the time that Jose Rangel was on the
2  Charles Clark, and I think you testified in your earlier
3  testimony, or at least asked a question, I can't really
4  recall the answer, and you were asked a question about
5  how could you know if there are transfers not reflected
6  in the captains' logs if they're not in the captains'
7  logs.  And, I guess, my question to you is, looking at
8  this log as an example, is there any particular time
9  period in which the Charles Clark could have left the
10 WEB 161 and WEB 162, gone and picked up other barges,
11 taken them somewhere else, performed a transfer and then
12 come back and picked up the 161 and 162?
13   A. No.  That would be impossible.
14   Q. Why?
15   A. First off, we can never leave red-flagged barge
16 unattended, so you wouldn't leave it unattended at
17 Motiva Port Arthur.  Also, there's no time period --
18 there's no time period where there's a period of time
19 where they weren't shifting barges or loading barges
20 that they could have done it.  And another instance is
21 that in Port Arthur, where Motive Port Arthur is, the
22 closest fleeting area is about three hours away, so
23 there's no other barges there.
24   Q. And let's just set aside this captain's log for a
25 second.  Just as a practical matter, is there any

**Page 248**

1  instance that you're aware as director of operations
2  where a crew might get pulled off of the Charles Clark
3  to go do a job to work for some other boat and it not
4  get reported?
5    A. No.
6    Q. Why is that?
7    A. For revenue purposes, for payroll purposes, if we
8  would pull a man off of a boat, he would be paid under a
9  different boat.
10   Q. And what about practically, what would a Captain
11 Garrett do if you took Jose Rangel and James Vick off
12 the boat?
13   A. There's -- every crew member has duties that
14 are -- that should be done every day.  The captain has
15 got -- he has responsibilities to their port captains in
16 order to maintain the boat and the barges, and if he
17 doesn't have a crew, then he can't maintain his
18 equipment, so, you know, quite frankly, the captain
19 would be raising a stink with the office if we pulled
20 his crew.
21   Q. I'll ask you to flip to Exhibit 5, please.
22 Paragraph 27, which is on page 7, in response to the
23 assertions by Mr. Akins, did you review any captains'
24 logs?
25   A. I did.

62  (Pages 245 to 248)

**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                    June 5, 2012

## Page 249

1   Q. And what did you learn?
2   A. I learned that Dustin Akins wasn't on the David
3   Vitter for a certain period of time. He was actually
4   pulled off of that boat, went to a new boat that was in
5   the shipyard. They were getting ready to depart the
6   shipyard for its maiden voyage. Also, there was an
7   instance here -- I can't remember the exact specifics of
8   it -- where he said he was on one boat and had done some
9   transfers and the boat was actually -- he said the boat
10  was basically in the river, and they were actually in
11  Houston, so the days and the port don't match up.
12  Q. What about his allegations in the third to last
13  sentence about picking up the WEB 190 H on April 29th
14  and taking it to Stolt; did you find anything in your
15  investigation about that?
16  A. I did -- the 190 H was moved around that -- the
17  190 H was moved around that time, and it wasn't to
18  Stolt. It was actually to Chocolate Bayou, and it
19  wasn't -- I think he has it on here that it was the
20  David Vitter, but it was actually the Jack Green. So he
21  was on the Jack Green at the time; but he's off a couple
22  of days, I think, and the electronic logs confirmed that
23  the 190 H was being moved by the Captain Jack Green.
24  Q. When you say the logs, other than the electronic
25  logs, what documents did you review for this

## Page 250

1   investigation?
2   A. Just the electronic logs.
3   Q. So the transfer he's talking about was in the
4   electronic logs?
5   A. Yes.
6   Q. So it's part of your analysis?
7   A. Yes.
8   Q. Did you do any more advanced than calculus to
9   perform your analysis?
10  A. No. Thank goodness.
11  Q. What math skills were required to come up with
12  your percentages?
13  A. Simple addition, multiplication, division.
14  Q. And I know we talked about the fact that you have
15  not performed an analysis exactly like this before, but
16  as part of your regular duties as director of
17  operations, how often do you look at captains' logs?
18  A. Every day.
19  Q. For what purposes do you look at those?
20  A. We look at them for accuracy, we look at them for
21  completeness, we look at them for -- look at the
22  performance of the boat, to make sure that they're
23  performing well, that they're making miles. We'll
24  review the trips that are coming up, the trips that
25  they're on, look at the delivery temperatures, the

## Page 251

1   temperatures of the cargo, pump RPMs and pressures, fuel
2   levels, crew members on board.
3   Q. How often do your tankerman get called back when
4   you're off duty -- or I didn't ask that very well. Let
5   me ask it a different way.
6       In your experience, how often do tankermen that
7   are not on a hitch get called back to perform any type
8   of work as a shore-based tankerman, as Mr. Oberti
9   characterized it?
10  A. At most, once a month.
11  Q. When you say at most, once a month, you're
12  talking about each tankerman gets called back once a
13  month?
14  A. No. We may have one occurrence a month.
15  Q. And that's system-wide?
16  A. Yeah, system-wide. And the way that works, it's
17  basically an incentive for the tankerman, if the wanted
18  to do a transfer on their days off and they live either
19  in or close to a port we frequent, they can call us up
20  and basically, you know, put their name in the hat to be
21  call if there's a transfer, and if they want to do it,
22  then we allow them to do it, and if not, we just call
23  out a shore tankerman.
24  Q. Do you have any barges in Blessey Marine's fleet
25  that are not subject to sinking?

## Page 252

1   A. No.
2   Q. What about any that are not subject to hogging?
3   A. Yeah. Our pressure barges wouldn't be subjected
4   to hogging because there's only one tank.
5   Longitudinally there's just one tank, so it fills up
6   level.
7   Q. I think you said there are six barges?
8   A. Yes.
9   Q. So there are over 100 non-pressure barges?
10  A. Correct.
11  Q. All of the these are subject to hogging or
12  sagging?
13  A. Yes.
14  Q. When Mr. Oberti was asking you questions, he
15  asked you that if you added extra time to the numerator
16  of the fraction, the percentages would go up; do you
17  recall that?
18  A. Yes.
19  Q. And I think you would agreed that if you add
20  extra time, the percentages would go up?
21  A. Correct.
22  Q. What would happen if you were to deduct time from
23  the numerator; would the percentages go down?
24  A. Yes.
25  Q. If we had actually followed around Cody Duke and

63   (Pages 249 to 252)



**Torres Reporting & Associates, inc.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 fax

New Orleans, LA
504.392.4791
504.392.4852 fax

1.866.982.6878 toll free

DUSTIN GRENON                                                    June 5, 2012

Page 253

1  Josh Fox and taken a stopwatch to see when they were
2  actually performing tanking duties and not giving them
3  credit for these days that we know they didn't do it,
4  would those percentages be lower or higher than you your
5  conclusions were?
6      A. They would be lower.
7      Q. How much lower would you speculate?
8      A. Few percent points, single digits probably.
9      Q. We also heard a lot about ghost transfers in some
10 of the other testimony and seen it in some of these --
11 "ghost transfers," I've used that term, and I think
12 "under the radar" are the terms used in here. If you
13 include the allegations about, quote, "under the radar
14 transfers" that these folks talk about, does that give
15 any of these individuals over 20 percent?
16     A. No.
17         MR. GRIFFITH:
18             I don't have anything else.
19         MR. OBERTI:
20             All right. A few follow-up questions,
21 Mr. Grenon.
22         THE WITNESS:
23             Sure.
24 RE-EXAMINATION BY MR. OBERTI:
25     Q. Just so it's clear of what happened, when I

Page 254

1  finished my questioning of you and then we took a break,
2  and during the break -- don't tell me anything you said,
3  but you talked to Mr. Griffith during the break;
4  correct?
5      A. Yes.
6      Q. And then we came back and he asked you a series
7  of questions, naturally. Now, I just want to be clear,
8  you're not retracting the veracity and truthfulness of
9  anything you swore to under oath and under my
10 questioning earlier today; are you?
11     A. No, not at all.
12     Q. Okay. And in regards to Topic Number 2 that you
13 were designated to testify regarding in the notice,
14 which was the day-to-day job duties of the tankerman
15 employed by Blessey --
16     A. Yes.
17     Q. -- that are the plaintiffs in this lawsuit from
18 January 17th, 2009 to present, I think it's accurate to
19 say, but I just want to be clear, that the only thing
20 you did in order to prepare for that testimony is review
21 the captains' logs?
22     A. That's correct.
23     Q. Okay. Now, do all barges at Blessey have
24 engines?
25     A. No.

Page 255

1      Q. Okay. And do you know how many do?
2      A. All of our barges, except six. There are six
3  pressures barges that don't have an engine on them.
4      Q. Okay. And the ones that do have engines, what's
5  the purpose of the engine?
6      A. The engine either runs a pump or runs a
7  generator.
8      Q. Okay.
9      A. Depending on what barge it's on.
10     Q. What's the purpose of the pump if it runs a pump?
11     A. The engine spins a PTO, a power takeoff unit,
12 which spins a pump. It will either be a centrifugal
13 pump or a gear pump.
14     Q. And what's the purpose of a centrifugal or gear
15 pump?
16     A. To discharge product.
17     Q. And then the other thing that an engine might do
18 if not power a pump would be to power a generator?
19     A. Correct.
20     Q. And what's the purpose of a generator on a barge?
21     A. The generator powers the alarm panel system.
22 You'll only find an engine that powers a generator on a
23 black oil barge, and it powers the alarm panel for the
24 heater system and it also powers the fuel pump for the
25 heater system.

Page 256

1      Q. Okay. And so it sounds it me like, is it
2  accurate to say that there's more Blessey barges with
3  pumps on them than generators on them?
4      A. Yes.
5      Q. And the generator, you said, has two things:
6  Number one, it powers the alarm system on the heaters?
7      A. Correct.
8      Q. What's the purpose of the alarm system?
9      A. Okay. On a heater barge, there's an alarm
10 system, and it will alarm if there's low fuel pressure,
11 high fuel pressure. If it's set at a certain
12 temperature, the fire goes out, it will alarm, and
13 there's an audible alarm and a visual alarm on the
14 barge.
15     Q. So is the purpose of the alarm to -- or a
16 purpose, anyway, to ensure that the customer's fuel is
17 always being heated at the proper temperature?
18         MR. GRIFFITH:
19             Object to the form.
20         THE WITNESS:
21             What the alarm will do is, if the boat's
22 underway and -- there's an alarm or visible light, so if
23 the barge -- if the boat is underway and there's nobody
24 out on the barges and the heater goes down, a light will
25 start flashing, and the captain can notify the rest of

64 (Pages 253 to 256)



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                                    June 5, 2012

---

Page 257

1  the crew and they can go out there and troubleshoot the
2  problem.
3  BY MR. OBERTI:
4      Q. The problem would be, if the alarm goes off, that
5  the heater is not heating the product to the proper
6  temperature or at all?
7      A. Something has happened to cause an alarm to go
8  off. It may be still heating, but it may be the fuel
9  pressure is not at the correct level.
10     Q. Okay. It's something to do with the fact that
11  the heater is not treating the product properly?
12     A. Yes.
13     Q. Okay. And then the other thing that an engine
14  might do when it's powering a generator is -- there was
15  two things: One was the alarm system on the heater, and
16  then what was the second thing?
17     A. To run the fuel pump on the heater system.
18     Q. And what's the purpose of a fuel pump on the
19  heater system?
20     A. It pumps diesel fuel through a nozzle, which is
21  ignited and that heats the thermal heater coils that are
22  on a boiler system and it gets pumped throughout the
23  barge.
24     Q. Okay. And the reason that it's important that
25  the barge be heated properly is, once again, to maintain

Page 258

1  the proper temperature of the fuel -- I mean, not the
2  fuel, but proper temperature on the product?
3      MR. GRIFFITH:
4          Object to the form.
5      THE WITNESS:
6          Of the product, yes.
7  BY MR. OBERTI:
8      Q. And Exhibit Number 24, which is the Barge
9  Readiness Checklist we looked at before, I guess, are
10  you saying that -- well, you're kind of speculating that
11  even though Blessey requires that this be done, people
12  blow it off on a regular basis?
13     A. Yes.
14     Q. Okay. And is that speculation, or is it what you
15  did when you were a tankerman?
16     A. That's speculation.
17     Q. Okay. And do you know who actually created this
18  form?
19     A. No, I do not.
20     Q. I guess you didn't?
21     A. I don't know.
22     Q. Okay. Well, is there -- even if people blow it
23  off, is it something that is a checklist that they're
24  supposed to go through, even if not in writing?
25     A. Yes. There's a checklist that they're supposed

Page 259

1  to go through.
2      Q. And it says you're supposed to go through before,
3  it says, "each loading or discharging"?
4      A. That's correct.
5      Q. And it doesn't say that they're supposed to go
6  through it every time a tow boat leaves a dock with a
7  barge; right?
8      A. No. It says "prior to each loading or
9  discharging."
10     Q. Yes. And so from that, would you agree with me
11  that it's reasonable to infer that the items on the
12  checklist are important because they're important to the
13  safe and proper loading or discharging?
14         MR. GRIFFITH:
15             Object to the form.
16         THE WITNESS:
17             That's correct.
18  BY MR. OBERTI:
19     Q. Okay. Now, can a heater barge be navigable with
20  a broken heater?
21         MR. GRIFFITH:
22             Object to the form.
23         THE WITNESS:
24             It depends. It depends. If the barge
25  was going to go to, say, Joliet and we planned on that

Page 260

1  barge and the customer planned on that barge loading
2  asphalt and the heater didn't work, we couldn't send it
3  to Joliet, we couldn't send it to Chicago. We would
4  need to get it repaired before we sent it.
5      Q. You couldn't send it because it wouldn't be
6  capable of carrying the product the customer wanted;
7  correct?
8      A. That's correct.
9      Q. But you could still attach it to the tow boat and
10  run it up to Joliet; right?
11     A. Yes.
12     Q. And do you put anything in a heater barge, other
13  than a product that requires heating?
14     A. Yes. Sometimes the product is a light enough
15  product that it doesn't require to be heated.
16     Q. So it's in heater barge, but you're not actually
17  using the heating functionality of the barge?
18     A. That's correct.
19     Q. All of the parade of horribles that could occur
20  of improper loading or maintenance of a barge that you
21  and Mr. Griffith talked about at length, to our
22  knowledge at Blessey, thank God so far they have not, in
23  fact, occurred; correct?
24     A. No. We have had problems with water getting into
25  the heater systems.

65 (Pages 257 to 260)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON

June 5, 2012

Page 261

1    Q.  Sure.  And what happened there?
2    A.  Asphalt blew out of the tank and got on one of
3    the crew members.
4    Q.  And then what happened?
5    A.  He got sent to the hospital.
6    Q.  Okay.  And were you still able to navigate the
7    tow boat and the barge?
8        MR. GRIFFITH:
9            Object to the form.
10       THE WITNESS:
11           Not until we had the barge fixed.
12   BY MR. OBERTI:
13   Q.  Well, how did you get it to dock to fix it?
14   A.  Coast Guard issues an 835 -- anytime there's
15   an -- I'm not sure if they had to issue an 835 on this,
16   but anytime there's a problem on the barge, whether it's
17   a structural problem or a hole in the barge or water in
18   the tanks, the Coast Guard most of the time will come
19   out and inspect the barge for its seaworthiness and
20   determine whether or not the problem is so bad that they
21   can't move the barge off the dock.  They'll issue what's
22   called an 835, and that's basically a temporary permit
23   to proceed and the only reason it's for is to go and
24   have the barge repaired.
25   Q.  So in the answer you're describing, you're not

Page 262

1    sure if the Coast Guard issued an 835 or not?
2    A.  I don't remember.
3    Q.  If they didn't -- well, do you know if this
4    occurred out in the middle of the river somewhere or on
5    dock?
6    A.  It happened on the dock.
7    Q.  Okay.  So I imagine since it happened on the
8    dock, the barge just stayed on the dock?
9    A.  That would be speculation on my part.
10   Q.  Okay.  For example, you mentioned a broken barge,
11   hypothetical to there -- I think it wasn't a
12   hypothetical.  You said in the 1990s some other company
13   had a broken barge?
14   A.  Yes.
15   Q.  How do you know about that?  Just generally
16   through gossip?
17   A.  Yes.
18   Q.  Do you know how those broken pieces of the barge
19   got back to the dock?
20   A.  No, I don't.
21   Q.  Okay.
22   A.  It sank.
23   Q.  Are they still out there in the river somewhere,
24   in the river bed?
25   A.  I would imagine they salvaged the barge.

Page 263

1    Q.  Okay.  You would agree me that whether a
2    tankerman does it or not, there's a lot of tasks done at
3    Blessey by somebody, could be a tankerman, could be a
4    deckhand, could be somebody else to ensure that
5    Blessey's barges are capable of discharging or loading
6    product properly; correct?
7        MR. GRIFFITH:
8            Object to the form.
9        THE WITNESS:
10           That's correct.
11   BY MR. OBERTI:
12   Q.  Okay.  And in your analysis, you assumed that
13   every single cargo transfer that occurred was done by a
14   tankerman; correct?
15   A.  Correct.  That's correct.
16   Q.  Do you think that's a reasonable assumption, or
17   is that just a crazy assumption?
18   A.  That's a reasonable assumption.
19   Q.  Now, when a tankerman is -- does Blessey ever
20   have multiple tow boats in the same dock?
21   A.  At times, yes.
22   Q.  And do you know, has Blessey ever had a situation
23   where, you know, maybe one vessel is on standby and
24   another vessel needs tankermen, so they share the
25   tankerman, send him over to another vessel; do you know

Page 264

1    if that occurs?
2    A.  Not that I'm aware of.
3    Q.  Is there any rule against it?
4    A.  No.
5    Q.  Now, are tankermen -- when you were a tankerman,
6    were you familiar with captains' logs?
7    A.  Yes.
8    Q.  How so?
9    A.  I knew that they were filled out -- I knew that
10   as a tankerman, I had to take down certain information
11   and relay it to the captain so he could put it in a log
12   book.
13   Q.  Okay.  Had you seen them before, captains' logs?
14   A.  Yes.
15   Q.  Exactly what are you an expert on?
16       MR. GRIFFITH:
17           Object to the form.  I don't think you
18   have to -- I'm not sure that question is capable of
19   answering.
20   BY MR. OBERTI:
21   Q.  Well, I know you're being tendered, as I
22   understand it, in some way as some sort of expert, so
23   I'm trying to understand what your expertise might be.
24       MR. GRIFFITH:
25           We tendered him as an expert.  He didn't

66 (Pages 261 to 264)

TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON                                                              June 5, 2012

Page 265

1  tender himself as an expert.  I can answer the question
2  if you want.
3       MR. OBERTI:
4            No.  I want to know if he knows.
5       MR. GRIFFITH:
6            Are you asking him what the legal impact
7  is of being designated as an expert?
8       MR. OBERTI:
9            No.  I want to know if he knows what his
10  area of purported subject or subjects --
11       MR. GRIFFITH:
12            I think it's expressed in these
13  declarations.
14       MR. OBERTI:
15            Okay.  If it's expressed and he signed
16  the declaration, then he ought to be able to tell me.
17       MR. GRIFFITH:
18            All right.  Let's flip to Exhibit 3 and
19  we'll let him read it for to you.
20       MR. OBERTI:
21            All right.  Whatever you need to do.
22       THE WITNESS:
23            I can read it to you.
24  BY MR. OBERTI:
25       Q.  So you don't know what you're an expert in

Page 266

1  without reading it?
2       MR. GRIFFITH:
3            Objection to the form.
4  BY MR. OBERTI:
5       Q.  Right?
6       A.  (No response).
7       Q.  Right?
8       MR. GRIFFITH:
9            I mean, so the question is, does he know
10  what I have disclosed in the court filings that I've
11  sent to you about what his area of expertise is; is that
12  the question?
13       MR. OBERTI:
14            Well, the question is, what is he a
15  purported expert in for purposes of this case?
16       MR. GRIFFITH:
17            I don't think it's -- I mean, you can
18  ask him if he knows what I have put in the expert
19  disclosure.
20  BY MR. OBERTI:
21       Q.  Do you know what Mr. Griffith put in the expert
22  disclosure in this case alleging you as an expert in?
23       MR. GRIFFITH:
24            It's a document that you haven't seen.
25       THE WITNESS:

Page 267

1            No, I haven't seen it.
2  BY MR. OBERTI:
3       Q.  Do you know what the subject matter is?
4       A.  Yes.
5       Q.  What?
6       A.  The subject matter is...
7       Q.  The percentage of time these fellows spent on
8  cargo transfers?
9       A.  No.  That, in addition to other things.
10       Q.  What else?
11       A.  As to whether or not the tankermen are seamen.
12       Q.  Under the Fair Labor Standards Act?
13       A.  Yes.
14       Q.  Okay.  Anything else?
15       A.  No.
16       Q.  Okay.  As far as somebody's ability to do the
17  same analysis you did regarding what percentage of their
18  working time was spent on cargo transfers, anybody who
19  is familiar with captains' logs can do the same thing
20  you did; right?
21       MR. GRIFFITH:
22            Object it the form.
23       THE WITNESS:
24            Yes.
25  BY MR. OBERTI:

Page 268

1       Q.  And as a matter of fact -- let me ask you this:
2  Did you think that by having a higher percentage of time
3  of each claimant being considered time spent on cargo
4  transfers, that would be better or worse for Blessey
5  Marine, prior to May 29th, 2012?
6       MR. GRIFFITH:
7            Object to the form.
8       THE WITNESS:
9            I didn't care.  I strictly did an
10  analysis.
11  BY MR. OBERTI:
12       Q.  Okay.  Why did you include blowback time as a
13  cargo transfer time in your analysis?
14       A.  When it was logged, I included it.
15       Q.  Why?
16       A.  Because the hose was hooked up.  It was part
17  of -- to me, it's a part of the transfer.  They're still
18  blowing product that is inside of the barge down through
19  the pipeline.
20       Q.  Okay.  But they're not transferring product for a
21  customer; correct?
22       A.  No, but we're still using their dock, so we're
23  still tying up their dock.  We're still tying up their
24  dock.  It's logged, and sometimes it could take a number
25  of hours to complete it, so I included it.

67  (Pages 265 to 268)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

DUSTIN GRENON

June 5, 2012

Page 269

1    Q. Okay. Why did you include the DOI signoff or
2  inspection time in your analysis as cargo transfer time?
3    MR. GRIFFITH:
4       Object to the form.
5    THE WITNESS:
6       Because that's the one thing that a
7  tankerman can do that nobody else can do.
8  BY MR. OBERTI:
9    Q. Okay. And I think we've established that your
10 position is that there's lots of different activities
11 that a deckhand can do or a tankerman can do or even
12 somebody else can do; correct?
13   A. That's correct.
14   Q. So as to the actual reality factually of what
15 actually occurred on any of the claimants' vessels and
16 who did what, all you know is what's based on the
17 captains' logs?
18   A. That's correct.
19   Q. And by your own admission, there's plenty of
20 things that we know get done, but are not reflected in
21 those captains' logs; correct?
22   MR. GRIFFITH:
23       Object to the form.
24   THE WITNESS:
25       Not everything that gets done on the

Page 270

1  boat is reflected in the captains' logs.
2  BY MR. OBERTI:
3    Q. Okay. And has your methodology ever been peer
4  reviewed?
5    A. No.
6    Q. And have you ever given an expert testimony
7  before?
8    A. No, I haven't.
9    Q. Did you even know until today that you were being
10 tendered as an expert in this case?
11   A. Yes.
12   Q. When did you find that out?
13   A. I'm not sure, but I've known for some time.
14   Q. Okay. And once again, the two areas of your
15 expert testimony, to your knowledge anyway, is what
16 percentage of working time the claimants spent on cargo
17 transfers, and, two, whether they're seamen under the
18 Fair Labor Standards Act?
19   A. Right. And I'm an expert in this industry. I've
20 been in the industry for 18 years.
21   Q. Sure. And have y'all ever been sued under the
22 Fair Labor Standards Act before?
23   A. I don't know.
24   Q. And have you ever, even up until today,
25 undertaken any effort yourself to ensure that the

Page 271

1  company is compliant with the Fair Labor Standers Act in
2  any respect?
3    MR. GRIFFITH:
4       Object to the form.
5    THE WITNESS:
6       At times, yes.
7  BY MR. OBERTI:
8    Q. Specific to the tankermen?
9    A. Not that.
10   Q. All right.
11   MR. OBERTI:
12       All right. Thank you. Pass the
13 witnesses.
14 RE-EXAMINATION BY MR. GRIFFITH:
15   Q. Mr. Grenon, how many directors of operations does
16 Blessey Marine have?
17   A. One.
18   Q. And I know we talked a little bit about it
19 earlier, but tell us what your duties are as director of
20 operations.
21   A. I oversee the operations department and the
22 personnel department, primarily. That simplifies things
23 really, but what we do is, on a daily basis, we ensure
24 that the right boats with the right crews are going to
25 the right destinations. If there is a customer

Page 272

1  complaint, we work with the marketing department to work
2  with the crews to ensure that we correct any problem.
3  If there's a situation -- if a boat's underperforming,
4  we try to mentor the crew to get them up to the
5  customer's standards.
6    Q. You said earlier that you review captains' logs
7  on a daily basis?
8    A. Yes.
9    Q. Do you review captains' logs for only a portion
10 of the fleet or all captains' logs?
11   A. All captains' logs.
12   Q. You may not look at a log for every vessel every
13 single day, but you have authority over all of the
14 vessels; is that right?
15   A. Yes.
16   Q. How many port captains does Blessey Marine
17 employ?
18   A. Six.
19   Q. And are there any of the vessels within Blessey
20 Marine's fleet outside the scope of authority of port
21 captains?
22   A. I beg your pardon?
23   Q. Let me ask it a different way: Who reports to
24 the port captains?
25   A. The vessel captains and the vessel crews.

68  (Pages 269 to 272)



TORRES REPORTING & ASSOCIATES, INC.

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

Baton Rouge, LA
225.751.0732
225.752.7308 FAX

New Orleans, LA
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE

**DUSTIN GRENON**                                                            June 5, 2012

---

Page 273

```
1       Q. So approximately, to the extent it can be
2   generalized, how many captains report to port captains,
3   to each one?
4       A. Eight to eleven.
5       Q. And is there any port captain at Blessey Marine
6   that would have the same level of knowledge about the
7   overall operations of Blessey Marine that you have?
8           MR. OBERTI: ]
9               Objection, calls for speculation.
10              You can answer.
11          MR. GRIFFITH:
12              You can answer the question it.
13          THE WITNESS:
14              No, I don't believe so.
15  BY MR. GRIFFITH:
16      Q. Is there any person at Blessey Marine in the
17  operations department that would have as much knowledge
18  as you about the overall operations of Blessey Marine on
19  a day-to-day basis?
20      A. No.
21      Q. Is there any person, to your knowledge, at
22  Blessey Marine that would have as much familiarity with
23  the ongoings on the boats themselves?
24      A. No.
25      Q. Is there any person that would have as much
```

---

Page 274

```
1   expertise or knowledge about what's on the captains'
2   logs?
3       A. No.
4       Q. Is there any tankermen within Blessey Marine that
5   could have the same level of familiarity with the
6   captain's log?
7       A. No.
8       Q. To your knowledge, are any tankermen involved in
9   the preparation of captains' logs?
10      A. No.
11      Q. Are the tankermen supposed to be involved in the
12  preparation of captains' logs?
13      A. No.
14      Q. As part of their normal job duties, do tankermen
15  review, prepare or edit or otherwise input information
16  on captains' logs?
17      A. No.
18          MR. GRIFFITH:
19              I don't have anymore questions.
20          MR. OBERTI:
21              That's it.
22          (Testimony concludes at 4:27 p.m.)
23
24
25
```

---

Page 275

```
1   WITNESS' CERTIFICATE:
2
3           I, Dustin Grenon, read or have had the
4   foregoing testimony read to me and hereby certify that
5   it is a true and correct transcription of my testimony,
6   with the exception of any attached corrections or
7   changes.
8
9
10
11          _____
                    Dustin Grenon
12
13
14  _____ Signed with corrections noted.
15  _____ Signed without corrections noted.
16
17
18  DATE OF DEPOSITION: 6/5/12
19
20
21
22
23
24
25
```

---

Page 276

```
1   STATE OF LOUISIANA:
2           This verification is valid only for a transcript
3   accompanied by my original signature and original blue
4   seal on this page;
5           I, Elicia H. Woodworth, Certified Court Reporter
6   in and for the State of Louisiana, as the officer before
7   whom this testimony was taken, do hereby certify that
8   the witness, to whom oath was administered, after having
9   been duly sworn by me upon authority of R.S. 37:2554 did
10  testify as hereinbefore set forth in the foregoing
11  pages;
12          That this testimony was reported by me in the
13  stenotype reporting method, was prepared and transcribed
14  by me or under my personal direction and supervision,
15  and is a true and correct transcript to the best of my
16  ability and understanding;
17          That I am not related to counsel or to the
18  parties herein, nor am I otherwise interested in the
19  outcome of this matter.
20          Baton Rouge, Louisiana, on this date _____.
21
22
23          _____
            Elicia H. Woodworth, CCR
24          Certificate No. 27014
25
```

---

69 (Pages 273 to 276)



**TORRES REPORTING & ASSOCIATES, INC.**

COURT REPORTING & LITIGATION SERVICES

tra@torresreporting.com
www.torresreporting.com

**Baton Rouge, LA**
225.751.0732
225.752.7308 FAX

**New Orleans, LA**
504.392.4791
504.392.4852 FAX

1.866.982.6878 TOLL FREE